Sylvia L. Thomas - Bar No. 023845
**LAW OFFICE OF SYLVIA L. THOMAS, LLC**
P.O. Box 1584
Tempe, Arizona 85280-1584
480.273.9431 direct
sylvia.thomas@sltlaw.net
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| THE LAW OFFICE OF SYLVIA L. THOMAS, an Arizona limited liability company; SLT BUSINESS ENTERPRISES, an Arizona limited liability company; SYLVIA LYNNE THOMAS, an individual,<br><br>Plaintiffs.<br><br>v.<br><br>STATE OF ARIZONA SUPREME COURT, a subdivision of the State of Arizona; STATE BAR OF ARIZONA, an Arizona non-profit corporation and subdivision of the State of Arizona; ARIZONA STATE UNIVERSITY ex rel ARIZONA BOARD OF REGENTS, a body corporate; POLSINELLI, PC, an Arizona professional corporation; ANTONIO J. AND JANE DOE DOMINGUEZ, husband and wife; NEXO LEGAL, LLC, an Arizona limited liability corporation; COMUNIDAD UNIVERSITARIA DEL GOLFO CENTRO, A.C., a México corporation dba UNIVERSIDAD IBEROAMERICANA PUEBLA; HORIZON RESEARCH PUBLISHING CORPORATION, LTD a California corporation dba HORIZON RESEARCH PUBLISHING, USA; SECRETARÍA DE TURISMO, A.C., a México government entity; CONSEJO NACIONAL DE CIENCIA Y | Case No. _____<br><br>**COMPLAINT FOR:**<br><br>- ANTITRUST VIOLATIONS<br>- CIVIL RIGHTS VIOLATIONS AND VIOLATIONS OF THEIR INTERNATIONAL HUMAN RIGHTS ANALOGUES<br>- VIOLATIONS OF THE UNITED STATES CONSTITUTION AND ITS ARIZONA CONSTITUTION ANALOGUES<br>- VIOLATIONS OF UNITED STATES LAWS AND TREATIES<br><br>**JURY TRIAL DEMANDED** |

TECNOLOGÍA FONDOS MIXTOS, a México government entity; BENEMÉRITA UNIVERSIDAD AUTÓNOMA DE PUEBLA, a México non-profit public entity; INSTITUTO DE CIENCIAS JURÍDICAS DE PUEBLA, A.C., a México corporation; ISAAC AND JANE DOE OSADOLOR OSADEMWIGIE, husband and wife; ADMINISTRACIÓN LOCAL JURÍDICA DE PUEBLA NORTE DE SERVICIO DE ADMINISTRACIÓN TRIBUTARIA, the México federal government revenue service bureau; PROCURADURÍA DE LA DEFENSA DEL CONTRIBUYENTE, a México federal government non-profit public agency, TRIBUNAL FEDERAL DEL JUSTICIA FISCAL Y ADMINISTRATIVA, a México federal government entity; SECRETARÍA DE GOBERNACIÓN INSTITUTO NACIONAL DE MIGRACIÓN, a México federal government agency; DELEGACIÓN PROCURADURÍA FEDERAL DEL CONSUMIDOR DE PUEBLA, a México federal government consumer protection agency; HONORABLE TRIBUNAL SUPERIOR DE JUSTICIA DEL ESTADO DE PUEBLA, a México government entity; CINEYMAS MAGAZINE, S.A. DE C.V., a México corporation; COMERCIALIZADORA RALE, S.A. DE C.V., a México corporation dba MI VIEJO CAFÉ; INTERNAL REVENUE SERVICE, a bureau of the United States department of treasury; NAVIENT CORPORATION, a Delaware corporation dba NAVIENT SOLUTIONS, INC.; SUNTRUST BANKS, INC., a Georgia corporation;

PENNSYLVANIA HIGHER EDUCATION

ASSISTANCE AGENCY, a state agency of the Common-wealth of Pennsylvania dba AMERICAN EDUCATION SERVICES dba FEDLOAN SERVICING; ANTONIO AND JANE DOE DOMINGUEZ, husband and wife; DOMINGUEZ LAW FIRM, PC, an Arizona professional corporation, MARK and ELAINA WEST, husband and wife; THOMAS E. AND JANE DOE CARMODY, husband and wife; THOMAS E. CARMODY dba TOM CARMODY COMPANY, an Arizona business; BRIAN R. AND JANE DOE BOOKER, husband and wife; QUARLES & BRADY, LLP, an Arizona limited liability partnership; BOWMAN & BROOKE, LLP, an Arizona limited liability partnership; GORDAN & REES, LLP, an Arizona limited liability partnership; BOOKER T. AND JANE DOE EVANS, JR., husband and wife; GREENBERG TRAURIG, LLP, an Arizona limited liability partnership; BALLARD SPAHR, LLP, an Arizona limited liability partnership; MICHAEL R. AND JANE DOE ROSS husband and wife; GALLAGHER & KENNEDY, PA, an Arizona professional association; LARRY J. AND JANE DOE COHEN husband and wife; COHEN LAW FIRM, an Arizona corporation; JAMES M. AND JANE DOE LAGANKE, husband and wife; JAMES M. LAGANKE, PLLC, an Arizona professional limited liability company, KWAME T. AND JANE DOE MUMINA, husband and wife; GREEN JOHNSON MUMINA D'ANTONIO, an Oklahoma corporation; WILLIAM H. AND JANE DOE DOYLE husband and wife; THE DOYLE FIRM, PC, an Arizona professional corporation; JUDITH A. AND JOHN DOE BERMAN

husband and wife, JUDITH A BERMAN, PLLC, an Arizona professional limited liability company;  LORI V. AND JOHN DOE BERKE, husband and wife; BERKE LAW FIRM, PLLC, an Arizona professional limited liability company; MARK A. AND JANE DOE KIRKORSKY husband and wife; MARK A. KIRKORSKY, PC, an Arizona professional corporation; MARICOPA COUNTY JUSTICE COURTS ex rel MARICOPA COUNTY BOARD OF SUPERVISORS; MARICOPA COUNTY SUPERIOR COURT, a subdivision of the state of Arizona; JAMES R. AND JANE DOE NEARHOOD, husband and wife; NEARHOOD LAW OFFICES, PLLC, an Arizona professional limited liability company; JOE AND JANE DOE PADILLA, husband and wife; RICHARD L. AND JANE DOE RIGHI, husband and wife; RIGHI FITCH LAW GROUP, PLLC, an Arizona professional limited liability company; TRACY AND JOHN DOE TODARO, wife and husband; ARIZONA HOMESTAY GROUP, LLC, an Arizona limited liability company; ROBERT AND JANE DOE BLACKSTAD, husband and wife; BRANDON AND JANE DOE HRABE, husband and wife; BLACKSTAD HRABE & KIRKORSKY, LLC, an Arizona limited liability company; DOES NOS. 1-12 fictitious identities not yet known; CORPORATIONS NOS. 1-10 fictitious true identities not yet known,

Defendants.

Plaintiffs the Law Office of Sylvia L. Thomas, LLC (SLTLAW), SLT Business Enterprises, LLC (SLTBE) and Sylvia Lynne Thomas, through undersigned counsel, file this Complaint and allege as follows:

4

### NATURE OF THE ACTION

1.      This an action to obtain injunctive relief and recover monetary damages arising from the Defendants' antitrust conspiracy to restrain the North American Free Trade Agreement (NAFTA) by eradication of the Plaintiff as an interdisciplinary niche market competitor, and thereby eliminate the niche market competition in general where,

(1)      The Defendants, via the institution of a nontariff trade barrier to the Plaintiff's entry into the interdisciplinary practice of business law, involving the unlawful application of Logotherapy theories against the Plaintiff designed to place the Plaintiff in a psychological, physiological and spiritual tri-level depressed state for the purpose of refocusing the Plaintiff's life purpose towards marriage, family, child-rearing, gratuitous pro bono or other volunteer community service, and employment or a supervised business partnership through all of which, the Defendants could control the Plaintiff, usurp innovation and ownership of the Plaintiff's SLTLAW/SLTBE Project℠ components and reap financial rewards.

(2)      Through orchestrated acts and omissions, Defendants applied Logotherapy theories against the Plaintiff not limited to the unlawful (1) employment of identity politics; (2) dissemination of the Plaintiff's confidential mandatory Arizona Supreme Court character and fitness disclosures; (3) impermissible use and distribution of the Plaintiff's consumer credit report; (4) exploitation of the Plaintiff's judgment in full discharge of bankruptcy debt; (5) manipulation over the outcome of the Plaintiff's client matters including attempted entrapment of the Plaintiff in ethical misconduct; (6) influence over third-party legal counsel effectively barring the Plaintiff from effective

impartial co-representation, case co-management, expert consultation and mentoring colleague guidance; (7) assessment of monetary and otherwise economic sanctions against the Plaintiff, including the interim suspension of the Plaintiff's license to practice law in Arizona and subsequent reinstatement with admonition followed by an ambiguous post-notice of appeal errata notification targeted to vilify the Plaintiff's professional reputation; (8) distribution of false and misleading distrust propaganda about the Plaintiff and the Plaintiff's trade services; (9) misrepresentation of the Plaintiff's associations; (10) ouster of the Plaintiff, removal of the Plaintiff's personal and business property, including theft of the Project Car, from the Project House; (11) investigation of the Plaintiff's personal activities and business operations by telephonic, computer, audio and video electronic monitoring and otherwise invasive intrusion of the Plaintiff's privacy and home life; (12) satirical parodies of the Defendants' manipulation over the Plaintiff's case outcomes; (13) institution of a sham attorney disciplinary proceeding against the Plaintiff's lawful dissemination of a litigation preservation notice, which posed no harm to the administration of justice or the competency, ethics and professionalism of lawyers practicing in México, the United States and this District and likewise presented no danger to others; and, (14) fraudulent entrapment of the Plaintiff's family, friends clients, peers and colleagues in application of such Logotherapy theories designed to torture the Plaintiff into submission (collectively "conspiracy conduct").

(3)     The Defendants' conspiracy conduct was targeted to foreclose the Plaintiff from meaningful access to impartial adjudicatory tribunals and to conceal their use of fraud, deliberately discriminatory, false or misleading characterizations, statements, and

representations of the Plaintiff within the congressionally regulated commerce. The Defendants bolstered representations in order to create, pass and/or enforce unethical, immoral, incapacity and incompetency opinions and related legislation likewise aimed to adversely impact the Plaintiff's trade reputation. The Defendants sought to obstruct the Plaintiff's ability to make an income while disproportionately incurring debt in order to facilitate the debt peonage of the Plaintiff. The Defendants ultimate aim was to thwart the Plaintiff's economic trade operations as an African-American, single, female, NAFTA authorized independent interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor, through the infringement, supplant, acquisition, or otherwise unlawful transfer of the SLTLAW/SLTBE Project℠ or components thereof.

2.      The Defendants' conspiracy conduct was targeted to effect treatment less favorable than is accorded in similar circumstances to male, married and/or Mexican national private sector service providers, by application of a standards-related measure with the force of creating an unnecessary, inopportune, erratic and discriminatory obstacle to trade, which constitutes a disguised restriction on the cross-border provision of trade services and products that is designed to adversely impact the Plaintiff's trade reputation, eliminate the Plaintiff as a niche interdisciplinary market competitor, and thereby eliminate niche market competition in general.

3.      Plaintiff, an African-American, single, female United States national and first generation Attorney possessing a jointly conferred Juris Doctor/Masters of Business Administration, a Bachelor of Arts in Interdisciplinary Studies, mandatory membership in the State Bar of Arizona and respective admissions to practice in the Arizona Supreme

Court, the United States District Court for the District of Arizona and the United States Ninth Circuit Court of Appeals, identified a niche interdisciplinary trade market within the NAFTA international professional business investor trade framework and brought innovative economic trade services and service products to the niche market in the form of a holistic interdisciplinary law, business, communication design and entrepreneurial Project devised to:

(1)     Celebrate and promote the inherent influence and governing role of the law in interdisciplinary careers.

(2)     Build interdisciplinary law, business, communication, research, university academic, industry professional, expert and philanthropic collaborative partnerships.

(3)     Spread tourism culture, fostered with a view to reinvigorate and increase the efficiency of the institution of international university interdisciplinary academic exchange and its relevance to the global labor and entrepreneurial franchise markets.

(4)      Promote economic growth and improve societal relations through the engagement of interdisciplinary female leadership.

4.     Plaintiff conducts, produces and manages interdisciplinary continuing education seminars as accredited business law academic international fundraisers designed, in part, to finance the Plaintiff's provision of degree and licensing scholarships and collaborative performance of interdisciplinary practical training functions, which in consideration of profitable internship production, provides paid intern professional experience inroads to practical training provider employment and low overhead global entrepreneurial

cooperative mini-franchise operations via the SLTLAW/SLTBE Project℠ FireBaby Breads™ Catering & International Academic Exchange University Housing component.

5.     To position themselves as the lead multidisciplinary trade competitor(s) and the North American global higher education innovators providing a centralized system for the delivery of continuing legal education programming, professional legal training and employment inroads, the Defendants sought to control the Plaintiff's stake in the NAFTA authorized business law interdisciplinary continuing education seminar and practical training international trade. To that end, the Defendants perpetrated a series of continuing and deliberate antitrust violative acts and omissions within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries) in attempt to monopolize the niche market and attempted facilitation of such monopolized replication on a global scale.

6.     Under the pretext of safeguarding ethics in "advocacy, transactions with persons other than clients and to the maintaining of the integrity of the profession, and service and protection of the public with respect to the provision of legal services and access to justice", the Defendants conspired to impair, delay and/or prevent the Plaintiff from becoming and/or successfully operating as the first African-American, single, female, United States national with dual residency, and dual licensed NAFTA authorized economic trade operations as an independent interdisciplinary business law attorney, communication strategist and entrepreneurial franchisor within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries).

7.     The Defendants thus brought about prohibited reprehensible effects within the United States and therefore are within the jurisdiction of the United States courts and may be punished for their offenses against the Plaintiffs and their trade reputation in violation of Antitrust, RICO, FCRA, Landham, RFRA and Civil Rights Acts, the United States Constitution, the Laws of the United States, and Treaties, and their International Human Rights and Arizona Constitution analogues.

## JURISDICTION AND VENUE

8.     Original Federal Question Jurisdiction (arising under the United States Constitution, the laws of the United States and treaties) and Subject Matter Jurisdiction (arising under an Act of Congress relating to antitrust and unfair competition), Supplemental Jurisdiction (state law claims forming part of the same case and controversy) and Specific Personal Jurisdiction (conspiracy conduct reasonably expected to lead to consequences within the United States) are proper:

(1)     Plaintiffs bring this action, in part, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 25 and 26, to obtain injunction relief and recover damages, including treble damages, costs of suit and reasonable attorneys' fees, against Defendants for antitrust injuries and damages sustained by Plaintiff as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a, and Sections 73 and 74 of the Wilson Tariff Act, 15 U.S.C. §§ 8-9, alleged herein.

(2)     Plaintiffs also bring this action, in part, pursuant to 28 USC § 1331, 15 U.S.C. § 1116, 42 U.S.C. §§ 1983, 1988 and 2000d,  Article III, Section 2, Article VI,

Clause 2 and the First, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, Thirteenth and Fourteenth Amendments of the United States Constitution, to obtain declaratory, injunctive and other appropriate relief and recover damages, including treble damages, costs of suit and reasonable attorneys' fees against Defendants for antitrust injuries and damages sustained by Plaintiff as a result of Defendants' violations of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), 15 U.S.C. §§ 1681 b(f) and 1681w of the Fair Credit Reporting Act (FCRA), Articles 25 and 26 of the United States-México Income Tax Convention, 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1592, 1593A, 1594, 1595, 1952, 1961, 1962 of the Racketeering Influenced and Corrupt Organizations Act (RICO), Articles 904(3)-(4), 1202-1205, 1210, 1501-1502 and 1601-1602 of the North American Free Trade Agreement (NAFTA), 19 U.S.C. §§ 3301, 3311 et. seq. and violations of Article 1 of the Convention Concerning the Abolition of Forced Labor (CCAFL), Articles 2(b) and 5 of the Convention to Suppress the Slave Trade and Slavery (CSSTS), Section I, Article I of the CSSTS Supplement, Articles 2, 4-5, 13-14 and 16 of the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment (CAT), Articles 2, 3, 5, 8, 11(c) and 16 of the Convention for the Elimination of All Forms of Discrimination Against Women (CEDAW), Articles 1-5, 8, 10-11, 14 and 16 of the Convention for the Elimination of all Forms of Racial Discrimination (CERD), Articles 1-3, 7-8, 17-20, 23 and 26 of the Convention on Civil and Political Rights (CCPR), Articles 1-3, 6, 10 and 15 of the Convention on Economic, Social and Cultural Rights (CESCR), Article 1 of the Convention on Consent to Marriage (CCM) and Principle 1 of

the Recommendation on CCM, and 42 U.S.C. § 200bb-1(a) and (b) of the Religious Freedom Restoration Act (RFRA),  as alleged herein.

(3)     Plaintiffs also bring this action, in part, pursuant to 28 U.S.C. § 1367 to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, against Defendants for antitrust injuries and damages sustained by Plaintiff as a result of Defendants' overt acts of breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation or concealment, negligent misrepresentation, intentional interference with a contract, intentional interference with a business expectancy and prospective economic advantage, aiding and abetting (and upon information and belief, criminal impersonation) in furtherance of the federal antitrust conspiracy -- all orchestrated in flagrant violation of the Arizona Uniform State Antitrust Act, Ariz.Rev.Stat. §§ 44-1402, 44-1403 and 44-1408(B), as alleged herein. Plaintiffs' state law claims, which form part of the same case and controversy, are neither novel, nor complex or predominant.

(4)     Specific Personal Jurisdiction exists over the Defendants and their respective individual directors and officers, pursuant to the Conspiracy Doctrine, Section 12 of the Clayton Act, 15 U.S.C. § 22 and the Arizona Long-Arm Statute, Ariz.R.Civ.P., Rule 4.2. As alleged herein, Defendants conspired to eliminate Plaintiff as a competitor within the niche market and to eliminate the niche competition in general in perpetration of a disguised restriction against the NAFTA international professional business investor trade framework via institution of nontariff barriers, which Defendants reasonably expected to lead to consequences in this District. Each Defendant committed overt acts in

furtherance of the conspiracy. The acts of the Defendants violated the United States federal antitrust and false advertising/association laws, the Constitution of the United States of America and other United States federal acts, statutes, codes, laws and treaties, and laws of the State of Arizona, which subject the nonresident Defendants and their respective individual directors and officers to personal jurisdiction under the Arizona long-arm statute.

9.      Extraterritorial Jurisdiction is proper pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, FTAIA, 15 U.S.C § 6a, Article I, Section 8 and Article VI, Clause 2 of the Constitution of the United States of America, as guided by the Restatement (Third) of Foreign Relation Laws of the United States § 1 note 5, § 111 and its section comments d-e, §§ 114, 231, 401, 402 and its section comments c-d, f-g, i-k, § 403 and its section comments e and g, §§ 414(1), 415 and 721-22 (1987) and approved by the American Law Institute (ALI). American Law Institute 1986 Proceeding, 63 A.L.I. Proc. 140-141 (1986). Defendants illegally engaged in a criminal and civil conspiracy with persons and other entities who committed, and continue to commit overt acts in furtherance of the conspiracy in restraint of trade or commerce, as alleged herein, and defined in Section 1 of the Sherman Act, Section 12 of the Clayton Act, Section 6a of the FTAIA, Section 8 of the Wilson Tariff Act and Articles 9, 12 and 15-16 of the NAFTA.

10.     Defendants' conduct collectively and individually has unlawfully restrained domestic and foreign interstate commerce and injured consumers in the United States, México and other foreign countries.

11.     As a result of the Defendants' anticompetitive acts, as alleged in this Complaint, consumers and persons, including Plaintiffs, have sustained antitrust injury in Arizona.

12.     This District's exercise of extraterritorial jurisdiction is reasonable over anticompetitive conspiracy conduct within the United States in this District and México, having a direct, substantial and foreseeable antitrust injurious effect to general competition by antitrust injury to the Plaintiffs, the Plaintiffs' niche trade activities, property, and to the NAFTA professional business investor multilateral trade framework.

**VENUE, FORUM AND CHOICE OF LAW**

13.     Venue is proper in the United States District Court for the District of Arizona pursuant to 15 U.S.C. § 22, 28 U.S.C. §§ 1391(a)(1), (b)(2)-(3), (c)(2)-(3), (d) and 1404(a) (1964). Defendants transact business in this District within the meaning of Section 12 of the Clayton Act, reside in this District, may be found in this District, and/or a substantial part of the events giving rise to the Plaintiffs' claims in this action occurred within this District.

14.     In facilitation of its respective accreditation obligations via the Higher Learning Commission of the North Central Association of Schools and Colleges and the Accrediting Council on Education in Journalism and Mass Communication (ACEJMC), the Arizona Board of Regents on behalf of Defendant Arizona State University (ASU) conferred upon the Plaintiff the degree Bachelor of Interdisciplinary Studies with all the rights, privileges and honors thereunto appertaining. ASU further issued a letter to the Secretaría de Educación Pública Dirección General de Profesiones (SEP-DGP) attesting social service was not a requirement for the Plaintiff's undergraduate studies program.

Through its URL promoting the Study Abroad Office, International Center for Students and Scholars, Center for Law Science & Innovation, Center for Law & Global Affairs, Global Launch, Alumni Law Group and North American Law Degree programing, ASU purposefully directed trade activities to the citizens and residents of the United Mexican States, other foreign countries, and the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

15.    In facilitation of its respective accreditations via the American Bar Association, Association of American Law Schools and the Association to Advance Collegiate Schools of Business (AACSB International), the Oklahoma City University (OCU) School of Law and Meinders School of Business jointly conferred upon the Plaintiff the degree of Juris Doctor with all of the rights, honors, privileges, and responsibilities here and everywhere appertaining to that degree and the degree of Masters of Business Administration with all rights, honors and privileges here and everywhere appertaining to that degree. OCU further issued a letter to the SEP-DGP attesting social service was not a requirement for the Plaintiff's graduate studies program. Through its URL promoting International Admissions, Office of International Education, and Study Abroad Opportunities, OCU purposefully directed trade activities to the citizens and residents of the United Mexican States, other foreign countries, and the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

16.    In facilitation of its obligations under the Rules of the Supreme Court of Arizona, Defendant Arizona Supreme Court administered both the State Bar and Character and Fitness Examinations and thereby vetted the Plaintiff's competence, character and qualifications to practice law and subsequently authorized the Plaintiff to practice law as an Attorney and Counselor in the State of Arizona Supreme Court and all other Courts of the State not limited to appellate, superior, justice, municipal and city courts, subject to mandatory licensed membership in its corporate subsidiary, Defendant State Bar of Arizona (SBA). As the parent company, the Arizona Supreme Court did so in furtherance of the SBA's commercial activities in the trade, not limited to its Continuing Legal Education (CLE) Committee and International Law Section missions to respectively, "provide advice and recommendations regarding seminar developments, the annual program curriculum, publications, and alternative methods of delivering affordable, statewide CLE" and "promote throughout the State of Arizona the education of members of the SBA and the public on new developments and problems within the fields of private and public international law by sponsoring meetings, institutes, and conferences and by preparing, sponsoring and publishing legal writings." Through its CLE Committee and International Law Section, the SBA under the supervision of the Arizona Supreme Court purposefully directed trade activities to the citizens and residents of the United Mexican States, other foreign countries, and the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

17.     In facilitation of its obligations under the LRCiv 83.1(a), the United States District Court for the District of Arizona duly admitted and qualified the Plaintiff to the practice of law as an Attorney in the District in consideration of a $211 USD admission fee.[1] The District of Arizona did so commensurate with the Plaintiff's *good standing* licensed admission to practice law in the State of Arizona Supreme Court as a mandatory member of the SBA.

18.     To facilitate its obligations under FRAP 46(a) and Ninth Circuit Rule 46-1, the United States Court of Appeals for the Ninth Circuit admitted and qualified the Plaintiff to the practice law as an Attorney and Counselor in the Circuit, in consideration of a $230 USD admission fee.[2] The Ninth Circuit Court of Appeals did so commensurate with the Plaintiff's *good standing* admission to practice law in the United States District Court for the District of Arizona and *good standing* licensed admission to practice law in the State of Arizona Supreme Court as a mandatory member of the SBA.

19.     Arizona State University, Oklahoma City University, the Arizona Supreme Court, the State Bar of Arizona, United States District Court for the District of Arizona and the United States Court of Appeals for the Ninth Circuit each satisfied certain of the Plaintiff's minimum education and alternative credential requirements as a NAFTA authorized independent professional interdisciplinary business law attorney, communication design

---

[1] Pursuant to the Plaintiff's employment agreement, Defendant Polsinelli reimbursed this fee to the Plaintiff.
[2] Pursuant to the Plaintiff's employment agreement, Defendant Polsinelli reimbursed this fee to the Plaintiff.

17

strategist and entrepreneurial franchisor pursuant to Appendix 1603.D.1, which, in part, comprises the subject matter of and territoriality basis for the Plaintiffs' claims.[3]

20.     To facilitate its obligations under the NAFTA immigration measures, the Consulado de México Phoenix in consideration of a $98 USD fee, approved the Plaintiff's application and issued the Plaintiff's Passport Visa authorizing the Secretaría de Gobernación Instituto Nacional de Migración's (SEGOB-INM) issuance of a temporary resident status professional business investor FM3 Visa to the Plaintiff within the territory of México. The Consulado de México Phoenix did so on behalf of Defendant SEGOB-INM who purposefully directed its business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

21.     To facilitate its obligations under the NAFTA immigration measures, commensurate with the Plaintiff's Passport Visa, the SEGOB-INM issued the Plaintiff a temporary resident non-lucrative status professional business investor FM3 Visa ("NAFTA non-lucrative FM3 Visa"). Further, the SEGOB-INM México in consideration of about $1,403 USD in fees, renewed the Plaintiff's NAFTA non-lucrative FM3 Visa, issued the Plaintiff a Clave Única de Registro de Población (CURP), issued the Plaintiff a NAFTA lucrative status temporary resident permit and commensurate independent professional business investor immigrant work permit ("NAFTA independent

---

[3] Accordingly, Plaintiff sent a Litigation Preservation Notice to ASU, OCU, the Arizona Supreme Court (Committees on Character and Fitness and Examinations), SBA, United States District Court for the District of Arizona and/or the United States Court of Appeals for the Ninth Circuit.

professional immigrant work permit"), and subsequently a NAFTA lucrative permanent resident permit. The SEGOB-INM did so in furtherance of its purposefully directed business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.[4]

22.     In facilitation of its obligations under the Ley Aduanera Artículo 106, Fraccion IV, the Administración General de Aduanas Nuevo Laredo, commensurate with the Plaintiff's temporary resident NAFTA non-lucrative FM3 Visa, State of Arizona Certificate of Title No. 15750770 for Vehicle Identification No. WVWPD63B720238215, and in consideration of about a $86 USD fee, issued the Plaintiff a Permiso de Importación Temporal de Vehiculos No. TUPA472039003 authorizing the Plaintiff's Metallic Green 2002 Volkswagen Passat (the "Project Car") for personal and business activities within the territory of México. The Administración General de Aduanas did so in furtherance of the SEGOB-INM's purposefully directed business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

23.     In facilitation of its obligations under the Código Fiscal de la Federación, Reglamento Código Fiscal de la Federación, Resolución Miscelanea Fiscal and United States-México Tax Treaty, the Servicio de Administración Tributaria (SAT) issued the Plaintiff a Registro Federal de Contribuyentes (RFC) taxpayer identification number

---

[4] Accordingly, Plaintiff sent a Litigation Preservation Notice to the Consulado de México Phoenix and/or the SEGOB-INM.

commensurate with the Plaintiff's NAFTA lucrative temporary resident permit and independent professional immigrant work permit. Defendant SAT did so in furtherance of the SEGOB-INM's purposefully directed business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

24.     In facilitation of its obligations under the Reglamento Interior de la Secretaría de Educación Pública, Ley General de Educación and the Sistema Educativo Nacional, in consideration of about $432 USD, the SEP-DGP approved the Plaintiff's application for revalidation of foreign degrees, issued the Plaintiff a certificate of revalidation for each of her high school, undergraduate, graduate and doctorate degrees. The SEP-DGP's certification was, in part, commensurate with the Plaintiff's temporary resident NAFTA non-lucrative FM3 Visa and respective technical opinions of equivalency issued by Defendants' Benemérita Universidad Autónoma de Puebla (BUAP) and Instituto de Ciencias Jurídicas de Puebla (ICJ) regarding the Plaintiff's ASU and OCU degrees. The SEP-DGP did so in furtherance of the BUAP, ICJ and SEGOB-INM's purposefully directed business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

25.     Further in facilitation of its obligations under the Reglamento Interior de la Secretaría de Educación Pública, Ley General de Educación and the Sistema Educativo Nacional, in consideration of about $254 USD, the SEP-DGP, commensurate with the Plaintiff's NAFTA lucrative permanent resident permit and independent professional

immigrant work permit, issued the Plaintiff 3 cédulas profesionales (professional licenses) to conduct economic activities in the fields of law, business and communication within the interdisciplinary niche market. The SEP-DGP did so in furtherance of the IBERO, BUAP, ICJ and SEGOB-INM's purposefully directed business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

26.     In facilitation of its obligations under the Plaintiff's trade contract I, Defendant Universidad Iberoamericana Puebla (IBERO) entered into an electronic worldwide internet publishing transaction with Defendant HORIZON USA, and for the price of $300 USD, Defendant IBERO transacted business with HORIZON to publish the English Article, edited by Plaintiff, in HORIZON's <u>Advances in Economics and Business</u> internationally peer-reviewed electronic journal, and in so doing, Defendant IBERO purposefully directed its business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.[5]

27.     In facilitation of its obligations under the Plaintiff's trade Contract II, Defendant IBERO approved Joint Accreditation and Promotion of the Plaintiff's Interdisciplinary Continuing Education Seminars (ICES/SECI℠) International Fundraising Series benefitting the SLTLAW/SLTBE Project℠ Degree and Licensing Scholarship and Practical Training Internship. The IBERO further approved the participation of its

---

[5] Accordingly, Plaintiff sent a Litigation Preservation Notice to Horizon.

faculties, undergraduate alumni, and departments of Institutional Communication, Information and Communication Technology, Continuing Education and International Relations & Academic Exchange in the SLTLAW/SLTBE Project℠ FireBaby Breads™ Catering & International Academic Exchange University Housing mini-franchise component. The IBERO did so after having (a) toured the Colonia Lomas de San Alfonso (CLSA) I Project House, visited the future planned CLSA II and III twin Project House locations, (b) discussed a future Project House target location in Colonia Concepción las Lajas, (c) sampled the Project's FireBaby Bread Anjou Pear & Red Onion SoulFood Salmon Mexicana Cuisine Infusion and Debra Ann's Louisiana Pecan Carrot Cake, (d) previewed a hand-tiled furniture element of the Project's BigMan HandyMan™ Services Los Baños Completos Neighborhood Revitalization, Remodelation and Installation mini-franchise component, and (e) received the Plaintiffs' Certificates of Revalidation, State of Arizona Trade Name Certifications, Arizona Corporation Commission Good Standing Certifications, and minimum education and alternative credential requirements as a NAFTA authorized independent professional interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor pursuant to Appendix 1603.D.1, which, in part, comprises the subject matter of and territoriality basis for the Plaintiffs' claims. The IBERO purposefully directed its business activities to the citizens and residents of the United States, including the state of Arizona and this District where

substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.[6]

28.     In facilitation of their liaison obligations with the SEP-DGP, Defendants BUAP and ICJ issued the SEP-DGP respective technical opinions attesting the Plaintiff's ASU undergraduate degree and OCU master degree are equivalent to an undergraduate degree in communication and master degree in small business administration offered at BUAP, and the Plaintiff's OCU juris doctor degree is equivalent to a doctorate in law offered at ICJ. The Plaintiff paid about a $180 USD administrative fee to Defendant ICJ.

29.     The BUAP and ICJ did so after having received and analyzed the Plaintiff's Apostille authenticated transcript, course descriptions, and the subject juris doctor degree certification qualifying as minimum education and alternative credential requirements for a NAFTA authorized independent professional interdisciplinary business law attorney and communication design strategist pursuant to Appendix 1603.D.1, which, in part, comprises the subject matter of and territoriality basis for the Plaintiffs' claims.[7]

30.     In facilitation of their ancillary obligations under the Plaintiff's trade contract II with the IBERO, the BUAP and ICJ approved Joint Accreditation and Promotion of the Plaintiff's ICES/SECI℠ International Fundraising Series benefitting the SLTLAW/SLTBE Project℠ Degree and Licensing Scholarship and Practical Training Internship. The BUAP and ICJ further approved the participation of their respective

---

[6] Accordingly, Plaintiff sent a Litigation Preservation Notice to Dr. Reyes and/or the IBERO.

[7] Accordingly, Plaintiff sent a Litigation Preservation Notice to the IBERO, BUAP and/or ICJ.

faculties, undergraduate alumni (pasantes), and offices of Institutional Communication, Continuing Education and International Relations & Academic Exchange in the SLTLAW/SLTBE Project℠ FireBaby Breads™ Catering & International Academic Exchange University Housing component. The BUAP and ICJ purposefully directed their business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.

31.    The Secretaría de Turismo (SECTUR) posted components of the SLTLAW/SLTBE Project Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship on its website as a social service learning program. Though its URL promoting México tourism, the SECTUR purposefully directed their business activities to the citizens and residents of the United States, including the state of Arizona and this District where substantial acts and injurious antitrust effects giving rise to the Plaintiffs' claims occurred.[8]

32.    Public interest in antitrust enforcement, reflected in the availability of treble damages under the Sherman, Clayton, Wilson Tariff and RICO Acts, trumps private interest in litigating in the México forum where relevant provisions of the federal economic competition law are neither analogous to the provisions of the Sherman, Clayton, Wilson and Foreign Trade Antitrust Improvement Acts, nor adequately proscribe anticompetitive conspiracy conduct to further the effectiveness of free trade competition

---

[8] Accordingly, the Plaintiff sent a Litigation Preservation Notice to the SECTUR.

law enforcement, in fulfillment of the objectives established under the NAFTA. This District's forum is adequate.

33.     Arizona law is the applicable governing law in this Court pursuant to the Restatement (Second) of Conflict of Laws § 186-17 (1971) and the Restatement (Third) of Foreign Relations Laws of the United States (1987).

34.     The Plaintiff's trade contracts with Defendant IBERO contain identical contractual choice of law provisions, which state that the United States laws of the State of Arizona govern their terms.

35.     The federal judicial branches within the territory of the United States are renowned as impartial courts of reasonably developed legal systems, competent to apply extraterritorial applications of federal antitrust, RICO, FCRA, RFRA, Landham and Civil Rights Acts, defamation, false advertising and false association laws, codes and statutes; interpretations of United States constitutional provisions and their analogues found in state law, international conventions and treaties consistent and in line with the principles of justice accepted by the international community.

**PARTIES**

36.     Plaintiffs the Law Office of Sylvia L. Thomas and SLT Business Enterprises are limited liability companies organized and existing under the laws the state of Arizona with their principal places of business in Tempe, Arizona.

37.     Plaintiff, Sylvia Lynne Thomas is a citizen of the United States of America, a dual resident of the United States and the United Mexican States, and is licensed to practice law in Arizona and this District and within the territory of México.

38.    The Plaintiffs conduct business under commercial trade names registered with theOffice of the Arizona Secretary of State as SLTLAW Consultoria Jurídica México, SLTLAW Despacho Jurídico México, Creative Strategist™, FireBaby Breads™ and BigMan HandyMan™ Services (collectively the "SLTLAW/SLTBE Project℠").

39.    At relevant times, the Plaintiff was promoting and conducting NAFTA authorized economic trade activities within the interdisciplinary niche market (encompassing trade within and between the territories of the United States, including this District, México and other foreign countries).

40.    State of Arizona Supreme Court is a subdivision of the State of Arizona organized and existing under the Arizona Constitution with its principal place of business in the Phoenix. At relevant times, the Arizona Supreme Court was in the possession, custody and control of the Plaintiff's mandatory confidential Character and Fitness Disclosures.

41.    State Bar of Arizona is an Arizona Corporation and subdivision of the State of Arizona, organized and existing under the laws of the State of Arizona with its principal place of business in Phoenix, Arizona.

42.    Arizona State University ex rel Arizona Board of Regents, a body corporate organized and existing under the laws of the State of Arizona with its principal place of business in Tempe, Arizona.

43.    Polsinelli, is a professional company organized and existing under the laws of the State of Arizona with its principal place of business in Phoenix, Arizona.

44.     Nexo Legal is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Phoenix, Arizona. Upon information and belief, Antonio J. and Jane Doe Dominguez are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Antonio J. and Jane Doe Dominguez was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Nexo Legal".

45.     Comunidad Universitaria del Golfo Centro, A.C. dba Universidad Iberoamericana Puebla, is a corporation organized and existing under the laws of the territory of México with its principal place of business headquartered in the state of Puebla where it is deemed to reside. Iberoamericana Puebla is a sponsored member of the Association of Jesuit Colleges and Universities headquartered in Washington, D.C.

46.     At relevant times, Iberoamericana Puebla was conducting worldwide business activities within the interdisciplinary niche market between the United States, including this District, México and other foreign countries, and pursuant to a trade contract with substantial connection to Arizona and governed by an Arizona choice of law provision. The Plaintiffs' antitrust injuries arise out of those activities.

47.     Horizon Research Publishing Corporation, Ltd dba Horizon Research Publishing, USA is a California corporation organized and existing under the laws of the State of California with its principal place of business in Alhambra, California.

48.     At relevant times, Horizon was conducting worldwide business activities within the interdisciplinary niche market between the United States, including this District,

México and other foreign countries, and pursuant to a trade contract with substantial connection to Arizona and governed by an Arizona choice of law provision. The Plaintiffs' antitrust injuries arise out of those activities.

49.     Secretaría de Turismo is a federal government entity organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

50.     Consejo Nacional de Ciencia y Tecnología Fondos Mixtos is a federal government non-profit public agency organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

51.     Benemérita Universidad Autónoma de Puebla is a state non-profit public entity organized and existing under the laws of the territory of México with its principal place of business headquartered in Puebla, Puebla, México.

52.     Instituto de Ciencias Jurídicas de Puebla is a corporation organized and existing under the laws of the territory of México with its principal place of business headquartered in Puebla, Puebla, México where it is deemed to reside.

53.     Isaac and Jane Doe Osadolor Osademwigie are husband and wife citizens of the United Mexican States and residents of Puebla, Puebla, México and upon information and belief, dual citizens of the United States residing in Southlake, Texas who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Isaac and Jane Doe Osadolor Osademwigie was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Osadolor".

54.     Administración Local Jurídica de Puebla Norte de Servicio de Administración Tributaria is the federal government revenue service bureau of the Secretaría de Hacienda y Credito Público organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

55.     Procuraduría de la Defensa del Contribuyente Delegación Oriente-Golfo is a México federal government non-profit public agency representative of the Procuraduría General de la RePública organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

56.     Tribunal Federal del Justicia Fiscal y Administrativa de México is a federal government entity organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

57.     Secretaría de Gobernación Instituto Nacional de Migración is a federal government agency organized and existing under the laws of the territory of México with its principal place of business headquartered in the Federal District of México where it is deemed to reside.

58.     Delegación Procuraduría Federal del Consumidor de Puebla is a federal government consumer protection agency representative of the Procuraduría Federal del Consumidor organized and existing under the laws of the territory of México with its

principal place of business headquartered in the Federal District of México where it is deemed to reside.

59.     Honorable Tribunal Superior de Justicia del Estado de Puebla is a state government entity organized and existing under the laws of the territory of México with its principal place of business headquartered in Puebla, Puebla, México where it is deemed to reside.

60.     CineyMas Magazine (Cine&Mas) is a corporation organized and existing under the laws of the territory of México with its principal place of business headquartered in Puebla, Puebla, México where it is deemed to reside.

61.     Comercializadora Rale dba Mi Viejo Café, is a corporation organized and existing under the laws of the territory of México with its principal place of business headquartered in Puebla, Puebla, México where it is deemed to reside.

62.     Internal Revenue Service is a bureau of the United States Department of Treasury organized and existing under the laws of the United States federal government and the Sixteenth Amendment to the United States Constitution with its principal place of business in the District of Columbia where it is deemed to reside.

63.     Navient Corporation dba Navient Solutions is a Delaware corporation organized and existing under the laws of the state of Delaware with its principal place of business in Wilmington, Delaware where it is deemed to reside.

64.     Suntrust Bank is a corporation organized and existing under the laws of the state of Georgia with its principal place of business in Atlanta, Georgia where it is deemed to reside.

65.     Pennsylvania Higher Education Assistance Agency is a state agency of the Commonwealth of Pennsylvania dba American Education Services dba Fedloan Servicing organized and existing under the laws of the state of Pennsylvania with its principal place of business in Harrisburg, Pennsylvania where it is deemed to reside.

66.     Dominguez Law Firm is a professional corporation, organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief Antonio and Jane Doe Dominguez are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Antonio and Jane Doe Dominguez was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Dominguez PC".

67.     Mark and Elaina West are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Mark and Elaina West was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "West".

68.     Tom Carmody conducts business as the Tom Carmody Company a business organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief, Tom and Jane Doe Carmody are husband and wife residents of the state of Arizona who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Tom and Jane Doe Carmody was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Carmody".

69.     Brian R. and Jane Doe Booker, are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Brian and Jane Doe Booker was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Booker".

70.     Quarles & Brady is a limited liability partnership organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

71.     Bowman & Brooke is a limited liability partnership organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

72.     Gordan & Rees is a limited liability partnership organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

73.     Booker T. and Jane Doe Evans, Jr. are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Booker and Jane Doe Evans was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Evans".

74.     Greenberg Traurig is a Arizona limited liability partnership organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona.

75.     Ballard Spahr is a limited liability partnership organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

76.     Michael R. and Jane Doe Ross are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Michael and Jane Doe Ross was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Ross".

77.     Gallagher & Kennedy is a professional association organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

78.     Cohen Law Firm is a corporation organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief Larry J. and Jane Doe Cohen are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Larry and Jane Doe Cohen was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Cohen".

79.     James M. Laganke is an Arizona professional limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief James M. And Jane Doe Laganke are husband and wife residents of the state of Arizona who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged

conduct of James and Jane Doe Laganke was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Laganke".

80.     Green Johnson Mumina D'Antonio is an Oklahoma corporation, organized and existing under the laws of the state of Oklahoma with its principal place of business in Oklahoma City, Oklahoma where it is deemed to reside. Upon information and belief, Kwame T. and Jane Doe Mumina are husband and wife residents of the state of Oklahoma who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct of Kwame and Jane Doe Mumina was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Mumina".

81.     The Doyle Firm is an Arizona professional corporation organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.  Upon information and belief William H. and Jane Doe Doyle are husband and wife residents of the state of Arizona who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of William and Jane Doe Doyle was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Doyle PC".

82.     Judith A Berman is a professional limited liability organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief, Judith A. and Jane Doe Berman are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Judith and Jane Doe Berman

was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Berman".

83.     Berke Law Firm is a professional limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief, Lori V. and John Doe Berke are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Lori and John Doe Berke was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Berke".

84.     Mark A. Kirkorsky is a professional limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Mesa, Arizona where it is deemed to reside. Upon information and belief, Mark A. and Jane Doe Kirkorsky are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Mark and Jane Doe Kirkorsky was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Kirkorsky".

85.     Maricopa County Board of Supervisors is a subdivision of the state of Arizona organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

86.     Maricopa County Justice Courts is a subdivision of the state of Arizona organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

87.     Maricopa County Superior Court is a subdivision of the state of Arizona organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside.

88.     Nearhood Law Offices is a professional limited liability company, organized and existing under the laws of the state of Arizona with its principal place of business in Scottsdale, Arizona where it is deemed to reside. Upon information and belief, James R. and Jane Doe Nearhood are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of James and Jane Doe Nearhood was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Nearhood".

89.     Upon information and belief, Joe and Jane Doe Padilla, are husband and wife residents of the state of Arizona, who caused acts to occur in México and Arizona out of which Plaintiffs' claims arise. All alleged conduct by Joe and Jane Doe Padilla was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Padilla".

90.     Righi Fitch Law Group, is a professional limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona where it is deemed to reside. Upon information and belief, Richard L. and Jane Doe Righi are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All conduct by Richard and Jane Doe Righi was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "Righi".

91.     Arizona Homestay Group is a limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Anthem Arizona where it is deemed to reside. Upon information and belief, Tracy and John Doe Todaro are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Tracy and John Doe Todaro was committed on behalf of and for the benefit of their marital community. Hereinafter, collectively "AZ Homestay".

92.     Blackstad Hrabe & Kirkorsky is an limited liability company organized and existing under the laws of the state of Arizona with its principal place of business in Mesa, Arizona where it is deemed to reside. Upon information and belief, Brandon D. and Jane Doe Hrabe, Robert B. and Jane Doe Blackstad and Mark A. and Jane Doe Kirkorsky are husband and wife residents of the state of Arizona, who caused acts to occur in Arizona out of which Plaintiffs' claims arise. All alleged conduct of Brandon D. and Jane Doe Hrabe, Robert B. and Jane Doe Blackstad and Mark A. and Jane Doe Kirkorsky was committed on behalf of and for the benefit of their respective marital communities. Hereinafter, collectively "BHK".

93.     Defendants John and/or Jane Does Nos. 1-12 are fictitious party individuals whose identities are not yet known and may be substituted via amended complaint.

94.     Defendants ABC Corporations Nos. 1-10 are fictitious party entities whose true identities are not yet known and may be substituted via amended complaint.

/ / /

/ / /

## FACTUAL BACKGROUND

95.     Plaintiff, The Law Office of Sylvia L. Thomas, LLC dba SLTLAW was formed and incorporated by Plaintiff, Sylvia Lynne Thomas, an Arizona licensed attorney.

96.     The Plaintiff, SLT Business Enterprises, LLC dba SLTBE, was formed incorporated by Plaintiff, Sylvia Lynne Thomas, an Arizona licensed attorney who holds a jointly conferred JD/MBA and practices business law.

97.     The Plaintiff, Sylvia Lynne Thomas, identified an interdisciplinary niche market within the North American Free Trade Agreement's (NAFTA) international professional business investor trade framework, providing for the Plaintiff's conduction of seminars and provision of intern scholarship practical training functions with inroads to employment and global entrepreneurial cooperative mini-franchise operations and related services and service products to worldwide legal, business and university academic community customers, consumers and end-users within and between the United States, México and other foreign countries via the SLTLAW/SLTBE Project.

98.     The Plaintiffs leased a residential/commercial zoned property located at 531 E. Lynwood Street, Phoenix Arizona (the "Project House prototype") for the purpose of implementing the SLTLAW/SLTBE Project℠ as an interdisciplinary business law, communication design and entrepreneurial franchise capable of operating components globally within and between the United States, México and other countries.

99.     The Plaintiffs and the landlord could not come to terms on the landlord's proposed lease renewal and purchase option.

100.    The Plaintiffs declined the landlord's proposal, and explained how the technological advances impacting supply and demand for interdisciplinary small business legal services in the global market both challenge and enable solo practitioner attorneys to innovatively reduce, subsidize or altogether eliminate overhead costs and expenses.

101.    On February 13, 2011, the Plaintiffs declined to engage the representation of Foreign Legal Consultant Antonio J. Dominguez of Nexo Legal.

102.    On February 23, 2011, Lexington Law confirmed that the January 8, 2000 Bankruptcy judgment was removed from the Plaintiff's consumer credit report.

103.    On February 24, 2011, the Plaintiffs declined service as an Arizona Black Bar Association (ABBA) officer and member at large.

104.    On February 25, 2011, the Plaintiff received the Consulado de México Phoenix temporary resident status NAFTA professional business investor passport Visa authorization.

105.    On March 17, 2011, the Plaintiff received the Secretaría de Gobernación Instituto Nacional de Migración temporary resident status NAFTA non-lucrative professional business investor FM3 Visa.

106.    On April 18, 2011, the Plaintiff imported to México the 2002 Volkswagen Passat (the "Project Car") and the office equipment required to effect relocation of the Project's electronic virtual remote desktop operations.

107.    The Plaintiffs' service on the State Bar of Arizona Appointments Committee formally ended May 31, 2011, however effective commensurate with the relocation of the Project's electronic operations.[9]

108.    The Plaintiff immigrated to México as a NAFTA professional business investor for the purpose of relocating the SLTLAW/SLTBE Project℠ electronic operations while simultaneously promoting the Project's future economic trade activities within the territory of the United Mexican States, and implementing components on behalf of the Project's present and future global clientele operating (or interested in operating) within interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries).

109.    The Plaintiff leased a residential/commercial zoned property located at Cerrada Cadillac No. 20, Interior 4-3, Colonia Lomas de San Alfonso, Puebla, Puebla, México (the "Project House") for the sublet of secure upper-level furnished rooms to university international academic exchange students, which would subsidize the principal rent and simultaneously support the SLTLAW/SLTBE Project℠ provision of low-overhead global cooperative entrepreneurial mini-franchise opportunities for México university undergraduate alumni through the Project's Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship component.

110.    The Plaintiff established the Project's scholarship and practical training internship to be funded, in part, by the Project's ICES/SECI℠ International Fundraiser Series.

---

[9] Accordingly, Plaintiff sent a Litigation Preservation to Carrie Sherman, Nina Benham and/or John Furlong.

111.   The Plaintiff entered into trade contracts I and II with the Universidad Iberoamericana Puebla, and pursuant to the latter, facilitated an ancillary collaborative agreement with the Universidad Iberoamericana Puebla, Benemérita Universidad Autónoma de Puebla and the Instituto de Ciencias Jurídicas de Puebla for the Joint Accreditation and Promotion of the SLTLAW/SLTBE Project℠ premier ICES/SECI℠ international fundraiser and the DAAD seminar as a collaborative business academic Conference in celebration of the inherent influence and governing role of the law in interdisciplinary careers.

112.   The Defendants contracted, combined and/or conspired to restrain the NAFTA international professional business investor trade framework by multilateral annihilation of the Plaintiff competitor through the commission of acts and omissions to obstruct or otherwise control the Plaintiff's enforcement of trade contracts I and II within the interdisciplinary niche market.

113.   The Arizona Supreme Court Committee on Character and Fitness distributed the Plaintiff's confidential mandatory disclosures to customers and end users within the interdisciplinary niche market and targeted the Plaintiff as, "Just the type of attorney for whom the lawyer regulation disciplinary process exists."

114.   Polsinelli characterized the Plaintiff within the interdisciplinary niche market as, "Unable to identify credit worthy clients." and "Does not want to be an attorney." and recommended the Plaintiff, "Go find and invest in something that you love to do."

115.   Quarles & Brady, Bowman & Brooke, Greenberg Traurig, Gallagher & Kennedy and Gordon & Rees distributed information from the Plaintiff's consumer credit report and/or characterized the Plaintiff within the interdisciplinary niche market as, "A Ja Nelle Jenkins. Thinks everyone owes [her]. Thinks she knows everything. Not committed."

116.   Doyle targeted the Plaintiff within the interdisciplinary niche market as likely to, "Commit judicial malpractice and miss a filing deadline."

117.   The Plaintiff's colleagues targeted the Plaintiff within the niche market as, "Bankrupt and charging…high attorneys' fees so she can pay her bills. Doesn't know how to make money and need[s] to find an old rich man and marry him just before he dies."

118.   The SBA targeted the Plaintiff within the niche interdisciplinary market as offering, "Competing CLE events" of which "… requests to promote…will not be granted".

119.   Complainants Antonio J. Dominguez and Ronald Logan targeted the Plaintiff in the interdisciplinary niche market as, "self-interested".

120.   The ABBA targeted the Plaintiff within the interdisciplinary niche market as, "Lacks commitment. Extraordinarily challenged with navigating distinctive constitutions, laws, judicial systems, and languages."

121.   The Los Abogados HNBA targeted the Plaintiff within the interdisciplinary niche market as, "One of those women who…do not want to give up control… need[s] to recognize that this is a man's world."

122.   The MCBA characterized the Plaintiff within the interdisciplinary niche market as, "Keep[s] making the same mistake."

123.   Elaina West characterized the Plaintiff within the interdisciplinary market as, "Wants to live for free. Thinks she knows everything. Needs to find a husband. Untrustworthy with money."

124.   The IRS audit targeted the Plaintiff within the interdisciplinary niche market as, "Does not claim sufficient income to evidence ability to support herself, claims expenses not actually realized and extraordinarily expensed funds on upgrades and maintenance for real estate property not owned. I can understand not wanting to get married, but why would she want to live in México?"

125.   The PHEAA, Navient and SunTrust Banks characterized the Plaintiff within the interdisciplinary market as, "Delinquent…ineligible for a student loan deferment."

126.   The Arizona State Government depicted the Plaintiff within the interdisciplinary market as, "LOST".

127.   Antonio J. Dominguez expanded the Nexo Legal service offerings to include screening and monitoring business partners.

128.   The Defendants obstructed the Plaintiff's ability to timely acquire revalidation of foreign degrees and an independent professional work permit from the SEP-DGP and professional residency documents from the SEGOB-INM.

129.   The Defendants obstructed the Plaintiff's ability to timely acquire professional residency documents from the SEGOB-INM and professional license credentials from the SEP-DGP.

130.   The IBERO denied authenticity of the trade contract II subcontractor payment guarantee and required that all vendor invoices be issued in the Plaintiff's name.

131.   The IBERO refused payment to the Plaintiff of the trade contract I publication bonus.

132.   The IBERO excluded the Plaintiff's editorial credit for the trade contract I Article the Plaintiff edited from its presentations and publications.

133.   HORIZON USA excluded the Plaintiff's editorial credit for the trade contract I Article that the Plaintiff edited from its electronic publication.

134.   REINICIG excluded the Plaintiff's editorial credit for the trade contract I Article that the Plaintiff edited from its Third International Conference program and presentation materials and from its referred ISSN-numbered publications.

135.   The IBERO restricted the advertising and registration sales of the trade Contract II seminar and conference. The IBERO did not recommend candidates to the Plaintiff for participation in the SLTLAW/SLTBE Project℠ interdisciplinary degree and licensing scholarship and practical training internship.

136.   The BUAP restricted its advertising and promotion of the trade Contract II seminar and conference. The BUAP did not recommend candidates to the Plaintiff for participation in the SLTLAW/SLTBE Project℠ interdisciplinary degree and licensing scholarship and practical training internship.

137.   The ICJ restricted its advertising and promotion of the trade Contract II seminar and conference. The ICJ did not recommend candidates to the Plaintiff for participation

in the SLTLAW/SLTBE Project℠ interdisciplinary degree and licensing scholarship and practical training internship.

138.   For the stated purpose of precluding advertisement of "competing CLE events", the SBA BOG unanimously voted to amend the Communications Access to Members Policy by adding, "In general, requests to promote non-Bar CLE events will not be granted".

139.   The IBERO denied receipt of benefit from the Plaintiff's performance under trade contracts I and II.

140.   For the stated purpose of "assuring compliance with the Supreme Court Rules and Mandatory Continuing Legal Education (MCLE) regulations," the SBA Continuing Legal Education (CLE) Task Force recommended the SBA Board of Governors (BOG) seek approval from the Arizona Supreme Court to implement a process for the precertification of entities offering CLE programs in Arizona.

141.   The ICJ's recommended accountant filed income tax forms with the SAT declaring that in November 2013, the Plaintiff received income and simultaneously authorized deductions from that income.

142.   The Ciudad Judicial de Puebla alleged the Plaintiff falsified a cosigner signature on the Project House lease agreement and attempted service of alleged judicial notices concerning an eviction settlement hearing demonstrative of unconstitutionalities and procedural inefficiencies.

143.   The Plaintiff denied the allegation and as a reasonable good faith basis for nonattendance asserted and preserved her to right to seek redress in the United States district courts against the Defendants for violations of federal laws and supplemental state law claims including breach of contracts I and II as inextricably linked to the modified terms of Project House lease renewal, but is neither novel, nor complex or predominant.

144.   The SBA BOG's CLE Task Force Subgroup recommended the creation of a centralized system for the delivery of all CLE programs, with the CLE Department overseeing all programs, paying all costs and receiving all associated revenue.

145.   The Defendants ousted the Plaintiff from the Project House, removed the Plaintiff's personal and business property and stole the Project Car.

146.   The SECTUR posted to its website significant elements of the SLTLAW/SLTBE Project℠ interdisciplinary degree and licensing scholarship and practical training internship component as a social service learning program.

147.   The SBA revised Section 8 of its Mentor Program Guidelines to highlight, "WHAT NOT TO DO when discussing a particular case…to avoid even the appearance of the existence of an attorney/client relationship…that…may require prior consent from the client before disclosure…may violate the ethical rules."

148.   ASU claimed innovation for the SLTLAW/SLTBE Project℠ components, Technical English for Professionals and Language Testing Performance Enhancement Series，ICES/SECI℠ International Fundraiser Series and Interdisciplinary Degree and

Licensing Scholarship and Practical Training Internship as its respective Global Launch, CLE Funded Scholarships and ASU Alumni Law Group programming.

149.   The Plaintiff alleged the Defendants' conduct arises to federal antitrust violations and asserted her right to seek redress through the United States federal district courts.

150.   The Plaintiff sent a litigation preservation notice to potential witnesses, defendants and custodians of record within the interdisciplinary niche market who the Plaintiffs believe are in the possession, custody and/or control of evidence relevant to their federal antitrust claims.

151.   Antonio J. Dominguez and Nexo Legal received the Plaintiffs' litigation preservation notice and subsequently initiated a complaint against the Plaintiff with the SBA Lawyer Regulation Department.

152.   Based on what the SBA disclosed as complainant Dominguez's supposed allegation, "I do not know Attorney Sylvia L. Thomas. I do not understand emailed me a Litigation Preservation Notice," the SBA urged the Plaintiff to agree with its opinion that complainant Dominguez could have forgotten his February 2011 prospective client relationship with the Plaintiff on behalf of Nexo Legal. The Plaintiff disagreed.

153.   The SBA requested the Plaintiff's substantive written response explaining among other inquiries why she sent complainant Dominguez a litigation preservation notice and subsequently issued a subpoena mandating the Plaintiff's compliance.

154.   As a reasonable good faith basis for not providing the information, the Plaintiff asserted conflict of interest because the complainants Dominguez and Nexo Legal, ASU,

Polsinelli, the Arizona Supreme Court and the SBA are defendants in the Plaintiff's impending antitrust lawsuit.

155.   The Plaintiff alleged, upon information and belief, Antonio J. Dominguez, on behalf of Nexo Legal is the strawman complainant representative for the México party defendants named in this antitrust action, and in such concealed capacity initiated the subject "Bar charge" disciplinary action against the Plaintiff and solicited Arizona Attorney Ronald Logan's testimony and joinder as a complainant therein.

156.   The Plaintiff alleged, upon information and belief, ASU, Polsinelli, the Arizona Supreme Court, the SBA and certain other defendants named in this antitrust action, along with nonparties ABBA, HNBA, MCBA and other non-party recipients of the Plaintiff's litigation preservation notice are undisclosed complainants in the subject "Bar charge" disciplinary action against the Plaintiff.

157.   Complainant Dominguez joined the Forakis Law Firm, PLC as an associate and Christine Goodson Forakis (aka Christine Cracchiolo) joined Nexo Legal of Counsel.

158.   The SBA disclosed Complainant Dominguez's supposed further allegation, "Since my practice focuses on México, I'm not sure what Ms. Thomas is trying to accomplish with these emails. I'm not sure why she is suing the Mexican University in Arizona, I'm not sure if she is trying to prevent me to get potential client."

159.   Douglas J. Sylvester is the Dean of ASU Law School and serves as an SBA Director. On February 28, 2017, upon information and belief, Dean Sylvester posed as the Arizona Supreme Court Presiding Disciplinary Judge.

160.   On February 28, 2017, upon information and belief, an ASU Law student posed as bar counsel for the SBA.

161.   The SBA by omission gave false testimony to the believed to be Presiding Disciplinary Judge (PDJ), which concealed evidence of SBA email communications with the Plaintiff demonstrating the reasonable basis for the Plaintiff's noncompliance. In reliance on the SBA's testimony and evidence, the believed to be PDJ ordered the interim suspension of the Plaintiff's license to practice law until such time the Plaintiff complied with the SBA's subpoena.

162.   The believed to be PDJ's Order permitted the SBA to display for the public on its website the Plaintiff's status as "Suspended" and to provide the public with information enumerating possible reasons for suspension to include:

> A lawyer may be suspended pending the outcome of disciplinary proceedings if the lawyer has been convicted of a felony or other serious misdemeanor conviction; appears to be misappropriating funds; engaging in conduct that would result in substantial harm, loss or damage to the public, the legal profession or the administration of justice; or some other basis allowed by the rules. While on interim suspension, a lawyer may not practice law in Arizona.

163.   Arizona Supreme Court Rules 53(b)(1) and (3) respectively set forth the SBA will provide a complainant,

> …a copy of respondent's initial response…shall advise the complainant of a recommendation of any discipline…or agreement for discipline by consent…and of any public proceeding before the presiding disciplinary judge…The state bar shall provide information to enable the complainant to ascertain the date, time and location of such proceedings, which may include the website address of the state bar or the disciplinary clerk. In the case of agreement for discipline by

consent,…bar counsel shall submit the complainant's objection to the presiding disciplinary judge…

164.   The believed to be PDJ's Order stayed the Plaintiff's pre-litigation investigation and simultaneously (in advance of procedural discovery and disclosure), afforded Defendants access to and provided Defendants an interim suspension window for the destruction of conspiracy evidence gleaned from the Plaintiff's "substantive" compliance with the SBA's Subpoena for Written Response to Screening Letter.[10]

165.   After the Plaintiff's March 13, 2017 compliance, the PDJ granted the Plaintiff's reinstatement to the practice of law, however denied the Plaintiff's requests therein to vacate the suspension and to indefinitely stay further disciplinary proceedings.

166.   On March 28, 2017, five days after the Plaintiff filed a Notice of Appeal, the believed to be PDJ issued a Notice of Errata and Amended Order clarifying the prior Order of Admonition was not a sanction, but rather a warning mandated against the Plaintiff in reliance on the SBA's false testimony by omission.

167.   Pending before Defendant Arizona Supreme Court is the Plaintiff's March 22, 2017 appeal from the believed to be PDJ's order denying the Plaintiff's requests to vacate the suspension and for an indefinite stay of disciplinary proceedings.

168.   On April 4, 2017, the SBA threatened further costly disciplinary proceedings against the Plaintiff (and at the Plaintiff's expense), and therein urged the Plaintiff to

---

[10]   The actual litigation preservation notices contain recipient contact information. The written substantive response lists each recipient and provides the legal basis for sending a litigation preservation notices to each recipient whether a potential non-party witness or custodian of record or defendant.

alternatively consent to discipline or seek third-party legal representation, likewise influentially interested by mandatory membership in the SBA.

169.   The Defendants seek to eradicate the Plaintiff as a competitor, to likewise eliminate general competition, and thus monopolize the interdisciplinary niche market to the end of multilateral monopolization and monopolized global replication of the SLTLAW/SLTBE Project℠ components.

170.   The Defendants acts and omissions constitute an unreasonable restraint of trade or commerce in attempt to monopolize, or combine, or conspire with another person or persons to monopolize the interdisciplinary niche market or commerce.

171.   The Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce and involving foreign commerce that caused or are likely to cause reasonably foreseeable injury within the United States or involve material conduct occurring within the United States.

172.   Defendants engaged in unfair or deceptive acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of a material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of merchandise by, among other things, making misrepresentations and taking steps to conceal their anticompetitive schemes.

/ / /

/ / /

/ / /

**THE NAFTA**
**PROFESSIONAL BUSINESS INVESTOR**
**INTERNATIONAL TRADE IMMIGRATION PROCESS**

173.   After the Consulado de México's February 25, 2011 approved issuance of the Plaintiff's temporary resident status non-lucrative NAFTA professional business investor FM3 Visa, the Plaintiff acquired additional personal loan converted investments to fulfill the related measures and otherwise support promotion of the SLTLAW/SLTBE Project℠ future economic trade activities within the interdisciplinary niche México submarket over the one-year non-lucrative restriction period.

174.   The Instituto Liderazgo y Decisión dba Vive Internacional Conocete Aceptate Superate (VIVE), agreed to the Plaintiff's proposed expansion of services as a client of the SLTLAW/SLTBE Project℠ and provided letters in support of the Plaintiff's NAFTA immigration as an interdisciplinary business law attorney.[11]

175.   The Plaintiff's temporary resident status NAFTA non-lucrative FM3 Visa, restricted her one-year adherence to:

     a.     No México income.

     b.     Source of income limited to the United States.

     c.     No plans of entry into the local labor market.[12]

     d.     Promotion of authorized economic activities on behalf of SLTLAW/SLTBE Project℠ that amongst other service and general business and service products, would

---

[11] Accordingly, Plaintiff sent a Litigation Preservation Notice to Cesar Stalin Tafur.
[12] Includes employment within the interdisciplinary niche market (i.e., within and between the United States, México and other foreign countries).

provide scholarships, practical training internships and global entrepreneurial mini-franchise operation opportunities, internationally funded, in part, by a series of interdisciplinary business law continuing education seminars.

176.   According to the SEGOB-INM, in one year, the Plaintiff could receive change of status to permanent resident NAFTA professional immigrant authorized to earn a México income, and with certified revalidation of foreign university studies by the SEP, the Plaintiff could receive a work permit to operate as an independent professional interdisciplinary business law attorney within the territory of México.

177.   After 10 months of diverted assistance from the SEP Puebla and delayed processing of technical opinions solicited from Defendant IBERO and nonparty Universidad de las Américas Puebla (UDLAP), the Plaintiff reported their uncooperativeness and/or incapacity to facilitate to the United States Embassy in México City, who referred the Plaintiff to the SEP Federal District Office.

178.   On November 17, 2011, the SEP-DGP accepted and processed Plaintiff's Application for Revalidation of her United States JD, MBA and BA-BIS studies.

179.   On February 7, 2012, the SEP-DGP informed Plaintiff that revalidated high school and undergraduate studies are prerequisites to revalidation of graduate studies. According to the SEP-DGP, absent undergraduate revalidation, the Plaintiff could not receive her JD professional license. The SEP-DGP invited Plaintiff to assist in solicitation of the México university technical opinions of equivalency required to support revalidation.

180.   On February 9, 2012, the SEP Dirección General de Bachillerato (SEP-DGB) accepted Plaintiff's application for revalidation of her foreign high school studies and on

May 21, 2012, certified the Plaintiff's United States high school degree as equivalent to a high school degree offered in México.

181.   Defendant BUAP's Office of International Relations and Academic Exchange provides gratuitous services to SEP-DGP Applicants seeking technical opinions for revalidation of foreign university studies.

182.   On February 22, 2012, Plaintiff submitted a request for BUAP technical opinions of equivalency in relation to her BA-BIS, MBA and JD studies. Plaintiff explained to the BUAP her plans to obtain an independent operation work permit, informed the BUAP of her strategic interdisciplinary business law continuing education fund development programming, and the importance of her autonomy in México to the funding objectives of the SLTLAW/SLTBE Project℠, which preclude Plaintiff from working as an employee.

183.   On March 18, 2012, the SEGOB-INM renewed Plaintiff's NAFTA FM3 Visa for an additional year, again without authorization to earn a México income.

184.   Respectively April 24, 2012 and October 9, 2012, Plaintiff received the BUAP's technical opinion of equivalency concerning her MBA and BA-BIS studies. On October 10, 2012, the BUAP Faculty of Law and Social Sciences informed the Plaintiff, "the BUAP does not provide technical opinions concerning the revalidation of 'Gringo' courses."

185.   Defendant ICJ, an incorporated professional school of the BUAP, provides services to SEP-DGP Applicants seeking technical opinions for revalidation of foreign university studies for a case-by-case determinant administrative fee.

186.   On around July 17, 2012, Plaintiff submitted a request to the ICJ for a technical opinion regarding her JD studies. Plaintiff explained to the ICJ her plans to obtain an independent operation work permit, informed the ICJ of her strategic interdisciplinary business law continuing education fund development programming, and the importance of her autonomy in México to the funding objectives of the SLTLAW/SLTBE Project℠, which precluded Plaintiff from working as an employee.

187.   On July 23, 2012, Plaintiff paid the $180 USD fee and received the ICJ's technical opinion of equivalency concerning her JD studies.

188.   Plaintiff's August 20, 2012 Application for participation in the BUAP Student Mobility Spanish Language and Culture Program ("Student Mobility Program"), under the direction of Professor Enrique Bagatella Bermudez, documented Plaintiff's intent during the extended no México income restricted promotional period to:

a.   Exchange multicultural leadership ideas and opinions in an environment that embraced ethnic unity and where cultural diversity enriched experiences.

b.   Participate in international academic cooperation and engender discussions with international students about the globalization of higher education curriculum and infusion of international issues in their respective university curriculums.

c.   Share educational and sociological insights regarding the increasingly global circumstance of numerous unemployed university undergraduates, who eventually find themselves working in an area outside of their career field.

d.   Discuss how student-proposed instrumental interdisciplinary academic and business law partnership platforms can create experiential international practical training

programming and develop global leadership skills, competencies and standards of professional practice.

e.       Increase student potential as agents of change in their community with experiences that allow them to live and think about multicultural leadership.

f.       Develop a common understanding and appreciation for the value of interdisciplinary and entrepreneurial thinking as an optimal method for inserting oneself into the professional world and its constantly changing global labor and entrepreneurial franchise markets.

189.   Plaintiff's Application also documented emergency telephone and address contact information for the Plaintiff's mother and sister in Wichita, Kansas.

190.   After Plaintiff discovered that Professor Bagatella required Plaintiff's payment of a $500 USD fee to participate in the BUAP Student Mobility Program, on September 18, 2012, the BUAP confirmed Plaintiff's withdrawal without cost.

191.   On October 16, 2012, the SEP-DGP certified Plaintiff's United States university studies as equivalent to a Doctor of Law, Master of Small Business Administration and Bachelor of Communication offered at México universities.

192.   The SAT's November 12, 2012 issuance of the Plaintiff's RFC categorized the SLTLAW/SLTBE Project℠ as an "individual person [the Plaintiff] with professional business activities". Based on the SEP-DGP's certified revalidation of the Plaintiff's degrees, the SAT authorized Plaintiff to implement the SLTLAW/SLTBE Project℠ professional business economic trade activities in México classified as "other

professional, scientific and technical services" provided by the private sector, beginning July 1, 2013.

193.   On February 6, 2013, the SEGOB-INM issued Plaintiff a CURP and on March 13, 2013, Plaintiff submitted correspondence to the SEGOB-INM as prepared by Accountant José Francisco Rafael López Galindo, which enclosed a copy of the November 12, 2012 SAT Obligations Guide evidencing that prior to July 1, 2013, Plaintiff had no fiscal reporting obligation.[13]

194.   The SEGOB-INM confirmed that as of March 16, 2013, Plaintiff had accumulated 2 years of temporary residency in México under NAFTA non-lucrative FM3 Visa. According to the SEGOB-INM, the 2012 reformed México immigration laws required 4 years of temporary residency for an applicant to obtain the permanent residency status required to receive a México professional license.

195.   On March 17, 2013, the SEGOB-INM replaced Plaintiff's NAFTA non-lucrative FM3 Visa with a temporary resident permit, which authorized Plaintiff to receive a México income in consideration of her professional economic trade activities. On March 18, 2013, the SEGOB-INM renewed Plaintiff's temporary resident permit for the additional 2 years required for Plaintiff to receive México professional licenses.

196.   On March 27, 2013, the SEP-DGP informed Plaintiff that under the 2012 reformed México immigration laws, the permanent resident NAFTA professional immigrant lucrative FM2 visa was replaced with the independent professional operation work permit

---

[13]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the SAT and/or Accountant José Francisco Rafael López Galindo.

and the permanent resident permit, the latter being the final requisite for Plaintiff to receive her México professional licenses. According to the SEP-DGP and SEGOB-INM, in 2 years Plaintiff could receive the permanent resident permit required to obtain her professional licenses.

197.   On April 4, 2013,

(1)   The SEGOB-INM issued Plaintiff's independent professional operation work permit to conduct economic trade activities and earn a México income effective January 3, 2013; and,

(2)   The Plaintiff became the first African-American, single, female, United States national authorized to operate within the territory of México as a NAFTA independent professional with SEP-DGP certified revalidated university studies.

198.   Attorney Michael Ross challenged the Plaintiff concerning the SEGOB-INM independent professional operation work permit, "It's not a real license to practice law. I have a 'little Gringo' attorney friend in México who actually has a real license."

199.   Prior to contracting interdisciplinary business law trade services within the territory of México and between the United States, México and other countries, as a mandatory member of the SBA, the Plaintiff was obligated to satisfy the Arizona Supreme Court requirements for authorized practice of law.

200.   In accordance with the 2012 reformed México immigration laws, the Plaintiff was required to obtain a México professional license for each of her university degrees, which required a México permanent resident permit that would be accessible to the Plaintiff after 2 additional years of temporary residency.

**THE IMPORTANCE OF THE PLAINTIFF'S AUTONOMY**
**WITHIN THE INTERDISCIPLINARY NICHE MARKET**
**INCOMPASSING TRADE WITHIN AND BETWEEN THE**
**UNITED STATES, MÉXICO AND OTHER FOREIGN COUNTRIES**

201.   At relevant times, impropriety, misappropriation, nepotism, favoritism, bribery, promissory fraud and other forms of corrupt practice were and continue to be a grave problem within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries).

202.   Plaintiff's dual licensure as an attorney in the United States and México, and the NAFTA professional immigration measures providing for México's (a) certified revalidation of Plaintiff's United States studies, (b) issuance of Plaintiff's permit to conduct independent economic trade operations, and (c) professional licensure of Plaintiff's United States JD, MBA and BA degrees, collectively would equip the Plaintiff with the necessary credentials to successfully implement the SLTLAW/SLTBE Project℠ interdisciplinary business law, communication design and entrepreneurial franchise components. Further, those credentials would equip the Plaintiff to solicit award of diverse global project grant funding and to attract diverse international investors, alumni and philanthropic trusts, foundations, major gift benefactors and other important donors capable of major gifting, international practical training associate providers and other international resources on behalf of the SLTLAW/SLTBE Project℠.

203.   Plaintiff's international licensed NAFTA authorized operations as an independent interdisciplinary business law attorney and communication design strategist and entrepreneurial franchisor within the niche market (encompassing trade within and

between the United States, México and other foreign countries) are essential to shield the Plaintiffs, and the Plaintiff's global clientele, associate providers, investors, alumni and philanthropic trusts, foundations, major gift benefactors, and other important donors capable of major gifting from the impropriety of and/or involvement in misappropriation, nepotism, corruption, favoritism, bribery, promissory fraud or other forms of foreign corrupt practices.

204.   Plaintiff's employment within, for, or on behalf of a research facility, university, community/junior college, vocational training institution, preparatory, high school, grade school, corporation, law firm, business, entrepreneur, non-profit community/ volunteer/social organization, governmental agency or other entity within the niche market encompassing trade within and between the United States, México and other foreign countries (the "local labor market"), and/or direct partnership therewith, would expose Plaintiffs to corruption, and thus compromise the Plaintiff's international licensures, the SLTLAW/SLTBE Project℠ funding objectives, Plaintiffs' intellectual property rights, global clientele, associate provider, funding and other resource awards from the Project's international good will acquisition of grants, investments, alumni and philanthropic trusts, foundations, major gift benefactors, other important donors capable of major gifting, and other resources developed by the Plaintiff, and which the Plaintiff would naturally develop operating as a NAFTA authorized independent interdisciplinary business law attorney and communication design strategist on behalf of the SLTLAW/SLTBE Project℠.

205.   To avoid such comprises and exposure, the Plaintiffs and the SLTLAW/SLTBE Project℠ <u>do not</u> target students currently engaged in studies at any education level as candidates for the Project's degree and licensing interdisciplinary practical training intern scholarship. Likewise, the Plaintiffs and the SLTLAW/SLTBE Project℠ <u>do not</u> provide gratuitous pro bono, bufete jurídico or other form community/volunteer/social service learning, which is standardly conducted throughout the three to five year university undergraduate study programs within the interdisciplinary market. Plaintiff and the SLTLAW/SLTBE Project℠ <u>do not</u> provide diplomado course formatted lecture series or curriculum, which is standard for university continuing education programming within the México submarket.

206.   From an unknown source, on behalf of the SLTLAW/SLTBE Project℠, the Plaintiff adopted the philosophy, "Focus on what you want to accomplish, map out an effective strategy, build collaborative partnerships; and hold steadfast to the belief that your work should positively impact the people in the communities that you serve."

207.   Plaintiff identified the interdisciplinary niche market within the NAFTA international professional business investor trade framework and from a desire to improve lives, brought new trade services and products to the market.

208.   To build trust and further protect reputation, the Plaintiff demonstrated clear personal and societal benefits, behaved with integrity and took actions to both increase profits and improve economic and social conditions -- via collaboration restricted indirect partnering, within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries) -- in provision thereof.

**DOMESTIC, FOREIGN AND GLOBAL
INTERSTATE COMMERCE**

209.   The activities of the Defendants, including activities related to their illegal, anticompetitive conduct, are in the flow of and substantially affect domestic, foreign and global interstate commerce.

210.   Among other things, Defendants' anticompetitive conduct results in communications with one another, including with and between Defendants across state lines and in foreign countries, using the interstate and global telecommunications networks, email, the Internet, domestic and international mail and other delivery services.

211.   The Defendants electronically or otherwise solicit, submit, publish, subscribe and register for the publication and trade of written Articles and/or the presentation of such Articles and/or opinions, excerpts and lectures expounded therefrom during participation in and attendance of courses, seminars, conferences, congresses, conventions and trade shows ("intellectual products and services") promoting academic tourism across international and national state lines, and in relation to the Plaintiff's interdisciplinary niche trade service and products offerings, at issue in this Complaint.

212.   Defendants reap substantial revenues, royalties, commissions and bonuses from the purchase, sale, publication and/or presentation of such intellectual products and services, at issue in this Complaint, amounting to millions of dollars, throughout the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries).

/ / /

**THE RELEVANT NAFTA
INTERDISCIPLINARY NICHE MARKET AND
THE DEFENDANTS' MARKET POWER**

213.   The relevant geographic market for the purposes of Plaintiffs' claim is an interdisciplinary niche market identified within the NAFTA professional business investor trade framework, for the offering of (business law and communication design interdisciplinary continuing education) seminars, conferences, practical training functions and related services and products to global legal, business and university academic community customers, consumers and end-users within and between the United States, México and other foreign countries ("interdisciplinary niche market").

214.   The Plaintiff is a competitor in the interdisciplinary niche market, where the NAFTA authorized development of global clientele, practical training associate providers, employment and entrepreneurial cooperative mini-franchise inroads, alumnus and philanthropic trusts, foundations, grants, major gift benefactors, and other important donors capable of major gifting, in addition to economic activities, which encompass profitable interdisciplinary niche trade business law, communication design and entrepreneurial franchisor services and related general services and products, as well as, after sales services as follows:

(1)   Legal and Business Law Transaction Management and Consulting Services and Products.

(2)   Business Management, Research and Development Consulting Services and Products.

(3)     Conduction, Production, Direction, Organization, Management and Registration Sales of Interdisciplinary Seminar & Conference Event Services and Products.

(4)     Seminar and Conference Event Reservation Sales Management and Consulting Services and Products.

(5)     Seminar and Conference Event & Special Occasion Catering Services, Management and Commercial Sales.

(6)     Agency Representation Management and Consulting Services and Products.

(7)     University Undergraduate Alumnus and Business Professional Educational & Training Management and Consulting Services and Products.

(8)     University Alumnus Degree Scholar Selection, Practical Training Internship, Personnel Recruitment, & Placement Management and Consulting Services and Products.

(9)     Targeted-Publication Editorial, Advertising, Public Relations, Marketing, Tourism & Community Relations Services Management and Consulting Services and Products.

(10)    Communication & Graphic Design Services Management and Consulting Services and Products.

(11)    Technical English Language, Translation & Interpretation Services Management and Consulting Services and Products.

(12)    Installation Maintenance Services, Management, Consulting and Commercial Sales.

215.    The relevant business law and communication design trade services and products for the purposes of Plaintiffs' claim is:

>Plaintiff's provision of corporate formation, copyright, trademark, contract, wills & trusts, probate, general counsel and business communication design interdisciplinary trade services, Plaintiff's provision of a basic American business law lecture series, Plaintiff's provision of targeted-publication Americanized editorial management, and Plaintiff's production and management of interdisciplinary business law and communication design continuing education seminars as accredited business academic international fundraisers, which, in part, finance Plaintiff's provision of university alumnus degree scholarships and internship practical training functions, as inroads to employment and low-overhead global entrepreneurial franchise operations subsidized by Plaintiff's conscription and provision of secure housing to university international academic exchange students, as follows:

(1)    Business law and communication design project development, promotion and management opportunities.

(2)    Targeted-publication Americanized editorial management services, fund development and accredited interdisciplinary continuing education business law and communication design seminar conduction, production and management to facilitate fulfillment of annual presentation, publication and licensing competency requirements.

(3)    Internationally funded interdisciplinary degree and licensing intern scholarships, paid practical training and inroads to employment, as well as reduced overhead global cooperative entrepreneurial mini-franchise operations.

(4)    "In Defense of Foreign Nationals" a collaborative interdisciplinary Public, Political and Legal Oratory Competition Series.

(5)     A graduate level English/Spanish language Basic American Business Law lecture series simultaneously designed to enhance Test of English as a Foreign Language (TOEFL) performance.

(6)     An English Review, Strategic Planning Article and Business Advertisement Subscription Package, from which to establish a joint venture international strategic empowerment publication.

(7)     International management of long-term vacant rental homes and condominiums as reduced overhead interdisciplinary cooperative business operations for university alumnus, which is subsidized through conscription of university international academic exchange students who rent the upper level as secure housing.

(8)     Neighborhood revitalization programming to improve quality of life and property values.

(9)     Paid interdisciplinary practical training provider relationships for university alumnus.

(10)    International fundraising and inroad to the development of alumni relations and establishment of alumnus associations.

216.   Even where certain private universities may cover the cost of their undergraduate alumnus degrees and professional licenses, all México university undergraduate alumnus, in addition, have a professional practice obligation, and for all international university undergraduate alumnus, internship practical training experience can set you apart as an globally employable candidate.

217.   Prior to the Plaintiff's entry, none of the Defendants had exercised market power within the interdisciplinary niche market, where for the vast majority of México university undergraduate alumnus, the cost of their degree and professional license are not covered by their university tuition, and there exists no integral practical training programming and/or organized university alumnus association. Likewise, for a majority of international university undergraduate alumnus (within the United States and other countries), their student loan repayment obligations are overburdening and there exists no integral employment inroad opportunities within their career fields outside of the highly competitive exclusive top ten percent (10%) traditional major firm summer internship recruitment process and, specifically with the field law, the alternative low-pay construction litigation, insurance defense and personal injury firms.

218.   As alleged herein, at relevant times, no service and product substitutes were available to customers, consumers and end-users within the interdisciplinary niche market, save the respective options (1) for México university undergraduate alumni to obtain a certified letter from their university and purchase a permit from the SEP-DGP to work in a non- or semi-professional capacity within their career field until such time they can accumulate the required funding and relevant practical training hours to obtain their degree and professional licensure, and (2) for International university undergraduate alumnus (within the United States and other countries) to work in non- or semi-professional temporary placement positions within their career field (i.e., legal secretary, administrative assistant or paralegal) or temporary to permanent positions outside of their career field. During their 5-years of undergraduate study, current México university

67

students participate in government social service/bufete jurídico programming or other forms of community/volunteer/social service learning, which either <u>does not</u> equate to practical training viewed as relevant professional experience by certain prospective employers or is not paid. As alleged herein, there are nontariff barriers and tariff barriers, under the pretext of public health and safety, disguised as nontariff barriers to entry into the interdisciplinary niche market.

219.   Defendants IBERO, BUAP and ICJ, other incorporated professional schools of the BUAP, and the UDLAP, as well as Universidad Popular Autónoma del Estado de Puebla (UPAEP), Universidad del Valle de México (UVM), Universidad Autonoma de San Louis Potosi (UASLP) and Universidad Instituto de Educación Universitarios (IEU) are México universities with at least one campus location in the states of Puebla and San Louis Potosi that offer undergraduate degrees in diverse career areas of study. The IBERO, UDLAP, UPAEP, UVM, UASLP, IEU and BUAP offer language study programs (the latter makes the same available to its incorporated professional schools), including English language courses, for which there exists competition overkill within a saturated English language studies market, save group technical vocabulary and conversational English for diverse business professionals. Additionally, each offers continuing education diplomado (course) format curriculum programming. Each offers both undergraduate and graduate law degrees. Each maintains a bufete jurídico and/or other social service learning liaison relationships with the SEP and/or Defendants Ciudad Judicial de Puebla, the Tax Courts, PRODECON, PROFECO, Procuraduria General, SEGOB-INM, SAT, SECTUR and certain Puebla Professional Colleges. Additionally, each maintains funding or other

resource affiliations with Defendants SECTUR, CONACYT-FOMIX or ACACCI-COMPITE (OMC/UNCTAD). Defendant IBERO additionally has membership affiliations with the DAAD, the AJCU and the System of Jesuit Universities.

220.   After completion of their studies and social service learning requisites, in order for México university undergraduate alumnus to obtain their degrees and professional licenses, and be employable within their profession, each must pay fees and provide documentation to the SEP-DGP certifying their completion of a varying quantity of practical training hours distinguished by their career area.

221.   Defendant ASU, as well as other United States universities offer undergraduate degrees in diverse career areas of studies. ASU and its United States university competitors offer language study programs, including English language courses, for which there exists competition overkill within a saturated English language studies market, save group technical vocabulary and conversational English for diverse business professionals. Additionally, Defendant ASU and its United States university competitors, via their respective colleges of law offer continuing legal education curriculum programming. Each offers graduate law degrees. ASU claims innovation for its ASU Alumni Law Group, which each of its United States university competitors maintain a law clinic, and/or other form gratuitous pro bono volunteer learning liaison relationships. Certain ASU United States university competitors have membership affiliations with the AJCU and the System of Jesuit Universities.

222.   Members of Defendant SBA in addition to nonparty members of other state bar associations, professional colleges, expert industries, specialized practices, university

academia and professional organizations within the United States, México and other foreign countries are licensed professionals subject to competency standards, which require their annual completion of a designated quantity of accredited continuing legal education programming hours. These Defendants and nonparties have a demand for and would benefit from the Plaintiff's NAFTA authorized operation on behalf of the SLTLAW/SLTBE Project℠.

223.   Each México State University within the interdisciplinary niche market is authorized to accredit continuing education seminars available to consumers worldwide.

224.   Defendant BUAP is the State University located in the Puebla, Puebla, México, authorized to accredit continuing education seminars within the interdisciplinary niche market available to consumers worldwide.

225.   Neither Defendant Arizona Supreme Court, Defendant SBA nor Defendant ASU have a system for authorized accreditation of continuing education seminars within the interdisciplinary niche market available to consumers worldwide.

226.   Defendant ASU and its nonparty United States university competitors, the Defendants IBERO, BUAP and ICJ, along with nonparty incorporated professional schools of the BUAP,  the UDLAP, UPAEP, UVM, UASLP and IEU are universities that offer international academic exchange study programs, within the interdisciplinary niche market available to consumers worldwide. Nonparty Ms. Benitez is a residential and commercial property owner within the interdisciplinary niche market. These Defendants and nonparties have a demand for and would benefit from the Plaintiff's conscription of

academic exchange university students from the United States and other foreign countries and the provision of SLTLAW/SLTBE Project℠ secure.

227.   Members of state bars, professional colleges, expert industries, specialized practices, university academia and other professional organizations within the interdisciplinary niche market are licensed professionals subject to competency standards, which require or encourage their annual (international, national and/or statewide) publication and presentation of peer-reviewed scholarly articles and other intellectual property. These individuals and entities have a demand for and could benefit from the Plaintiff's provision of SLTLAW/SLTBE Project℠ targeted publication and interdisciplinary continuing education seminar management.

228.   Defendants IBERO, BUAP and ICJ, along with nonparty incorporated professional schools of the BUAP, and nonparties UDLAP, UPAEP, UVM, UASLP and IEU are among numerous universities within the interdisciplinary niche market that have a demand for and would benefit from the Plaintiff's provision of SLTLAW/SLTBE Project℠ targeted publication and interdisciplinary continuing education seminar international fundraisers.

229.   The Plaintiffs and select other mandatory members of the Defendant SBA in addition to select nonparty members of other state bar associations within the United States, México and other foreign countries, nonparty LegalZoom and other nonparty online legal service providers offer contract, wills & trust and other probate legal document preparation services and/or corporate formation, copyright and trademark state and federal registration services available to consumers worldwide.

230.   Defendant SBA and other nonparty state bar associations allege that LegalZoom should not be permitted to provide online legal services to residents within their respective jurisdictions, arguing that LegalZoom's service provision constitutes unauthorized practice of law. Similarly, the alleged "Bar charge" sham disciplinary hearing conspiracy against the Plaintiff deliberately challenges the federal practice of copyright and trademark protection services vital to the international scope of the SLTLAW/SLTBE Project℠.

231.   Individuals and entities within the interdisciplinary niche market have a demand for and would benefit from the Plaintiff's provision of state/federal/international copyright and trademark registration, corporate formation, contract, wills & trust and other probate legal document preparation services. In foreign markets, culture dictates demand where (e.g., annually within the territory of México), there are designated months when family traditionally prepare testaments for the transfer of property rights between and amongst their heirs.

## DEFENDANTS' ANTICOMPETITIVE ACTIVITIES

232.   Defendants conspired to supplant the SLTLAW/SLTBE Project℠ with the Enabling Capabilities Program in the frame of the FOMIX International Seminar Project ("FOMIX Project") in attempt to facilitate an interpretation of the terms of the Plaintiff's trade contract II commensurate with alternative facts indicating:

(1)   The Plaintiff was contracted to manage the FOMIX Project in the capacity of the SECTUR/FOMIX Coordinator on behalf or as an employee of the IBERO, FOMIX-CONACYT, SECTUR, ASU, Arizona Supreme Court, SBA, ABBA, and/or HNBA.

(2)      The IBERO's Scholarship for current Social Science students is the third-party beneficiary, rather the SLTLAW/SLTBE Project℠ Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship programming for interdisciplinary niche market university undergraduate alumnus (referred to as Pasantes in México) and graduate alumnus (e.g., MBA and Juris Doctor) as confirmed on August 22, 2013.

(3)      The SECTUR's scholarship and practical training through social service learning for current university students is the third-party beneficiary, rather the SLTLAW/SLTBE Project℠ Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship programming for interdisciplinary niche market university undergraduate Pasante and graduate alumnus as confirmed on August 22, 2013.

233.   Upon information and belief, the Arizona Supreme Court through its Committee on Character and Fitness Members[14] who served a term between the years of 1998 and 2005, distributed the Plaintiff's confidential mandatory character and fitness examination disclosures to Polsinelli and other individuals and entities within the interdisciplinary niche market not limited to the SBA, ASU, Nexo Legal, Dr. Isaac Osadolor and the IBERO.[15]

---

[14] Attorney Members: Howard D. Sukenic, Timothy R. Hyland, David F. Gaona, James H. Dyer, Troy P. Foster, Lee M. Holtry, J. Russell Skelton,  Evelyn Patrick Rick, Hon. Donald F. Daughton, Ann Birmingham Scheel, Stephen M. Weiss, Bruce G. MacDonald, Lawrence McDonough and Juan Perez-Medrano. Public Members: Ronald Watson, Vicki Barrett, Norma Nelson, H. Christina Hill, Rev. John Goldstein and Henry Manuelito.

[15] Polsinelli Locations: Arizona, Georgia, Tennessee, Illinois, Texas, Colorado, Missouri, California, New York, Kansas, Missouri, North Carolina, District of Columbia and Delaware.

234.   Upon information and belief, the Defendants disseminated the Plaintiff's confidential mandatory character and fitness examination disclosures within the interdisciplinary niche market.

235.   Upon information and belief, Defendants Brian R. Booker and Quarles & Brady[16] distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

236.   Upon information and belief, Defendants Brian Booker and Bowman and Brooke[17] distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

237.   Upon information and belief, Defendants Brian Booker and Gordon Rees[18] distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

238.   Upon information and belief, Defendant Elaina West distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

239.   Upon information and belief, Defendant Joe Padilla distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

---

[16] Quarles & Brady Locations: Arizona, Illinois, Indiana, Wisconsin, Florida and District of Columbia.
[17] Bowman & Brooke Locations: Arizona, Minnesota, Michigan, California, Virginia, Texas and Florida.
[18] Arizona, Georgia, Texas, Maryland, Alabama, Massachusetts, South Carolina, Ohio, Connecticut, Nevada, Florida, Wisconsin, New York, Oklahoma, Pennsylvania, Oregon, North Carolina, South Dakota, Virginia, Utah, Washington and West Virginia

240.   Upon information and belief, Defendants Antonio Dominguez and the Dominguez Law Firm distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

241.   Upon information and belief, Defendants Kirkorsky and Blackstad Hrabe & Kirkorsky distributed the Plaintiff's credit report containing the bankruptcy judgment within the interdisciplinary niche market.

242.   Upon information and belief, Defendant SBA distributed the Plaintiff's character and fitness disclosures, within the interdisciplinary niche market.

243.   Upon information and belief, Defendant ASU distributed the Plaintiff's character and fitness disclosures, within the interdisciplinary niche market.

244.   Upon information and belief, Defendants Antonio J. Dominguez and Nexo Legal, distributed the Plaintiff's character and fitness disclosures, within the interdisciplinary niche market.

245.   Upon information and belief, Defendant Osadolor distributed the Plaintiff's character and fitness disclosures, the credit report containing the bankruptcy judgment and other information acquired from his investigation of the Plaintiff within interdisciplinary niche market.

246.   Upon information and belief, Defendant IBERO distributed, within the interdisciplinary niche market, the Plaintiff's character and fitness disclosures, the credit report containing the bankruptcy judgment and other information about the Plaintiff acquired from the Defendants.

247.   After receipt of the Plaintiff's character and fitness disclosures, credit report containing the bankruptcy judgment and other information about the Plaintiff obtained from the Defendants:

(1)    The IBERO denied liability for payment of the trade contract I publication bonus and withheld the diverse publications and presentations of the Article edited by the Plaintiff and required for the Plaintiff to accurately calculate the publication bonus.

(2)    The IBERO denied authenticity of the trade contract II vendor and other subcontractor payment guarantee to its recommended vendors, who subsequently requested deposits or full payment in advance.

(3)    The IBERO insisted that all recommended vendor and other subcontractor products and services be invoiced in the Plaintiff's name and that Dr. Reyes personally guarantee payment.

(4)    The IBERO suspended, delayed and otherwise restricted all trade contract II advertising to its campus.

(5)    The IBERO, BUAP and ICJ suspended, delayed and/or otherwise ceased all trade contract II joint promotion and accreditation performance.

(6)    The IBERO, BUAP and ICJ suspended, delayed and/or other ceased all trade contract II scholarship intern alumni candidate recommendations

(7)    The IBERO distributed distrust propaganda against the Plaintiff within the niche interdisciplinary market.

(8)    The IBERO denied liability for payment of the trade contract II–fees and commissions.

(9)    Dr. Osadolor threatened application of *Logotherapy* against the Plaintiff and mandated that going forwarding she be his girlfriend.

248.   The Defendants' conspiracy conduct, identified as applied *Logotherapy* theories was designed to place the Plaintiff in a tri-level depressed state where at the:

(1)    Psychological level the Plaintiff, as a single female independent interdisciplinary business law attorney, was targeted for case manipulation and ethical misconduct entrapment, barred from court awarded attorneys' fees, and unlawfully sanctioned and blacklisted internationally as incompetent, thus would experience resultant feelings of inadequacy, which the Defendants enforced upon a level-one depressed Plaintiff as allegedly having stemmed from her ambitious choice of a single livelihood and NAFTA authorized independent business law trade operations on behalf of the SLTLAW/SLTBE Project℠.

(2)    Physiological level the Plaintiff, as a single female independent interdisciplinary business law attorney, was unlawfully ousted from the Project House, the Project Car stolen and (via web-based corporate directory) her ownership of FireBaby Breads™ an SLT Business Enterprise challenged, thus would experience resultant feelings of having "reached a vital low" and "suffered diminishment of physical energy," which the Defendants enforced upon a level-two depressed Plaintiff as allegedly having stemmed from her single female income driven inadequate management of personal and business affairs.

(3)    Spiritual level the Plaintiff, as a single, female, African-American, interdisciplinary business law attorney was outed as promiscuous, and where under the

Defendants' mistaken belief that they proved themselves to be greater against the Plaintiff than God alone for her, would experience resultant tension between who the Defendants believe the Plaintiff should be…an incompetent, sanctioned, monetary penalized, suspended or otherwise disciplined, insolvent, single, female, African-American attorney turned submissive trophy wife, compliant debt peon, supervised employee or otherwise patronized business partner – in contrast to who the Plaintiff actually is…the first generation attorney in her family, and the first African-American, single, female, United States national with dual residency, and dual licensed NAFTA authorized economic trade operations as an independent interdisciplinary business law attorney, communication design strategist and entrepreneur franchisor between the United States, México and other foreign countries. The Defendants condescend to the level-three depressed Plaintiff that such tension allegedly stemmed from the effectual consequences of the Plaintiff, a single, African-American, female, adult-reentry, middle-aged independent attorney, having experienced mid-life crisis regret over prior decisions in declination of pre-selected supposed well-intended male suitors and opting against what the Defendants touted as attractive employment career choices compatible with and to the complementary liking of the pre-selected male suitors.

249.    The Defendants further suggested to the tri-level depressed Plaintiff that because (unlike the Widow in the Bigman's favorite Gospel of Luke parable) she misdirected her persistence towards a nonviable, unattainable interdisciplinary SLTLAW/SLTBE Project℠ that did not come to fruition, lost her sense of future, lost her sense of meaning

and thus suffers from a form of depression, which the Defendants recommended as treatable through the Defendant SBA's Member Assistance Program.

250. During the Plaintiff's business trip to Wichita, Kansas, beginning May 30, 2016 the Plaintiff's mother and sisters received up to 21 landline calls and/or registered caller ID logs from Phoenix area codes through June 30, 2016. The callers, (a) suggested Plaintiff's family owns the 531 E. Lynwood Street property in Phoenix, Arizona and/or (b) at times asked for Tom or said they were calling on behalf of Tom Carmody, or (c) asked, "Do you know you are the Lynwood homeowner?" [19]

251. On May 30, 2016, the Plaintiff discovered that on around August 8, 2009, Tom Carmody was privy to her confidential mandatory disclosures maintained by the Arizona Supreme Court Character and Fitness Committee.

252.   A Tuberculosis public health issue arose in relation to the Plaintiff's July 26, 2016 to September 4, 2016 and October 5, 2016 to December 25, 2016 stays at one of the Airbnb metro-Phoenix host homes. The Tempe homeowners also hosted an AZ Homestay Indonesian ASU Global Launch student who was predisposed to Tuberculosis prior to arriving in Arizona. The student was placed under medical isolation. The Maricopa County Public Health Department alleged the Plaintiff was the student's AZ Homestay host.

253.   Upon information and belief, the homeowners in conjunction with ASU, AZ Homestay and Maricopa County Public Health manipulated those circumstances to

---

[19] Accordingly, Plaintiff sent a Litigation Preservation Notice to AT&T and/or Tom Carmody.

misrepresent the Plaintiff as an ASU employee, who allegedly became exposed to tuberculosis during the performance of her alleged duties as an ASU International Academic Exchange Ambassador Homestay Contact.[20]

254.   On February 28, 2017, in furtherance of the Defendants' international anticompetitive scheme, Defendants Arizona Supreme Court, SBA, ABBA, HNBA, Dominguez/NexoLegal, ASU and Polsinelli conspired to and did temporarily suspend the Plaintiff's license to practice law.

255.   On February 28, 2017, the Plaintiff discovered that in 2005, as part of a national anticompetitive scheme to permanently impair the Plaintiffs' reputation and thereby hinder the Plaintiff's career advancement in the business law trade, the Defendants contracted, combined and/or conspired to deprive the Plaintiff of her inalienable rights, statuses and liberty interests of self-determination[21], to be free from discrimination, prejudice, reputation damage and defamation, and to be respected by her family, friends, clients, peers and colleagues.

256.   The Defendants, via attributable action or inaction, in part, for unlawful retaliation of the Plaintiff's bankruptcy filed after the Defendants disenfranchised the 1999 *Glamour*

---

[20]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Arizona Homestay, Maricopa County Public Health and/or ASU.

[21]  The enjoyment of civil, political, economic, social, and cultural development, respect for private and family life, home and correspondence, and enjoyment of the freedom of opinion, expression and association, the freedom in choice of career, profession, occupation and self-employment, the freedom in choice of residence and locality of business operations, the freedom in choice of partners, significant others, boyfriends or husband and their occupation, race, color, ethnicity, national origin or religion, and the freedom in the choice to remain single and not consent to marriage.

*of Success*[22] event hosted at the Arizona Center, utilized identity politics to obstruct the Plaintiff's ability to make an income as a form of *Logotherapy*.

Defendants' Institution of Barriers to the Plaintiff's
Independent Business Operations and Professional Education and Training

257.   After the Plaintiff delivered the 1995/1996 Dr. Martin Luther King, Jr. Fine Arts Scholarship fundraising sponsorship presentation to Quarles & Brady of Counsel Attorney William H. Hawgood, II, Attorney Hawgood encouraged the Plaintiff to pursue a career in law.

258.   After the Plaintiff declined Wilford Rhine's counter to the Plaintiff's offer to host the 1999 *Glamour of Success* at Club Central, Rhine had an off-duty police officer place the Plaintiff in handcuffs for distributing promotional flyers in the Park Central Mall parking lot. The Plaintiff reported the incident to then Director of City of Phoenix Police Department, Gerald Richard and explained that Rhine's conduct was motivated by his belief that he was entitled to the Mary Kay sponsorship acquired by the Plaintiff and to dictate the event profits distribution.

259.   After the Plaintiff declined the partnership proposal of Vernard Bonner who was recommended by *Glamour of Success* event investor Elaina West, Plaintiff learned that Bonner owed West money and that the Arizona Center had consistently refused Bonner's prior event proposals. The Plaintiff reported to West that Bonner believed he was entitled to dictate how much of the profits the Plaintiff would receive and later explained how the

---

[22] Accordingly, Plaintiff sent a Litigation Preservation Notice to Mary Vizzerra (formerly Mary Hurtado Garcia) and/or Rick Vizzerra (formerly Rick Garcia).

conduct of both Rhine and Bonner contributed to the disenfranchisement of the *Glamour of Success* event.[23]

260.    On around May 13, 1999, the Plaintiff's father, revered as the "Bigman", encouraged the Plaintiff's plans to return to college.

261.    After review of the Plaintiff's consumer credit report, Quarles & Brady Attorney Brian R. Booker, on behalf of Quarles & Brady, declined pro bono representation of the Plaintiff against the Arizona Center owners of the dueling pianos, sports and alternative bars that hosted the *Glamour of Success* event, and rather recommended that the Plaintiff petition for Bankruptcy.

262.    After the Plaintiff took Attorney Booker's advice and on February 14, 2000 petitioned for Bankruptcy, Attorney Booker called the Plaintiff, asked why she filed Bankruptcy and denied having recommended that the Plaintiff do so. More recently in 2015/2016, Attorney Booker explained that he did not personally pull the Plaintiff's consumer credit report and clarified that Quarles & Brady had specific staff for that task in addition to evaluation and analysis. Although Attorney Booker has never been employed by Gallagher Kennedy, he further explained, "It is not now nor has it ever been the policy of Quarles & Brady, Bowman & Brooke and Gallagher Kennedy to pull the

---

[23] Accordingly, Plaintiff sent a Litigation Preservation Notice to Elaina West and Director Richard.

credit report of a prospective client as a determining factor of whether to take on their

legal representation."[24]

263.   After the Plaintiff returned to college, Attorney Booker reviewed a letter the

Plaintiff wrote to the ASU Financial Aid Office and mischaracterized the Plaintiff's

writing style as, "You write as if you believe everyone owes you."

264.   After Attorney Hawgood learned of the Plaintiff's Fall 1999 return to college, he

introduced the Plaintiff to Quarles & Brady Attorney Roger L. Norris, who encouraged

the Plaintiff to complete her undergraduate program, continue as planned in pursuit of her

JD/MBA, and consider medical law as one of her practice areas after graduation. Attorney

Booker referred to the Plaintiff's meetings with Hawgood and Norris as, "A joke because

everyone here knows that Hawgood is on his way out, so your meetings are nor more than

fruitless courtesies."

265.   After Quarles & Brady Attorney Melanie Hart granted the Plaintiff an interview

for her BIS 301 assignment, Hart questioned the Plaintiff's ability to have written the

corresponding essay.

266.   After ASU Professor Michael Morrell reviewed the Plaintiff's BIS 402 research

assignment, which analyzed the impact of misogynistic rap lyrics on African-American

female interdisciplinary business law attorneys, the Plaintiff's writing style was

mischaracterized as radical feminist and was unjustly graded. After successful appeal, the

---

[24] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorneys Brian Booker, Booker Evans and Michael Ross, and to law firms Quarles & Brady, Bowman & Brooke, Gordan Rees and/or Gallaher & Kennedy.

Plaintiff's grade was modified subject to the reviewing professor's grade increase limitation.

267.   After report of ASU Professor Michael ("Miguel") Flys' commentary that the Plaintiff, "Could make a good living as a prostitute because Spanish men love Black women," the ASU Equal Opportunity/Affirmative Action Office precluded the Plaintiff from conducting research interviews in Spain for publication in collaboration with Professor Janet ("Jess") Alberts and Melissa Pritchard. The Plaintiff was permitted to study abroad where she successfully completed the Spanish language and culture 2000 Summer programming.

268.   After the OCU Office of the Dean breached its fiduciary duty to safeguard the network server storage and file archive of the Plaintiff's submission, *Boa Constrictor: The Absolute Power of Statutory Interpretation*, in review of the United States Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board (NLRB),* which foreclosed the NLRB from awarding back pay to an undocumented Mexican immigrant unlawfully working in the United States, the Plaintiff was accused of having plagiarized the layout formatting from the sample article the Board recommended as a format guide. The Plaintiff reported this incident to the OCU Associate Dean for Student Services, Deborah R. Fathree.

269.   After the Plaintiff prepared an overview of a complex litigation matter involving an asbestos concern, a Kerr-McGee supervisor alleged the Plaintiff's internship was merely a political product of the OCU Law Review scandal. The Plaintiff reported this incident to the OCU Associate Dean for Student Services, Deborah R. Fathree.

270.   After Professor J. William ("Bill") Conger (deceased) noticed the Plaintiff of his intent to grade her performance lower than her two male partners, and thus preclude the Plaintiff's receipt of the coveted CALI Award, the Plaintiff successfully petitioned Professor Conger and received the equal top grade and the CALI.

271.   After soliciting the assistance of the Plaintiff's White boyfriend to stop her from being elected to serve as the incoming OCU Student Bar Association President, certain members of the graduating White male leadership publicized, via student body email correspondence, their intent to prevent the Plaintiff from being elected and simultaneously uphold their proclaimed right to provide unbiased volunteer service on the elections, voting and ballot committee(s). When the Plaintiff maintained her candidacy, the SBA officers accused the Plaintiff of misfeasance and arranged for the Sargent at Arms, Shawn Jefferson, to literally drag the Plaintiff down the auditorium stairs and across the auditorium if, during her address to the student body, the Plaintiff did not immediately shut up when told. OCU students Shawn Jefferson and Jerry Noblin warned the Plaintiff of the plan, which was reported to the OCU Associate Dean for Student Services, Deborah R. Fathree.

272.   After the OCU student body email correspondence continued, the Plaintiff's Jessup Moot Court teammates shared their preference that the Plaintiff stop responding to what Jessup Faculty Coach, Professor Peter Dillon referred to as "Sylvia v. The White Boys" student body email discriminatory narrow mindedness that only served to belittle the Plaintiff's membership and overall importance of the competition.

273.    After Dean Lawrence K. Hellman usurped the Plaintiff's authority as NWLSA President by supplanting the NWLSA's National Conference Keynote Speaker invitation to Supreme Court Justice Sandra Day O'Connor with an invitation for Justice O'Connor to attend a conflicting private function with the Dean's special guests, Hellman sought to use the Plaintiff's federal externship as a favor chip. The Plaintiff reported these incidents to OCU NWSLA Faculty Advisor, Paula J. Dalley and to U.S. District Judge for the Western District of Oklahoma, Vicki Miles-LaGrange. In protest, Judge Miles-LaGrange did not attend the Dean's private function and the Plaintiff ultimately resigned as NWLSA president.

274.    After the Plaintiff further reported suspected unethical conduct at the Busey Group to Gina Rowsam, Assistant Dean of Professional Career Development Center, during a telephone conference with Attorney Cynthia Rowe D'Antonio, where the Plaintiff was explaining how Dean Hellman invited Justice O'Connor to attend a conflicting private function and sought to use the Plaintiff's federal externship with Judge Miles-LaGrange as a favor chip, Attorney D'Antonio abruptly alerted the Plaintiff that a third-party was listening in on their conversation, by insisting the Plaintiff, "Stop talking! Please God, I beg of you stop talking! Don't say another other word! Please, stop talking right now!"

Defendants' False, Misleading or Otherwise Adverse
Characterizations Against the Plaintiff's Professional Reputation

275.    During Attorney D'Antonio's representation of the Plaintiff's consumer reporting dispute in preparation for the Arizona Supreme Court Character and Fitness Examination, then former Oklahoma Attorney Kwame Telli Mumina worked as a paralegal in Attorney

D'Antonio's law firm. Attorney D'Antonio also agreed to be a reference on the Plaintiff's Character and Fitness Application.[25] More than 10 years after Attorney D'Antonio assisted in Attorney Mumina's reinstatement to the Oklahoma Bar Association (OKBAR), Attorney Mumina, on behalf of the law firm Green, Johnson, Mumina & D'Antonio, threatened to report the Plaintiff to the OKBAR alleging the Plaintiff's antitrust Litigation Preservation Notice constituted unauthorized practice of law.[26]

276.   Attorney Booker was a partner at Bowman & Brooke, PLLC when he agreed to be an attorney reference on the Plaintiff's Character and Fitness Application. After the Plaintiff passed the State Bar of Arizona Examination, Attorney Howard Sukenic held an informal Character and Fitness panel hearing alleging that based on the consumer report, financial and behavioral orientations history he gleaned from the Plaintiff's character and fitness evaluation[27], the Plaintiff presents as, "Just the type of attorney for whom the lawyer regulation disciplinary process exists", and the Committee wanted assurance the Plaintiff would not be a "credit abuse backslider and bankruptcy recidivist".[28]

277.   After the Plaintiff took the advice of Quarles & Brady Attorney Booker T. Evans and focused the Committee on her present status of pressing forward towards a future

---

[25] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney D'Antonio.
[26] Accordingly, Plaintiff sent a Litigation Preservation Notice to the OKBAR.
[27] To satisfy mandatory disclosure requirements, the Plaintiff submitted financial, consumer report, business involvement, bankruptcy, address, civil litigation and employment histories ("confidential mandatory disclosures") to the Arizona Supreme Court Committee on Character and Fitness.
[28] Accordingly, Plaintiff sent a Litigation Preservation Notice to Judge Howard Sukenic, David Gaona, Timothly Hyland and/or the Arizona Supreme Court Committee on Character and Fitness Chair, Edward Novak.

interdisciplinary career in business law, the Plaintiff passed the Character and Fitness Exam, was admitted to the practice of law in Arizona and simultaneously became the first generation attorney in her Family.

278.   The Plaintiff began establishing her business law practice as a solo practitioner, representing small business clients in matters involving contracts, corporate formation, corporate reporting, event and editorial publication marketing and management, communication design, trademark/copyright registration and franchise operations.

Elaina and Mark West

279.   In addition to being investors in the Plaintiff's Glamour of Success Event at the Arizona Center, Elaina and Mark West each wrote a recommendation letter in support of the Plaintiff's Character and Fitness Examination Application for admission to practice law in Arizona. The Plaintiff also provide small business legal representation on behalf of the Native American Basketball Invitational (NABI) Foundation, LLC.

280.   Elaina West referred Attorney James M. LaGanke to the Plaintiff, alleging Attorney LaGanke needed assistance with his burgeoning bankruptcy caseload. The Plaintiff explained to Mark and Elaina how after corresponding with LaGanke, she arrived at the Court to request a continuance on his behalf and was blinded-sided by LaGanke's client who, unknown to the Plaintiff, was accompanied by state and federal investigators looking into LaGanke's ethical misconduct that somehow involved Elaina's accountant Pamela Jo Hansen-Thompson.

281.   The Plaintiff further explained that certain of her mentoring colleagues advised that she steer clear of the SBA's attorney regulation radar and as such, the Plaintiff consulted

Michael R. Ross of Gallagher & Kennedy to assist in navigation of the investigators' requests to interview and/or depose the Plaintiff towards the possibility of obtaining her witness testimony against Attorney LaGanke.[29]

282.   Upon information and belief, Elaina West later initiated a collection action and IRS audit against the Plaintiff, and orchestrated an investigation of the Plaintiff's personal and business activities within the interdisciplinary niche market.[30]

283.   Additionally, the Plaintiff prepared an index-tabbed Candidate Presentation Folio complete with Cover Letter, Resume, Reference List and Writing Samples (including the Plaintiff's Law Review candidacy submission), which innovatively established how the Plaintiff's more than 15 years of professional experience in the capacities of service to public, private and non-profit industries brings a level of maturity and unique ability to identify and support diverse needs of business clients, as well as establish and maintain community and business partnerships.

284.   After the Plaintiff provided the Folio to Attorneys Evans and Booker for their input as experienced diversity recruiters, (a) During a meeting at Quarles & Brady, Attorney Evans questioned whether the Plaintiff had ever owned property, and considering Plaintiff's response cautioned, "Always ask people the reason behind their questions before answering, and in the future never tell anyone that you have never owned property,"

---

[29] Accordingly, Plaintiff sent a Litigation Preservation Notice to Mark West, Elaina West, Attorney LaGanke and/or Attorney Michael R. Ross of Gallagher & Kennedy.

[30]   Accordingly, Plaintiff sent a Litigation Preservation Notice to the Paradise Valley Unified School District, South Mountain High School, Nemos Investigations and Collections, Blackstad Hrabe & Kirkorsky, LLC, Carmen Bell, Dr. Issac Osadolor, Nexo Legal, LLC and/or Leo Canales.

and (b) Attorney Booker edited the cover letter to depict a purely impressionable naive candidate, practically pleading for a job, as opposed to someone like the Plaintiff, an adult reentry graduate, capable of and seeking to demonstrate the degree to which she can and will apply her education, experience and service to break through barriers and create socioeconomic, innovative and profitable business law and communication design global franchise entrepreneurial opportunities that promote economic growth, engage female leadership and improve societal relations.

Defendant Polsinelli, PC

285.   During the Plaintiff's 2006 law firm experience, Defendant Polsinelli's supervising Attorney Lori V. Berke edited the facts of a Motion the Plaintiff wrote to be *inconsistent* with those within its companion Statement of Facts also written by the Plaintiff, then threatened to safeguard the documents for future use as a writing sample against the Plaintiff.[31]

286.   After Attorney Booker alleged that his 5-year pursuit of the Ryan Companies US, Inc. took precedence over that of the Plaintiff's recent acquisition efforts, Steve Jordan cautioned that the Plaintiff and Attorney Booker need to resolve their differences and Attorney Berke took the lead on Polsinelli's targeted acquisition of the Ryan Companies. In addition to the Ryan Companies, the Plaintiff targeted for acquisition Complete Skycap Services, Inc. and had previously acquired Sims Business Systems, Inc. as an SLTLAW business law client.

---

[31] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Lori V. Berke.

287.   After Attorney Berke raised an undefined nondisclosure issue against the Plaintiff, managing partners Brian Goodwin and Marty Harper told the Plaintiff, "Your business clients are not welcome at this Firm," to which the Plaintiff's assigned mentor, Attorney Don Stevens, II explained, "They said that because the firm believes you are not capable of identifying 'credit worthy' clients."[32]

288.   After Johanna Howard, Polsinelli Human Resources Executive expressed the firm's mischaracterization, "Sylvia doesn't want to be an attorney," Howard recommended the Plaintiff, "Find and invest in something that you love to do," and Attorney Richard Rea provided the Plaintiff with a reference to prevent what he perceived as, "An injustice that could destroy your legal career before it gets started."

289.   After Attorney Evans cautioned the Plaintiff, "[Polsinelli] cannot afford to allow you to go down the street and be successful,"[33] Attorney Booker suggested the Plaintiff "invest in a large malpractice policy" and explained that he would no longer use the Plaintiff as an example (to African-American female law graduates) of how there are promising legal employment inroad opportunities in Arizona outside of the traditional highly competitive major firm summer intern recruitment process and the alternative low-pay construction litigation, insurance defense and personal injury firms.

/ / /.

/ / /

/ / /

---

[32] Accordingly, Plaintiff sent a Litigation Preservation Notice to Polsinelli.
[33] Accordingly, Plaintiff sent a Litigation Preservation Notice Attorney Booker Evans.

Defendant The Doyle Firm, PC

290.   During the Plaintiff's subsequent 2006/2007 law firm experience, Doyle, PC's mentoring Attorney Ruth Berman, questioned the Plaintiff, "Does your employment reference from Polsinelli Attorney Rea have anything to do with him getting a divorce?"[34]

291.   After Attorney William ("Bill") Doyle questioned whether the Plaintiff actually wrote the case analyses, memorandums and complaints he assigned, Doyle counseled the Plaintiff to encourage a client to exclude from their lawsuit certain attorney defendants that Doyle described as, "My friends".

292.   After the Plaintiff accepted the appointment to serve as a temporary judge in the Maricopa County Justice Courts, Doyle PC manager, Teresa Hayashi Wales expressed the firm's concern, "Sylvia may commit judicial malpractice that could negatively impact the firm."[35]

293.   After Attorney Wales advised the Plaintiff of a missed litigation filing deadline for a case that was not on the Plaintiff's assigned case list, the Plaintiff received an automated Westlaw email-notification indicating that someone at Doyle PC used her old Westlaw access code to conduct research that may have been related to that case.

294.   Attorney Booker cautioned the Plaintiff about "being viewed in the legal community as a Ja Nelle Jenkins." Attorney Booker explained how, "There is no real future for Attorney Lashawn Jenkins at Quarles & Brady as long as he is married to Ja

---

[34] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Ruth Berman.
[35] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney William Doyle.

Nelle because she does not fit the wife profile that the partners believe is complementary to a partnership track attorney."

Maricopa County Justice Courts

295.   During the Plaintiff's subsequent 2006/2007 experience as a Judge Pro Tem, after the Plaintiff completed the required formal training, Presiding Justice of the Peace, John Ore, circulated a Bench Policy Directive to give himself authority to suspend or remove the Plaintiff from then Maricopa County Presiding Judge Barbara Mundell's appointment.

296.   After Judge Ore and Chief Clerk/Court Manager Linda Perkins made false accusations that the Plaintiff submitted more hours than she had worked, changed the operations of the court, was absent from the bench without notifying the clerk, and exceeded the amount of time allowed for training, Judge Ore assigned Administrative Pro Tem Judge Quentin Tolby to investigate.

297.   After Chief Clerk Perkins distributed a notice to litigants referring to the Plaintiff as a "previous judge pro tem" and that the Plaintiff was "no longer with the Justice Courts", Judge Ore terminated and blacklisted the Plaintiff by persuading the other justices to agree to a policy giving him authority to prevent the Plaintiff from serving in their courts and the Plaintiff declined Judge Ore's later request that she temporarily return, without pay, to issue a ruling of a small claims matter over which she presided.[36]

298.   After Attorney Evans cautioned the Plaintiff, "If enough of them say it, even if not true, it takes on a spirit of truth," (a) City of Phoenix Director of Development Services,

---

[36] Accordingly, Plaintiff sent a Litigation Preservation Notice to the Maricopa County Justice Courts and/or the Maricopa County Board of Supervisors.

Lionel D. Lyons explained that the Plaintiff was intentionally pushed out in order to make room for the appointment of former City Councilman, Cody Williams, who Lyons said, "Needed a place to land where he could be on a more competitive professional footing with his wife," then an assistant Chief of Police,[37] and (b) Attorney Booker was incidentally present at the Jayburg & Wilk, PC offices when the Plaintiff arrived for a consultation with Attorney Kraig J. Marton regarding injunctive relief, actual and punitive damage recovery for federal and supplemental state claims against the Maricopa County Justice Courts.

299.    Thereafter, Attorney Marton's proposed legal representation of state claims (which preclude punitive damages and required a notice of claim) against Chief Clerk Perkins, were conditioned upon the Plaintiff's payment of an initial $3,500 retainer (as estimated to prepare an A.R.S. § 12-821.01 public entity demand) subject to Attorney Marton's $600 hourly rate under a non-contingency fee agreement.

Post-Market Crash Practice Area Addition and Demographic Change

300.    Around the time of the 2007/2008 housing market crash the Plaintiff took on representation that ultimately involving litigation. The Plaintiff co-managed her litigation caseload with seasoned attorney mentors and expert mentors experienced in investigation, business, finance, research, writing, arbitration, litigation, mediation and settlement. [38]By word of mouth references and recommendations, at times a great percentage of the

---

[37] Accordingly, Plaintiff sent a Litigation Preservation Notice to Lionel D. Lyons.
[38] The SBA established a mentor program with a similar concept that additionally provides pro bono accountability and continuing legal education ethics credits.

Plaintiff's litigation cases involved assisting Mexican, Latino and other Hispanic immigrants who she believed could additionally benefit from the type of co-management and consultancy relationships outlined in her OCU Introduction to Legal Practice "Best Business Plan".[39]

301.   The Plaintiff's case management challenges, between 2007 and 2014, involved orchestrated obstruction of her ability to make an income, but rather to incur the debt of sanctions as evidenced by identity politics:

(1)    Propagation of Plaintiff's consumer credit report and other confidential financial information.

(2)    Record judicial characterization of Plaintiff as desirous of "…be[ing] the end all be all over your client matters".

(3)    Use of the negative acronym "L.O.S.T." in place of Plaintiff's firm name to falsely characterize Plaintiff's legal and business services as aimless, inept and ineffectual.

(4)    Thwarted, predetermined and/or forced pre-trial settlement, arbitration and mediation of the Plaintiff's cases.

(5)    Calculated exposure of the Plaintiff to malpractice and ethical violations and resultant court ordered sanctions.

(6)    Premeditated provision of incomplete research and misleading legal analysis, followed by judicial restriction of the Plaintiff's oral argument to address only the incomplete research and misleading legal analysis.

---

[39] Accordingly, Plaintiff sent Litigation Preservation Notice to Louise Valentin, Marianne Hutchinson, Alex Torres and/or Consuelo V. Asete.

(7)     Judicial condoning of opposing counsel's unethical personal demeaning of the Plaintiff, rather than addressing the legal issues.

(8)     Judicial rousing for opposing counsel to request sanctions against the Plaintiff.

(9)     Judicial tolerance of opposing counsel's willful procedural violations during the Plaintiff's cases.

(10)    Biased court appointed settlement judges, arbitration officials and discovery special masters over the Plaintiff's cases.

(11)    Judicial goading for the Plaintiff's clients to challenge her legal strategy, hourly fee and fee agreement.

(12)    Judicial rulings strategically designed to force unaffordable appellate review and resultant withdrawal of the Plaintiff's clients.

(13)    Pre-appellate review transcribed Record editing to remove evidence of discriminatory and other forms of judicial misconduct against the Plaintiff.

(14)    Judicial denial or drastic reduction of the Plaintiff's attorneys' fee awards.

(15)    Urging by friends, instigated from the legal and business community, to offset the resultant economic antitrust injuries as pro bono accountability.

The Phoenix Project House Prototype

302.    The Plaintiff and Attorney Carmody shared in exterior security, cleaning and landscape improvement expenses toward an anticipated year two renewal lease purchase option of the 531 E. Lynwood Street, Phoenix, Arizona Project House prototype. After the Plaintiff obtained bids for installation of bathrooms, on around August 5, 2009, the

Plaintiff and Attorney Carmody were unable to come to terms on Attorney Carmody's proposed an $850,000 purchase price (involving $10,000 down payment deposits every 6 months for 3 years, and $4,000 monthly interest-only payments for 5 years) for the property the Plaintiff's expert appraised at $350,000.[40]

303.   After declining Attorney Carmody's offer, the Plaintiff regrouped, relocated and began downsizing in preparation for the Project's México electronic operations.

304.   Plaintiff compared the identity politics to street gang tactics designed to force a person or business to choose a side and pay to receive its protections or suffer the consequences of operating independently.

305.   Plaintiff was determined to neither be over burdened by political propaganda, nor allow the identity politics to undermine her work as a business law attorney, communication design strategist and entrepreneurial franchisor on behalf of the SLTLAW/SLTBE Project and the future international scope of the Plaintiff's NAFTA professional business investor activities.

Foreign Legal Consultant Antonio J. Dominguez

306.   After conducting an initial electronic case co-management operational testing and market investigation trip towards the development of authorized interdisciplinary business law trade activities between the United States and México, on around February 11, 2011, the Plaintiff corresponded with foreign legal consultant Antonio J. Dominguez of NexoLegal.

---

[40] Accordingly, Plaintiff sent a Litigation Preservation Notice to Tom Carmody, Priscilla Fellows and/or Angel Ruiz.

307.   After NexoLegal requested an $825 retainer and misinterpreted the Plaintiff's practical training provider employment inroad component as "job searching", on around February 13, 2011, the Plaintiff declined NexoLegal's services.[41]

The Arizona Black Bar Association

308.   After the Plaintiff confirmed that the Bankruptcy was removed from her credit report, on around February 24, 2011, the Consulado de México in Phoenix issued the Plaintiff's passport Visa authorizing the SEGOB-INM to issue the Plaintiff's NAFTA FM3 Visa immigration document.

309.   During the February 24, 2011 Hazel B. Daniels Arizona Black Bar Association (ABBA) planning session, the Plaintiff announced her electronic operations relocation plans towards implementation of the SLTLAW/SLTBE Project℠ in México as an independent professional immigrant and the ability to import the Project Car. At the close of the planning session, Attorney Evans, ABBA President Gerald Richard, and the Honorable Cecil B. Patterson, Jr. (Retired) voiced their anticipation that the Plaintiff would have difficulty navigating the distinctions between the constitutions, laws and judicial systems of the United States and those of the United Mexican States, while simultaneously learning the Spanish language as an adult.[42]

---

[41] Accordingly, Plaintiff sent a Litigation Preservation Notice to Antonio J. Dominguez and NexoLegal.

[42] Accordingly, Plaintiff sent a Litigation Preservation Notice to the ABBA, Attorneys Booker Evans and Gerald Richard, Judge Patterson (Retired), Judge Penny L. Willrich (Retired), the law firms Greenberg Traurig and Ballard Spahr, and/or Dunlap-Stone University.

310.   The next day, foreign legal consultant Dominguez contacted the Plaintiff and advised that she could not import the Project Car into México. The Plaintiff's research revealed that her México issued NAFTA non-lucrative FM3 Visa provided eligibility for the Plaintiff to receive a permit to operate the Project Car within its territory, which would auto-renew with the Plaintiff's FM3 Visa or other form NAFTA professional immigrant residency document.

The Maricopa County Bar Association

311.   Attorney LaShawn D. Jenkins of the Jenkins Law Firm served as a board member of the Maricopa County Bar Association (MCBA). During the Plaintiff's meeting with Attorney LaShawn D. Jenkins of the Jenkins Law Firm, the Plaintiff inquired about the possibility of leasing virtual office space that would house her remote desktop server and provide the Project's statutory agent, mail, delivery and occasional conference room accommodations. Before declining, Attorney Jenkins commented,

> There was this impressive independent attorney, everyone was so amazed at how she was dabbling in diverse areas of practice and managing her cases like a trained senior law firm partner. I remember how I was so hesitant about going out on my own to practice law, like she was doing and appearing to be successful. I wondered how attorneys were able to successfully practice solo like that, be able to pay their bills, support themselves and still have a life. You keep making the same mistake.

312.   After declining, Attorney Jenkins would not clarify to what mistake he referred, but cautioned the Plaintiff about his experience with an African-American male attorney whose legal career was ruined after he boisterously challenged the major law firm culture that ultimately excluded him from partnership track and went on to challenge the legal

and judiciary community. Attorney Jenkins advise the Plaintiff, "I could not have someone with that type of reputation working within, sharing office space with, or be otherwise associated with my firm."[43]

Holly L. Marshall Law Office

313.   During the Plaintiff's initial years establishing México electronic operations under the NAFTA non-lucrative FM3 Visa restriction, the Defendants conspired to require the Plaintiff's frequent personal appearance in the Arizona courts for matters traditionally handled via telephonic conference. This continued throughout the Plaintiff's second year while operating under the NAFTA non-lucrative FM3 Visa restriction.

314.   During her return trips, the Plaintiff sometimes worked out of the office of Attorney Holly L. Marshall, who advised the Plaintiff of the mischaracterization within the Arizona legal community that the Plaintiff is not committed to her client matters or to the practice of law.[44]

Defendants' Manipulation of the Plaintiff's Case Outcomes
and Obstruction of the Plaintiff's Ability to Make an Income

315.   During court ordered discovery and/or settlement conferences via the Maricopa County Superior Court Alternative Dispute Resolution, the Plaintiff experienced the Defendants' bias where pro tem Judges inappropriately interceded in favor of the opposing litigants and their counsel:

---

[43] Accordingly, Plaintiff sent a Litigation Preservation Notice Attorney LaShawn Jenkins.
[44] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Holly Marshall.

(1)    CV2007-023564 Castro v. Taylor Bean & Whitaker Mortgage Corp., et al.[45]

(2)    CV2008-023119 Scott v. C2C Transportation, Inc., et al.[46]

(3)    CV2008-015451 Serrano, et al. v. Serrano, et al.[47]

(4)    CV2009-008246 Batres et al. v. Rocha, et al.[48]

(5)    CV2010-028928 DSFCU v. Johnson, et al.[49]

(6)    2:10-cv-01482-SRB DSFCU v. Johnson, et al.[50]

(7)    13-15350 DSFCU, et al v. Johnson, et al.[51]

316.    During Maricopa County Justice Court, Maricopa County Superior Court, State of Arizona Court of Appeals, Arizona Supreme Court, United States Federal District Court District of Arizona, Ninth Circuit Court of Appeals, Administración Local Jurídica de Puebla Norte de Servicio de Administración Tributaria, Tribunal Federal del Justicia Fiscal y Administrativa, Juzgado Quinto Especializado en Materia Civil de la Ciudad de

---

[45] Accordingly, Plaintiff sent a Litigation Preservation Notice to Magaly Castro, Clyde Granderson, Attorneys Carol Shegog-Parker and Lance Venable and/or the Maricopa County Superior Court.

[46] Accordingly, Plaintiff sent a Litigation Preservation Notice to Charlie Scott, Attorney Chris Curran, James R. Nearhood and/or the Maricopa County Superior Court.

[47] Accordingly, Plaintiff sent a Litigation Preservation Notice to Elisa Serrano, Attorneys Carol Shegog-Parker, John R. Tellier and David S. Sandweiss and/or the Maricopa County Superior Court.

[48] Accordingly, Plaintiff sent a Litigation Preservation Notice to Alejandrina Rocha, Attorney Lance Venable and/or the Maricopa County Superior Court.

[49] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Mindy Leisure, Attorney Richard L. Righi, Judge Edward O. Burke (Retired) and/or the Maricopa County Superior Court.

[50] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Judge Susan R. Bolton and/or the Ninth Circuit Court of Appeals.

[51] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Chief Circuit Mediator Claudia Bernard and/or the Ninth Circuit Court of Appeals.

Puebla, Juzgado Quinto Especializado en Materia Civil del Distrito Judicial de Puebla and Juzgado Quinto Especializado en Materia Civil de la Capital proceedings, the Plaintiff experienced the Defendants' bias where Judges, Commissioners and/or Presiding Judges inappropriately interposed in favor of the opposing litigants and their counsel:

(1)    CV2009-028578 Salas, et al. v. Baseline Financial Services, et al.[52]

(2)    CV2008-015451 Serrano, et al. v. Serrano, et al.[53]

(3)    CV2008-023119 Scott v. C2C Transportation, Inc., et al.[54]

(4)    CV2007-023565 Walker v. Biltmore Westglen, LLC, et al.[55]

(5)    CV2009-008246 Batres et al. v. Rocha, et al.[56]

(6)    CV2010-028928 DSFCU v. Johnson, et al.[57]

(7)    2:10-cv-01482-SRB DSFCU, et al. v. Johnson, et al.[58]

---

[52] Accordingly, Plaintiff sent a Litigation Preservation Notice to Miguel and Dora Salas, Judge Larry Grant and/or the Maricopa County Superior Court.

[53] Accordingly, Plaintiff sent a Litigation Preservation Notice to Charlies Scott, Judge Bethany Hicks and/or the Maricopa County Superior Court.

[54] Accordingly, Plaintiff sent a Litigation Preservation Notice to Elisa Serrano, Attorney Carol Shegog-Parker, Judge Douglas L. Rayes and/or the Maricopa County Superior Court.

[55] Accordingly, Plaintiff sent a Litigation Preservation Notice to Sgt. Arthur and Anabelle Walker, Attorneys Daniel Kloberdanz, Paul Levine and David M. Souders, Judge Robert H. Oberbillig and/or the Maricopa County Superior Court.

[56] Accordingly, Plaintiff sent a Litigation Preservation Notice to Alejandrina Rocha, Sergio Batres, Jr., Judge John C. Rea and/or the Maricopa County Superior Court.

[57] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Mindy Leisure, Judge Katherine Cooper and/or the Maricopa County Superior Court.

[58] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Mindy Leisure, Judge Susan R. Bolton and/or the District of Arizona.

(8)    13-15350 DSFCU, et al v. Johnson, et al.[59]

(9)    CV2007-018519 Stingley v. City of Phoenix, et al.[60]

(10)   ST2007-000035 Horton-Rider v. Maricopa County Assessor Office[61]

(11)   ST2007000024 Lance v. Maricopa County Assessor Office[62]

(12)   CC2011-185628RC West Glenn Estates v. Lopez, et al.[63]

(13)   PDJ 2017-9015 In re Sylvia L. Thomas[64]

(14)   Prodecon Expediente No. 00817-IV-RL-61-2014
       Contribuyente: Sylvia Lynne Thomas

(15)   Prodecon Expediente No. 00033-IV-RL-4-2015
       Contribuyente: Sylvia Lynne Thomas

(16)   Requerimiento No. 401253EG000294[65]
       Contribuyente: Sylvia Lynne Thomas

---

[59]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton, Circuit Judges Ferdinand Francis Fernandez, Carlos Tiburcio Bea and Ronald Murray Gould, and/or the Ninth Circuit Court of Appeals.

[60]  Accordingly, Plaintiff sent a Litigation Preservation Notice to LP Stingley, Judge Edward O. Burke and/or the Maricopa County Superior Court.

[61]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Linda Rider and Marty Horton, Commissioners Michael Barth and Barbara Hamner and/or the Maricopa County Superior Court.

[62]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Steve and Catherine Lance, Commissioners Michael Barth and Barbara Hamner, the Maricopa County Superior Court, Attorneys Rachel Liebson (Maricopa County Attorney's Office) and Jerry A. Fries (Office of Attorney General), and/or the Maricopa County Assessor's Office.

[63]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Michael Lopez and Avelina del Coronado Lopez, Judge Pro Tems Jeff Fine and Don Calendar, and/or the Maricopa County Justice Courts.

[64]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the Arizona Supreme Court and/or the SBA.

[65]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the PRODECON, SAT and/or the IRS.

(17)   Oficio Numero: 12-01-58-16245458/14[66]
       Expediente No. 14/19668-12-01-01-04-ST
       Actor: Sylvia Lynne Thomas

(18)   Oficio Numero: 12-1-15870/15[67]
       Expediente: 240/15-12-01-4-ST
       Actor: Sylvia Lynne Thomas

(19)   Aclaración No. AC201456637420[68]
       Contribuyente: Sylvia Lynne Thomas

(20)   Expediente No. 166/2014 or 166/14/5C[69]
       Actor: Sylvia Lynne Thomas

317.   During Maricopa County Justice Court, Maricopa County Superior Court, State of Arizona Court of Appeals, Arizona Supreme Court, United States Federal District Court District of Arizona and Ninth Circuit Court of Appeals proceedings, the Plaintiff experienced the Defendants' bias where senior attorney mentoring colleagues, experts and peers attempted to entrap the Plaintiff in ethical misconduct:

(1)   CV2009-028578 Salas, et al. v. Baseline Financial Services, et al.[70]

---

[66]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the Tribunal Federal de Justicia Fiscal y Administrativa, PRODECON, SAT and/or the IRS.

[67]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the Tribunal Federal de Justicia Fiscal y Administrativa, PRODECON, SAT and/or the IRS.

[68]  Accordingly, Plaintiff sent a Litigation Preservation Notice to the PRODECON, SAT and/or the IRS.

[69] Accordingly, Plaintiff sent a Litigation Preservation Notice to the Honorable Tribunal Superior de Justicia del Estado de Puebla, Juzgado Quinto Especializado en Materia Civil de la Ciudad de Puebla, Juzgado Quinto Especializado en Materia Civil del Distrito Judicial de Puebla, and/or Juzgado Quinto Especializado en Materia Civil de la Capital (collectively "Ciudad Judicial Puebla").

[70]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Miguel and Dora Salas, and Attorneys Libby Banks, Larry J. Cohen, Joe Padilla, Judge Larry Grant (Retired) and/or the Maricopa County Superior Court.

(2)     CV2010-001299 Montgomery v. National Asset Direct, Inc., et al.[71]

(3)     CV2010-015985 Stingley v. Bowie[72]

(4)     CV2009-002771 Mendez, et al. v. GMAC Mortgage, et. al.[73]

(5)     2:10-cv-01482-SRB DSFCU v. Johnson, et al.[74]

(6)     13-15350 DSFCU, et al v. Johnson, et al.[75]

(7)     CV2008-015451 Serrano, et al. v. Serrano, et al.[76]

(8)     CV2007-018519 Stingley v. City of Phoenix, et al.[77]

(9)     Attorney LaGanke's client Bankruptcy Case[78]

---

[71]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Bonnie J. Montgomery and Attorneys Michael Ross, Ronald Logan and/or Joe Padilla.

[72]  Accordingly, Plaintiff sent a Litigation Preservation Notice to LP Stingley, Pricilla Fellows and Attorneys Antonio Bustamante, Antonio Dominguez/Dominguez, PC, Patricia J. Ramirez and/or John Furlong.

[73]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Carlos Mendez and Maria del Carmen Mendez, and Attorneys Larry Cohen, Ronald Logan and/or Antonio J. Dominguez and Nexo Legal.

[74]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton and Attorneys Libby Banks and Michael Ross, and Judge Edward O. Burke (Retired) and/or the Maricopa County Superior Court.

[75]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Nichelle Burton and Attorneys Libby Banks and Michael Ross, Judge Edward O. Burke (Retired) and/or the Maricopa County Superior Court.

[76]  Accordingly, Plaintiff sent Litigation Preservation Notices to Elisa Serrano and Attorneys Carol Shegog-Parker, Larry J. Cohen, Alex E. Navidad, Antonio D. Bustamante, Alicia Montoya-Sanchez, and/or Libby Hougland-Banks.

[77]  Accordingly, Plaintiff sent a Litigation Preservation Notice to LP Stingley, Dr. Joe Carbajal, Attorney Libby Banks, Judge Edward O. Burke (Retired) and/or the Maricopa County Superior Court.

[78]  Accordingly, Plaintiff sent a Litigation Preservation Notice to Elaina West, Mark West and Attorneys James LaGanke and/or Michael Ross.

(10)   State Bar Charge File No. 08-2144 Francesca Markus[79]

(11)   State Bar Charge File No. 17-0380 Antonio J. Dominguez[80]

(12)   State Bar Charge File No. 13-0270 LP Stingley[81]

(13)   PDJ 2017-9015 In re Sylvia L. Thomas[82]

(14)   SB-17-0017-AP In re Sylvia L. Thomas[83]

Defendants' Influence Over
the Plaintiff's Legal Representation and Ability to
Obtain Effective Representation to Redress Grievances

318.   During the Plaintiff's engagement of third-party legal counsel, Defendants inappropriately influenced Plaintiff's counsel and effectively barred the Plaintiff from effective impartial representation:

(1)   CV2008-002009 Thomas v. Maricopa County Board of Supervisors, et al.[84]

(2)   CV2009-029918 Thomas v. Markus[85]

/ / /

/ / /

---

[79] Accordingly, Plaintiff sent a Litigation Preservation Notice to Lionel Lyons, Attorneys Reginald Cooke, Daniel Kloberdanz, Ariel I. Worth/SBA, John Furlong and/or Michael Ross.

[80] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorneys Thomas McCauley, Nicole Kaseta and/or John Furlong.

[81] Accordingly, Plaintiff sent a Litigation Preservation Notice to LP Stingley and Attorneys Antonio Bustamante, Antonio Dominguez/Dominguez PC, Patricia J. Ramirez and/or John Furlong.

[82] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nicole Kaseta, John Furlong and/or William J. O'Neil.

[83] Accordingly, Plaintiff sent a Litigation Preservation Notice to Nicole Kaseta, John Furlong and/or William J. O'Neil.

[84] Accordingly, Plaintiff sent a Litigation Preservation Notice to Lionel Lyons, Attorneys Kraig Marton, Brian Booker, Booker Evans and/or Francis Fanning (deceased).

[85] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Michael Ross.

Defendants' Foreclosure of the Plaintiff's Student Loan Benefits
and Acceleration of the Plaintiff Student Loan Obligations

319.   After Defendant PHEAA placed the Plaintiff's government loans under Economic Hardship Deferment status, in accordance therewith, the Plaintiff's private loans were eligible for automatic Economic Hardship Forbearance status commensurate with the term of the deferment of the Plaintiff's government loans.[86]

320.   On around May 7, 2009, Defendant Navient (formerly Sallie Mae) unlawfully reneged on its eligibility endorsement of the Plaintiff's and her co-borrower's approved Economic Hardship Forbearance, and subsequently accelerated and transferred for third-party collection the Plaintiff's Private Loan Consolidation.

321.   After Navient's May 2009 mischaracterization of the Plaintiff's loan as "accelerated", "defaulted" and "delinquent" and reported for collection and to the bureaus inaccurate balances, interest, late fees and other charges, Navient and its Agents (e.g. Asset Recovery Solutions, AlliedInterstate, LLC, AlliedInterstate, Inc. dba iQOR, GC Services Limited Partnership, Arrowhead Financial Services, LLC and Windham Professionals) continue in attempt to collect on the disputed debt including negative reports of the disputed debt against the consumer credit reports of the Plaintiff and her co-borrower.[87]

/ / /

/ / /

---

[86] Accordingly, Plaintiff sent a Litigation Preservation Notice to PHEAA.
[87] Accordingly, Plaintiff sent a Litigation Preservation Notice to Navient.

**Defendants' Application of *Logotherapy* Against the Plaintiff
within the Congressional Commerce and between the United States
and the territory of the United Mexican States**

322.   The Defendants employed *Logotherapy* theories against the Plaintiff in México in order to punish the Plaintiff for something they suspected she had done, and attempted and continue in attempt to intimidate and coerce the Plaintiff based on discriminatory purposes:

Internal Revenue Service and Department of Economic Security

323.   Six months after the Plaintiff's May 2011 entry into the lease agreement for the México Project House located at Cerrada Cadillac No. 20, 4-3 Colonia Lomas de San Alfonso, Puebla, Puebla, México, the Defendants' instigated the Internal Revenue Service Small Business and Self-Employed to initiate an Audit of the Plaintiff's 2008 Income Tax Return.[88]

324.   Four months later, the Defendants' instigated the Department of Economic Security (DES) reinstitution of a 2010 Determination of Unemployment Insurance Liability and Determination of Liability for Employment or Wages.[89] Within its March 15, 2012 correspondence, the DES referred to the Plaintiffs by use of the derogatory acronym "LOST" to characterize the Law Office of Sylvia Thomas.

/ / /

/ / /

---

[88] Accordingly, Plaintiff sent a Litigation Preservation Notice to the IRS.
[89] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Shegog-Parker.

The Jesus Venegas and Ronald Logan Satirical Parody

325.    After the SEP's certified revalidation of the Plaintiff's foreign studies, the Project House landlord's alleged "family friend", Attorney Jesús Venegas, attempted to extort the Plaintiff into paying the landlord's pre-May 18, 2011 outstanding water consumption debt to the SOAPAP. After the Plaintiff refused, Venegas demeaned the Plaintiff using the stereotypical racial slur, "excrement".

326.    During the Plaintiff's 2009-2010 representation in the Mendez, et al. matter, Attorney Ronald Logan, portrayed himself as an "old family friend" of defendants Gary Willis and Cynthia Willis. After Defendants' instigated plaintiff Mendez's physical threat against the Plaintiff, the Plaintiff withdrew as counsel.

The Reyes, Cohen, Logan and Ross Attempted Ethical Entrapment Satirical Parody

327.    On around November 18, 2012, Dr. Reyes explained that in his prior event and project management experiences dealing with people trying to cheat him and/or take over his work, "I just let them do it, because in the end, the work gets completed, so everything works out okay and I still end up looking good." In response, the Plaintiff shared her strategy, "Hustle the hustlers by letting them believe they got you, until the defining moment when they realize that you actually got the best of them."

328.    During the Plaintiff's 2008-2012 representation in the Serrano et al. matter, Judge Rayes urged opposing counsel to request Rule 11 sanctions against the Plaintiff and dismissed Serrano's Complaint.[90] After the Plaintiff successfully refuted defense

---

[90] Judge Rayes' incitements for defense counsel to move for sanctions did not appear in the transcript. The Plaintiff consulted the SBA ethics hotline.

109

counsels' sanctions request, Attorney Cohen recommended the Plaintiff petition for the Court's reconsideration of its dismissal. Prior to the Plaintiff doing so, Judge Rayes invited Serrano to so move, however restricted to certain counts against Defendant Armando Serrano.[91] In accordance with Serrano's terms of engagement, the Plaintiff additionally moved for reconsideration of claims against Martha Serrano and Martin Chacon, which for a marked period remained unresolved and was later denied post-reassignment. During the settlement conference regarding Serrano's Third-Amended Complaint, Armando announced his plans to and later did petition for Bankruptcy.

329.   During the Plaintiff's 2009-2010 representation in the <u>Mendez, et al.</u> and <u>Montgomery v. National Asset Direct</u> matters, after the Plaintiff filed the Complaint, Attorney Logan, posing as an "old family friend" of Gary Willis), contacted the Plaintiff to arrange a meeting to discuss the possibility of a global out-of-court settlement. Thereafter, former employer Bonnie Montgomery sought to retain the Plaintiff's representation. The Plaintiff referred the Montgomery matter to Attorney Michael Ross, who contrary to the Plaintiff's opinion of a conflict of interest not subject to waiver, explained the Plaintiff could ethically represent both Mendez and Montgomery. Attorney Padilla counseled against the Montgomery representation. After the Plaintiff filed the Complaint, and Montgomery disclosed a resume evidencing Attorney Logan's former and ongoing representation of Gary Willis and National Assert Direct, the Plaintiff

---

[91] In defense of Serrano's Third-Amended Complaint, Plaintiff argued that Judge Rayes' 15-page limitation ran afoul of Ariz.R.Civ.P., Rules 8(a)(2) and 9(b) and Local Rule 3.2(f), and thus was chilling and fundamentally unfair.

successfully motioned the Court for withdrawal as attorney of record in the Montgomery matter.[92] Attorney Cohen counseled against the Plaintiff's withdrawal.

330.   On around March 26, 2013, Dr. Reyes emailed correspondence recommending Plaintiff's trade services to his IBERO law and international relations colleagues.

331.   After review of the Plaintiff's NAFTA Appendix 1603.D.1 minimum education and alternative credentials as an independent professional interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor pursuant to and alternative credentials, including the April 3, 2013 independent professional and temporary resident permits issued by the SEGOB-INM, the IBERO entered into two trade Contracts with the Plaintiff.

332.   After the Plaintiff edited the Article pursuant to trade Contract I, the IBERO concealed the Article's publication and presentation and refused to pay Plaintiff the publication bonus.

333.   After the BUAP accredited the Plaintiff's ICES/SECI℠ business component of the trade Contract II Conference Event, the IBERO attempted to supplant the SLTLAW/SLTBE Project℠ with the Enabling Capabilities Program and FOMIX-CONAYCT International Project and denied authenticity of the Contract II ancillary vendor Payment Guarantee.

334.   After the Plaintiff's November 8, 2013 explanation to the Puebla transit police that she is not a university professor and her business activities in Puebla involved

---

[92] The Plaintiff consulted the SBA ethics hotline and lawyer regulation department.

management services pursuant to trade Contracts with the IBERO, that afternoon, the IBERO denied authenticity of the Vendor Payment Guarantee, suspended all advertising and promotional print orders, caused the IBERO recommended vendors and other contractors to request advanced payment, and mandated that all invoices be addressed to the Plaintiff and guaranteed by Dr. Reyes.

335.   After the Plaintiff reported the IBERO's conduct, Dr. Reyes cautioned the Plaintiff, "To the IBERO, the SLTLAW/SLTBE Project℠ is a representation of you pointing your 'Uncle Sam' finger at México and questioning, 'what are YOU doing to help YOUR people?'"

336.   After Dr. Reyes personally secured the modified DAAD Contractor Payment Guarantee and allegedly resigned from his capacity of IBERO Coordinator, he alleged the IBERO threatened to terminate his employment and reduce his pension if he did not successfully negotiated a trade Contract II modification.

337.   After the Plaintiff conditionally modified trade Contract II as clarified commensurate with the approved DAAD Grant, towards resolution of the conflict, on December 4, 2013 the DAAD denied the Plaintiff's expense reimbursement. The IBERO refused to pay for the Plaintiff's trade services and rather offered the Plaintiff employment conditioned upon the Plaintiff's waiver of all claims against the IBERO arising out of trade Contracts I and II, the Vendor Payment Guarantee and the Conditioned Clarifications Modifying trade Contract II. The Plaintiff declined.

338.   Nine days later, on December 13, 2013, for the stated purpose of precluding advertisement of "competing CLE events", the SBA BOG unanimously voted to amend

the Communications Access to Members Policy by adding, "In general, requests to promote non-Bar CLE events will not be granted".[93]

339.    In Spring 2014, the Plaintiff delivered the ICJ approved Spanish graduate level lecture featuring the SLTLAW/SLTBE Project℠ as a Foreign Investment case study designed to engage student interests in other important economic and policy issues affecting North America's expansion of the integration process of the multilateral NAFTA international professional business investor trade framework.

340.    During the Plaintiff's lecture, on around March 5, 2014, the IBERO distributed a distrust letter against the Plaintiff to the interdisciplinary niche market, including the Project House landlord's brother, Attorney José Salvador Benítez Nájera who between May 9, 2014 and late June 2014 denigrated the Plaintiff alleging,

> My sister no longer believes the IBERO contracted your independent trade services. You are a woman alone in a foreign country, where you don't know the laws, and continue to incur debt. Your country doesn't care about you and would keep you here to become and remain insolvent. In México we conduct free 'diplomado' courses and each attendee receives a 'constancia' with the appropriate authorizations on the reverse side. You have not studied our laws and still have not learned not to involve other attorneys in your client matters. I don't believe you are a pernicious person, but you couldn't pay your bills in the United States and you can't pay your bills here in México, where the costs are much lower. You continue to use my sister's house as your México fiscal residence and operate multiple businesses, but have not paid the rent. My sister rented to you because she believed you were employed as a Puebla university professor.[94]

---

[93] Accordingly, Plaintiff sent the SBA a Litigation Preservation Notice.
[94] Accordingly, Plaintiff sent a Litigation Preservation Notice to Attorney Benítez and/or Ms. Benítez.

Arizona and Federal Courts and México SAT Assessed Sanctions Satirical Parody

341.   During the Plaintiff's 2010-2014 representation in the <u>Johnson, et al. adv. DSFCU, et al.</u> matter, the District Court imposed a post-remand monetary sanction against the Plaintiff, which the Plaintiff, under the guidance of Attorney Libby Hougland-Banks, appealed to the Ninth Circuit.[95] The Ninth Circuit upheld the District Court's ruling and likewise imposed monetary sanctions against the Plaintiff.

342.   DSFCU disclosed evidence anticipated within the District Court's ruling. The Plaintiff filed a Motion to Set Aside which the District Court denied and ordered the Plaintiff to show cause why she should not be further sanctioned. After review of the Plaintiff's Response, the District Court, referring to Plaintiff as "Defendant" wrote:

> The Court does not believe that imposing additional monetary sanctions against Defendant would deter further misconduct. Defendant already faces more than $9,000 of sanctions due to her actions…Thus, experience shows that Defendant has not been deterred by the prospect of financial loss. After reviewing the entire record, the Court believes that Defendant's improper conduct is most likely explained by Defendant's misunderstanding of federal jurisdiction and civil procedure. To ensure that Defendant becomes properly educated on federal civil procedure, the Court orders Defendant to complete sixteen hours of continuing legal education ("CLE") in the areas of federal jurisdiction and civil procedure. Defendant shall file proof that she attended the courses with the Court. If she fails to do so, the Court will suspend Defendant from practice in the United States District Court for the District of Arizona and may potentially impose further sanctions.

---

[95] Seeking the Circuit's consideration of new arguments in review of its decision in <u>Moore v. Permanente Medical Group, Inc.</u>, Attorney Banks' requested of the Plaintiff, "If we are granted oral argument, please allow me to argue this matter before the Ninth Circuit. Over my 20 plus years, this argument has been 'my baby' work in progress for a long time." Accordingly, the Plaintiff sent a Litigation Preservation Notice to Attorney Hougland Banks.

114

343.    As ordered, Plaintiff fulfilled the federal judiciary's CLE sanction.[96]

344.    As part of the terms of settlement, the parties agreed to jointly motion to vacate the prior award of sanctions against the Plaintiff. The Ninth Circuit prematurely denied before the District Court granted. In keeping with the terms of settlement the parties jointly motioned the Ninth Circuit to reconsider in light of the District Court's grant. The Ninth Circuit denied and refused to accept further filings in the matter.[97] The Ninth Circuit denied and refused to accept further filings in the matter.

345.    Between the Plaintiff's respective March 13, 2014, April 29, 2014, June 11, 2014 and June 18, 2014 consultations with the SAT, PRODECON and Camacho Vaca & Asociados regarding the SLTLAW/SLTBE Project℠ service offerings and the 2013 outstanding receivables owed by the IBERO, the SAT on June 10, 2014 unlawfully assessed tax sanctions against the Plaintiff for alleged 2013 fiscal noncompliance.

346.    On June 18, 2014, the ICJ recommended accountant prepared and filed November/December 2013 tax statements, which unknown to the Plaintiff falsely

---

[96] Procedural rules are laws of the United States. Arizona has substantially adopted the Federal Rules of Civil Procedure (FRCP) and Arizona courts give great weight to the federal interpretations of the procedural rules. An attorney's suspension from practice in a United States District Court, as a result of misinterpretation of federal jurisdiction and civil procedure, could open the flood gates to that attorney's suspension from practice in both the lower state and higher federal courts. It stands to reason that the same policy considerations of the United States Supreme Court, which dictate that its decisions are not meant to cause cases to be thrown out on a technicality, extend the mutual protections against the throwing out (political disbarment) of attorneys in order to facilitate justice.

[97] Accordingly, Plaintiff sent a Litigation Preservation Notice, Judge Susan R. Bolton, the District Court for the District of Arizona, Circuit Judges Ferdinand Francis Fernandez, Carlos Tiburcio Bea and Ronald Murray Gould, and/or the Ninth Circuit Court of Appeals.

declared her receipt of full payment of trade Contracts I and II from the IBERO and simultaneously claimed unauthorized deduction allowances.

347.   On July 21, 2014, at 11:39 am, the Plaintiff made a debit card purchase at the Colonia Azcarate Cadena Comercial Oxxo, S.A. de C.V. ("OXXO") who issued the Plaintiff a factura electrónica pagada (paid invoice) corroborating the purchase.

348.   On around July 23, 2014 the PRODECON misrepresented to the Administración Local Jurídica de Puebla Norte de Servicio de Administración Tributaria ("the Administrative Tax Court") that the Plaintiff prepared and filed the November/December 2013 tax statements.

349.   Around January 8, 2015, the SAT unlawfully assessed additional sanctions against the Plaintiff alleging that at 11:15 am, July 21, 2014, the Plaintiff evaded service of process.

350.   After the PRODECON refused to submit the Plaintiff's OXXO receipt as evidence to the contrary, on July 13, 2015, in reliance on the false testimony, the Federal Tax Court dismissed the Plaintiff's claim and thus upheld the SAT's unlawfully assessed sanctions.

Arizona Identity Politics and México Logotherapy Satirical Parody

351.   In lieu of guidance towards the Plaintiff's success as an independent Arizona attorney, between 2007 and 2014, the Defendants used identity politics to orchestrate case management obstructions that impeded the Plaintiff's ability to make an income and simultaneously caused the Plaintiff to incur debt.

352.    On around August 27, 2014, the Plaintiff presented the SLTLAW/SLTBE Project℠ to Dr. Isaac Osadolor Osademwigie who contrary to the Plaintiff's contention to seek redress of her grievances in the United States federal district courts, opined that resolution of the Plaintiff's conflicts uniquely involves international law and boasted,

> I developed my own stem-cell therapy treatment. You will never be able learn, understand or duplicate my work and research. I also studied *Logotherapy*, so if I wanted to, I could dictate the path of purpose in your life.

353.    After Dr. Osadolor boasted of his ability to likewise employ *Logotherapy* against the Plaintiff, the Plaintiff experienced further meddling interference by the Defendants to obstruct or otherwise control enforcement of the Plaintiff's trade contracts I and II on behalf of the SLTLAW/SLTBE Project℠.

354.    On September 12, 2014, Defendant PHEAA/AES placed the Plaintiff's government consolidated loan into default status and as a penalty lowered the Plaintiff's credit score.

355.    Two days later, on around September 14, 2014, Dr. Osadolor mandated that going forward he is the Plaintiff's boyfriend, which the Plaintiff declined. Simultaneously, unknown to the Plaintiff, Defendant SECTUR posted on its website significant elements of the SLTLAW/SLTBE Project℠ university undergraduate alumni Degree and Licensing Scholarship and Practical Training Internship component as a México government social service learning program.

356.   Two days later, on around September 16, 2014, the CineyMas Magazine General Director, Humberto Sales Roa, Jr. alluded to an arrangement made for payment of the Project House rent and refused to explain his comment to the Plaintiff.[98]

357.   The next day, on around September 17, 2014, BUAP Continuing Education Director Carlos Contreras opined to Plaintiff that insufficient advertising sabotaged the SLTLAW/SLTBE Project℠ ICES/SECI℠ Fundraiser Series business component of the 2013 Conference at the IBERO. The Plaintiff clarified that the breach of the trade contract II ancillary Joint Accreditation and Promotion, in part, sabotaged the advertising and registration sales.

358.   That same day, Dr. Osadolor affirmed his participation in the SLTLAW/SLTBE Project℠ First Annual Interdisciplinary Law and Medicine Continuing Education Seminar International Fundraiser Series.[99] Dr. Osadolor committed to demonstrate such support to the BUAP and ICJ, with the caveat, "You and I both realize that your Project is great for México, however, whether México, specifically Puebla, is ready to accept the necessity, social and economic benefits of your Project is yet to be determined." Dr. Osadolor mocked and scolded the Plaintiff,

> Like you, I also can walk around in the dark in my home, because after a few seconds my eyes adjust. I am not going to go sit up at some university every day either. As I told you, I study from 11 pm to 7 am each day. You need to spend more time studying and stop running around meeting with all of these different attorneys. You should not invite people into the upstairs level of your home on their first visit. My house is your

---

[98] Accordingly, Plaintiff sent a Litigation Preservation Notice to CineyMas, ICJ, and/or Accountant Miguel Cardoso Galeno.
[99] Accordingly, Plaintiff sent a Litigation Preservation Notice to Dr. Thomas H. Strong.

house, but I do not invite guests into the upper level of my home, until I have come to know them, at least until after I have allowed them to visit 2-3 times. You should not leave your house unless it is necessary. You should eat, drink and work in your home, instead of coffee shops and restaurants. You must check your bank account balance each day. Maybe someday you will be like Oprah Winfrey, but now, you must start over.

359.   The next day, September 18, 2014, the PRODECON misrepresented to the Tribunal Federal del Justicia Fiscal y Administrativa (the "Federal Tax Court") that the Plaintiff prepared and filed the November/December 2013 tax statements.[100]

360.   Seven days later, during the September 24, 2014 meeting, the BUAP and the ICJ proposed the Plaintiff's presentation of the SLTLAW/SLTBE Project℠ Basic American Business Law Curriculum Series as a 120-hour Diplomado Público (public course), rather than a Seminar during a 2015 public conference co-hosted by the ICJ in consideration of about $3.50 USD per hour.[101]

361.   The BUAP, ICJ and Dr. Osadolor encouraged the Plaintiff's collaboration with an Arizona bar association (e.g., SBA, ABBA, HNBA, and/or MCBA) via video conference link.[102]

The BUAP and Judge Grant Statute of Frauds Satirical Parody.

---

[100] Accordingly, Plaintiff sent a Litigation Preservation notice to the Tribunal Federal del Justicia Fiscal y Administrativa, PRODECON, SAT and/or the IRS.

[101] Accordingly, Plaintiff sent a Litigation Preservation Notice to the BUAP.

[102] Accordingly, Plaintiff sent a Litigation Preservation Notice to the SBA, ABBA, HNBA and/or the MCBA.

362.    The BUAP proposed the Plaintiff be responsible to advertise the public conference, and based on a *promise for future action*, in two years, the Plaintiff would be *eligible* for a book publication deal with the BUAP.

363.    The Plaintiff's 2009 representation in the <u>Salas, et al.</u> matter involved Arizona Attorney defendants who by false promise, took advantage of unrepresented Mexican immigrants in the process of obtaining their citizen. Judge Larry Grant (Retired) on dismissal of the matter held that because the Plaintiff, "…sat on [her] hands" the claims [against the Defendants] were barred by the statute of limitations…and the Plaintiff "…did not adequately address the statue of frauds concerning *this promise for future action*."

364.    The terms also involved the BUAP's receipt of 10 percent of the public conference registration sales in consideration of its contributed free use of an Edificio Carolino conference room and provision of Constancias (attendee accreditation certificates containing the appropriate authorization on the reverse side) absent the SLTLAW/SLTBE Project℠ logos and absent the Plaintiff's signature.

<u>The Mentoring Colleague and Osadolor Conflict of Interest Satirical Parody</u>.

365.    The BUAP director reminded Dr. Osadolor that he is one of his patients and simultaneously conditioned that the Plaintiff's submission of a completed BUAP Continuing Education Diplomado Project Guide would constitute an agreement under the proposed terms. Dr. Osadolor chided the Plaintiff,

> I have obtained United States citizenship for myself and my family. I did it the right way, by starting a business, investing in that business and providing jobs. That's the proper way to attain citizenship!

366.   On around September 24, 2014, the Plaintiff discovered that during her 2008-2014 representation in client litigation matters, certain attorney mentoring colleagues and case co-management consultants who asserted "no current conflict of interest" abused their mentor relationship to acquire the opposing corporate litigant as a client, to interpose a favor on behalf of the opposing corporate litigant, to create client disloyalty and doubt against the Plaintiff's competence, and/or to entrap the Plaintiff into a circumstance of ethical misconduct.[103]

The BUAP's First Failed Attempt to Forfeit the Plaintiff's NAFTA Protections

367.   The next day, on September 25, 2014, the Plaintiff declined the offer and informed Dr. Osadolor and the BUAP and ICJ Directors that the diplomado public conference course format presented a conflict of interest with the SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series benefitting the Degree Licensing Scholarship and Practical Training Internship as proposed on June 24, 2014.

368.   After the Plaintiff emailed a September 25, 2014 explanation of the same, Dr. Osadolor attempted to assure the Plaintiff, "You will make money. They just want you to agree to not use the word 'seminar' and replace it with 'diplomado'. You can make money."

369.   The Plaintiff explained how the proposed use of diplomado public course format and the proposed fee, in lieu of the seminar and the Plaintiff's license, registration,

---

[103] Accordingly, the Plaintiff sent a Litigation Preservation Notice to Booker T. Evans, Michael R. Ross, Joseph Padilla, Larry J. Cohen, Libby Hougland Banks, Christopher D. Hill, David L. Lockhart and Hyung S. Choi, Clyde H. Granderson, Michael Hays, Mindy Leisure and Priscilla Fellows.

121

materials and hourly fees, would position the Plaintiff in the commensurate circumstance of a México university employed professor, and thus compromise her NAFTA protections operating as an independent professional immigrant on behalf of the SLTLAW/SLTBE Project℠.

370.   The next day, on September 26, 2014, the BUAP affirmed its process to accredit the SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series as a business academic collaborative using the same or similar BUAP guide to register, present and report continuing education programs and application for certificates of attendance ("Continuing Education Accreditation Guide")

371.   On around October 19, 2014, the Plaintiff proposed incorporation of the relevant terms of the SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series Trade Contract within each completed Continuing Education Accreditation Guide submitted by the Plaintiff to the BUAP.

372.   The Plaintiff also counter-proposed use of the Edificio Carolino conference room as an offsite public course facility, separate and apart from the Projects' ICES/SECI℠ International Fundraiser Series  event location, where the México practical training associate providers would deliver gratuitous presentations to the Project's undergraduate alumnus interns framed as a Professional Practice Lecture Training Series commensurate with the BUAP's standard continuing education diplomado público course formatted programming.

The Yves Rocher, DAAD Conference and Glamour of Success Satirical Parody

373.    Between November 1, 2014 and November 26, 2014, the Defendants conspired to and did marginalize the Yves Rocher Sales Event to be held at the Plaza Sole similar to the disenfranchisement of the 2013 DAAD Conference held at the IBERO and the 1999 Glamour of Success Event held at the Arizona Center in Phoenix, Arizona.

374.    Around November 1, 2014, the Plaintiff proposed an SLTLAW/SLTBE Project℠ collaborative business law and academic practical training provider association with Yves Rocher on behalf of Leslie Torres Soto, a BUAP Business Administration national academic exchange student subletting at the Project House.

375.    The Plaintiff marketed Ms. Torres as a national exchange student, who could liaise between Yves Rocher and her contacts within the Puebla international academic exchange student market to earn her practical training hours.

376.    Ms. Torres was assigned the tasks of conducting a small university international academic exchange student market study, prepare and present YR with her Market Assessment and Business Proposal. The Proposal was aimed to assist YR representatives in promoting YR makeup and skin care products to México university students via international sales events managed by Ms. Torres, in collaboration with her international academic exchange student peers.

377.    The Pilot Yves Rocher Sales Event was simultaneously aimed to attract university students to the Plaza Sole (formerly Plaza del Sol), increase consumer traffic and sales, position Ms. Torres as a future business development liaison to establish an events management mini-franchise and promote the future development of a Yves Rocher store in her home town of Tamaulipas, México.

378.   After the Plaintiff discovered that, in part due to the Defendants conspiracy conduct, Ms. Torres was obstructed from fulfilling her proposed promotional obligations, the Yves Rocher Sales Event was cancelled.

The PRODECON and SBA False Testimony Satirical Parody

379.   Respectively on December 1, 2014, December 4, 2014 and December 7, 2014, the Plaintiff discovered and reported the false tax statements to the SAT and filed amended tax statements. Five days later, on December 12, 2014, the SBA BOG voted against adopting a CLE Provider Pre-Certification process.

380.   Around January 8, 2015, the SAT unlawfully assessed additional sanctions against the Plaintiff and by use of false Affidavit testimony alleged that at 11:15 am, July 21, 2014, the Plaintiff described using stereotypical racial epithets, evaded service of process.[104]

381.   Around April 10, 2015, the PRODECON refused to present to the Tax Courts the Plaintiff's Motion for Summary Judgment (MSJ) evidence (located within the SAT's invoicing system) to irrefutably evidence the Plaintiff did not evade service and thus the sanctions were unlawful. Around the same time Mi Viejo Café began boycotting the Plaintiff's presence as a single woman sitting in the restaurant's lower level.[105]

382.   After the PRODECON's refusal to present the Plaintiff's MSJ evidence, on July 13, 2015, in reliance on the false testimony, the Federal Tax Court dismissed the Plaintiff's claim and thus upheld the SAT's unlawfully assessed sanctions.

---

[104] Accordingly, Plaintiff sent a Litigation Preservation Notice to the SAT.
[105] Accordingly, Plaintiff sent a Litigation Preservation Notice to Mi Viejo Café.

383.   During the February 28, 2016 Order to Show Cause hearing, <u>In re the Matter of Sylvia L. Thomas</u>, the alleged Presiding Disciplinary Judge, in reliance on false testimony, found the Plaintiff in contempt and for an interim period suspended her license to practice law.

<u>The PRODECON, Gallagher Kennedy and Judge Cooper and MSJ Satirical Parody</u>

384.   To support its refusal to present the Plaintiff's MSJ evidence, the PRODECON asserted, "This not an appropriate time to petition for summary judgment...You are a taxpayer, not a client. The PRODECON will advise you of what pleadings to file, and when the appropriate time comes to present such arguments and evidence."

385.   During Gallagher Kennedy's 2009 representation of the Plaintiff in the <u>Thomas v. Markus</u> matter, Attorney Ross denied the Plaintiff's request to file a Motion for Summary Judgment pursuant to admissions made by Markus within her Answer to the Plaintiff's Complaint.

386.   During the Plaintiff's representation of the <u>Johnson, et al. adv. DSFCU, et al.</u> matter, after the District Court's denial of the Plaintiff's Motion to Set Aside based on DSFCU's untimely disclosed summary judgment evidence supporting federal court jurisdiction and a sanctions award, Maricopa County Superior Court Judge Cooper deliberately foreclosed the dispositive motion deadline, denied the parties request for continuance and forced the parties into settlement, in lieu of trial.

<u>AZ Supreme Court, SBA and Ciudad Judicial Sham Proceeding Satirical Parody</u>

387.   The SBA initiated a Bar charge against the Plaintiff based on a ruse screening investigation concerning strawman complainant Antonio J. Dominguez of Nexo Legal.

Based on the allegations of complainant Dominguez, the SBA issued an unconstitutionally aimed subpoena, from which the believed to be PDJ of the Arizona Supreme Court held a sham Show Cause hearing on February 28, 2017, held the Plaintiff in contempt and for an interim period suspended her license to practice law.

388.    Further, based on complainant Dominguez's allegations, the SBA and Arizona Supreme Court continue, in abuse of the judicial process, to threaten obstruction of the Plaintiff's ability to practice law as an NAFTA professional on behalf of the SLTLAW/SLTBE Project if the Plaintiff does not enter into a disciplinary consent agreement.

389.    Similarly, around January 14, 2015, the Puebla City Civil Court served an alleged judicial notice referencing case number 166/14/5C, replete with procedural and constitutional deficiencies and allegedly signed by Judge Horacio Bravo Negrete.

390.    On January 15, 2015, Ciudad Judicial de Puebla Judicial Secretary, Alfredo Louvier Hernández, wrongfully accused the Plaintiff of falsifying a cosigner signature on the Project House Lease Agreement. To avoid exposure of true signature and simultaneously demonstrate just cause for non-appearance, the January 20, 2015 filed Response contained a digital fingerprint and attached the Rental Agreement in exhibit as evidence that there is no co-signer.[106]

---

[106] Accordingly, Plaintiff sent a Litigation Preservation Notice to Andrew Shane Sanders, the Ciudad Judicial de Puebla and/or the PROFECO.

391.   On February 11, 2015, the Puebla Civil District Court served an alleged judicial notice referencing case number 166/14/5C, replete with procedural and constitutional deficiencies and allegedly signed by Judge Horacio Bravo Negrete.

392.   Again, to avoid exposure of true signature and simultaneously demonstrate just cause for non-appearance, the February 18, 2015 filed Response contained a digital fingerprint and attached the Rental Agreement in exhibit as evidence that there is no co-signer. Additionally, the Response noticed the Plaintiff's right to seek redress in the United States district courts against the Defendants for violations of federal laws and supplemental state law claims including breach of contracts I and II as inextricably linked to the modified terms of the Project House lease renewal, but are neither novel, nor complex or predominant.

393.   Four days later, around February 22, 2015, Dr. Osadolor declared to the Plaintiff, "I had you investigated." After the Plaintiff questioned Dr. Osadolor's knowledge of the México Defendants' NAFTA violations in furtherance of what appeared to be a United States-México antitrust conspiracy against the Plaintiff, Dr. Osadolor advised, "I don't really know what you mean. I am upset with your statement. I do not think I would have time [to talk] anymore."[107]

394.   On March 26, 2015, the Puebla Civil Capital Court served an alleged judicial notice referencing case number 166/14/5C, replete with procedural and constitutional

---

[107] Accordingly, Plaintiff sent Dr. Osadolor a Litigation Preservation Notice.

deficiencies and unsigned by the alleged Court officials, Attorney Alejandra Valdés Garcia and Attorney Alfredo Louvier Hernández.

395.   Again, to avoid exposure of true signature and simultaneously demonstrate just cause for non-appearance, the March 30, 2015 filed Response contained a digital fingerprint and attached the Rental Agreement in exhibit as evidence that there is no co-signer. Additionally, the Response noticed the Plaintiff's right to seek redress in the United States district courts against the Defendants for violations of federal laws and supplemental state law claims including breach of contracts I and II as inextricably linked to the modified terms of the Project House lease renewal, but are neither novel, nor complex or predominant.

The BUAP's Second Attempt to Forfeit the Plaintiff's NAFTA Protections

396.   Prior to its March 17, 2015 issuance of the Plaintiff's Permanent Resident Permit, the SEGOB-INM provided the Plaintiff with a statement for alleged mandatory inclusion in her application. The statement amounted to a declaration that the Plaintiff's temporary resident status immigration document was issued under the protections of the México Constitution, rather than the multilateral treaty protections of the NAFTA professional business investor immigration measures.[108] The Plaintiff did not comply with the SEGOB-INM's request.

---

[108] Accordingly, Plaintiff sent a Litigation Preservation Notice to the SEGOB-INM.

397.   On July 14, 2015, the SEP-DGP issued the Plaintiff a México professional license for her doctorate in law, masters in small business administration and bachelors in communication based on revalidation of her foreign university degrees.

398.   After the Plaintiff's August 20, 2015 completion of the PHEAA/AES loan rehabilitation program, the Plaintiff's consolidated government loan was transferred to Suntrust Banks, Inc. and the Plaintiff's eligibility for Economic Hardship Deferment automatically renewed at 3 years.[109]

399.   Nine days later, around August 29, 2015, the Defendants ousted the Plaintiff from the Project House, removed the Plaintiff's personal and business property and stole the Project Car.

400.   On September 3, 2015, Attorney Joe Padilla questioned the Plaintiff, "Do you have transportation? If you do, I thought we could have lunch." During the September 8, 2015 lunch meeting, Attorney Padilla challenged the Plaintiff to use the SLTLAW/SLTBE Project℠ presentation materials and, "Explain to me how you can make money? After the Plaintiff's overview, Attorney Padilla asserted, "The problem before was that you did not know how to make money. Now, are you ready to permanently return to Arizona to work as an attorney who only practices law?"

---

[109] Accordingly, Plaintiff sent a Litigation Preservation Notice to SunTrust Banks, Inc.

401.   On October 19, 2015, Ms. Benítez denied legal representation by the PROFECO and informed the Plaintiff of her belief that the Project Car was moved to a storage facility near San Pablo Apetatitlán, Tlaxcala, México.[110]

402.   On January 22, 2016, the Plaintiff's pre-litigation investigation research concerning Polsinelli's 2006 ambiguous nondisclosure allegation uncovered the article, When Character and Fitness Disclosures Collide: The Dilemma of Inconsistent Law School and Bar Admission Applications, published in the American Bar Association (ABA) newsletter, The Professional Lawyer, and the Plaintiff discovered the Defendants' distribution of her confidential mandatory character and fitness disclosures within the México interdisciplinary niche market.

The Thomas Family and Serrano Family Satirical Parody

403.   During the Plaintiff's May 2016 business trip to Wichita, Kansas, the Plaintiff and her brother Ronald answered and listened to several harassing telephone calls from metro-Phoenix area codes to her Mother's home landline alleging the Plaintiff's family members were the owners of the Project House prototype property located at 531 E. Lynwood Street Phoenix, Arizona. Two of the Plaintiff's sisters also confirmed receipt of similar harassing calls, and/or voicemails registered on their caller ID logs during the period of May 30, 2016 through June 30, 2016.

404.   Upon information and belief, the Defendants attempted to use the Lynwood property to coerce a settlement with the Plaintiff's family members and to cover up their

---

[110] Accordingly, Plaintiff sent a Litigation Preservation Notice to Dr. Reyes at his San Pablo Apetatitlán, Tlaxcala, México employment location.

conspiracy conduct, in part, evidenced by Attorney Carmody's unconscionable lease renewal purchase option proposed based on knowledge he acquired from the Character and Fitness Committee's unauthorized release of the Plaintiff's confidential mandatory disclosures.

405.   The Plaintiff's 2008-2012 representation in the <u>Serrano, et al.</u> matter, involved claims by plaintiff Serrano that her sister and brother defendants Martha and Armando Serrano lead in her family having taken advantage of her temporary depression and pretended to help the plaintiff, while actually stealing her property and businesses.

<u>The Criminal Justice System and SBA Lawyer Regulation Satirical Parody</u>

406.   In answer to the United States Commission on Civil Rights policy attention to the disproportionate prominent suffering of African-American males in the realm of the criminal justice system, My Brother's Keeper (MBK) was founded on the premise to give every child, no matter what they look like, where they live, the chance to reach their full potential…have opportunities to improve their life outcomes and overcome barriers to success.

407.   Through "Ban the Box" the MBK challenges the practice of asking about a criminal record at the first step in the application process as it takes a heavy toll on the disproportionately arrested, convicted and sentenced.

408.   The Arizona Supreme Court Committee on Character and Fitness vilification of the Plaintiff as "Just the type of attorney for whom the lawyer regulation disciplinary process exists," and subsequent distribution of the Plaintiff's confidential mandatory character and fitness disclosures effectively diminished the Plaintiff's opportunities to

improve her life outcomes by placing nontariff barriers and other anticompetitive trade restraints in the Plaintiff's path to success.

409.   The Plaintiff's brushes with ethical entrapment and orchestrated interactions with the SBA Lawyer Regulation department have been markedly disproportionate.

410.   Via the June 6, 2106 Bar charge, on February 28, 2017, the SBA initiated a sham disciplinary proceeding and by false testimony obtained and used the Plaintiff's interim suspension as a window of opportunity for the Defendants to destroy evidence and simultaneously warn off potential clients with publicly posted hypothetical assertions that the Plaintiff could have "committed a felony…engaged in conduct that would result in substantial harm, loss or damage to the public…", and thus foreclosing the Plaintiff from income.

411.   On April 4, 2017, the SBA threatened further disciplinary proceedings against the Plaintiff in attempted to coerce the Plaintiff into signing a plea deal in the form of a consent to discipline agreement.

412.   The Plaintiff's continued pain and suffering is inflicted by or at the instigation of or with the consent or acquiescence of Defendant public officials or other Defendants acting in their official capacities within the United States and México in furtherance of the anticompetitive scheme to place and maintain the Plaintiff in a distressed financial circumstance, which the Defendants manipulated to:

(1)     Discredit and otherwise vilify the Plaintiff within the interdisciplinary niche market as an untrustworthy American, an incompetent African-American interdisciplinary business law attorney, and sully or otherwise render of no value the Plaintiff's NAFTA

independent professional immigrant residency status and authorized economic operations encompassing trade within between the United States, México and other foreign countries.

(2)    Coerce the Plaintiff to marry or otherwise cohabitate, work as an employee or under a supervised partnership arrangement, which would position the Defendants to control the Plaintiff, compromise the Plaintiff's NAFTA protections including inherent intellectual property rights, and allow the Defendants to monopolize the niche interdisciplinary market and thereby claim title to SLTLAW/SLTBE Project℠ components and the market relationships the Plaintiff designed, developed and would naturally develop and cultivate on behalf of the SLTLAW/SLTBE Project℠.

413.   The Defendants' anticompetitive conspiracy conduct, within the interdisciplinary niche market encompassing trade within and between the United States, México and other foreign countries, has illegally excluded competitors, caused the rebuff, debasement and disregard of the Plaintiffs' trade services and service products, and has resulted in unlawful constraint of the NAFTA international professional business investor trade framework, the acquiescence, acceptance and tolerance of a low standard of ethical professional conduct, as well as student loan indebted, consistently underemployed, unemployed and/or non-employment ready consumers and end-users, rendered unable to compete on a national and/or global scale than would have prevailed in a competitive market.

414.   Unethical professional conduct, unemployable consumers and the exclusion of competitors are indicia of the monopolistic ambush for control over the interdisciplinary niche market power and unlawful anticompetitive conspiracy conduct of the Defendants.

## THE SLTLAW/SLTBE PROJECT℠

415.   Based on findings of undeveloped international fund development and collaborative law, business, academia, research and university exchange programming opportunities between the United States, México and other countries, in addition to foregone potential to present interdisciplinary continuing education seminar internationally funded degree and licensing intern scholarships with practical training functions, the Plaintiff, on behalf of the SLTLAW/SLTBE Project℠, developed component inroads to practical training provider employment, business start-up and subsidized entrepreneurial cooperative mini-franchise operations.

416.   The SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series benefits the Project's Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship, in addition to the Project's global entrepreneurial cooperative mini-franchise operation components:

(1)   The SLTLAW Consultoría Jurídica™ Comparative Business Law, Contract, Corporate Formation, Copyright and Trademark Registration and Wills and Trust Practice service and products component.

(2)   The Creative Strategist™ International Business Academic Targeted-Publication Americanized Editorial, Research, Fund Development, Agency and Event Management Consulting service and products component.

(3)    The FireBaby Breads™ Events and Special Occasion Catering Mini-Franchise and International Academic Exchange University Housing service and commercial sales component.

(4)    The BigMan HandyMan™ Services Mini-Franchise Neighborhood Revitalization Remodelation and Installation services and commercial sales component.

417.   Each mini-franchise component operates from within an SLTLAW/SLTBE Project House model. Plaintiff identifies (often long-term) vacant rental properties within select secure neighborhoods located on bus routes and/or designated bike paths near participating universities from which to launch an SLTLAW/SLTBE Project House as follows:

(1)    Plaintiff rents the property for dual residential and commercial use in order to temporarily reside, and simultaneously sublet furnished rooms to international academic exchange students (whose sub-tenancy agreement(s) offset the rent due under the principle rental agreement) in order to operate the SLTLAW/SLTBE Project℠ authorized economic activities.

(2)    In collaboration with the professional continuing education and international academic exchange programming of United States, México and other foreign country universities, Plaintiff attracts university international academic exchange student tenants (with preference to females) to rent the secured upper level of each Project House.

(3)    Each SLTLAW/SLTBE Project℠ intern scholarship recipient is a university graduate in law, medicine, accounting, business administration, graphic and/or web design, communication, marketing, journalism, culinary arts, tourism, hospitality and

hotel management, international relations, information technology, architecture or engineering, etc.

(4)     During the internship, the graduates learn, work and earn as a cooperative interdisciplinary Group and receive performance-based payments for completion of practical training assignments within their career fields, in consideration of profitable interdisciplinary internship production.

(5)     Because of the Group cooperative nature and aforementioned autonomy preservation standards, the SLTLAW/SLTBE Project℠ internship <u>does not</u> target students currently studying at the university undergraduate level, and <u>does not</u> provide community service, volunteer, bufete jurídico and/or social service learning programming, which is standardly conducted during the 5-year México university undergraduate study program.

(6)     The SLTLAW/SLTBE Project℠ will be the Group's first client. As such, the law, business administration, graphic and web design, information technology, communication, marketing, journalism and international relations interns would lead in the development of the Project's collateral materials, social media, website(s), internet presence, advertising, marketing, business, public relations, good will and community relations campaign(s).

(7)     Under Plaintiff's supervision, the Group will work a percentage of time at the Project House involved in limited comparative United States and México contract, corporate formation, wills & trusts and probate, copyright and trademark registration, and other intellectual property matters on behalf of the Project's clients, as well as other comparative legal research analysis on behalf of the Project's Basic American Business

Law Lecture Series. Certain comparative United States and México law practical training assignments are facilitated in collaboration with licensed attorney, law firm, in-house counsel and judiciary associate provider relationships developed by the Plaintiff on behalf of the SLTLAW/SLTBE Project℠.

(8)     Under Plaintiff's supervision, the Group will work a percentage of time at the respective minor co-logistical host and major co-logistical host location(s), involved in the collaborative production and management of an SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series . In consideration of their accreditation and other logistical contributions the co-hosts (in addition to the good will and advertising benefits) receive respective percentage(s) of the ICES/SECI℠ registration sales profits allocated to fund degree and licensing scholarships and paid practical training.

(9)     The Group will work a percentage of time at diverse SLTLAW/SLTBE practical training associate provider locations, under the supervision of the respective associate provider(s), involved in select paid practical training assignments delegated by the associate provider on behalf of its clients in consideration of profitable interdisciplinary internship production.

(10)    On occasion, Plaintiff, co-host(s) and associate provider(s) may jointly supervise the Group in relation to respective cross-over ICES/SECI℠ organization, logistical, production, management and associate provider practical training assignments. When such occasions involve accreditation, contractual bids, negotiations, contract awards, sponsorship, fund development, registration sales, program advertising, contractor exhibits, grant allocations, budgeting, accounting management, tax regulation,

social media, advertising, promotion, speaker and other entertainment acquisition, food service, travel, lodging and accommodations, logistical infrastructure, staging design, maintenance, equipment and technology, the Plaintiff's fully informed written consent and final executed approval is required.

(11)    In the absence of associate provider paid practical training assignments, the Group's practical training is exclusively supervised by the Plaintiff. In the absence of qualified scholarship candidate recommendations to comprise the Group, the Plaintiff and the major logistical co-host are obligated to fulfill all organization and management functions necessary for the success of the ICES/SECI℠ international fundraiser.

(12)    At the end of the Internship, Group members may obtain employment with an associate provider, employment with an ICES/SECI℠ co-host, employment with e the Plaintiffs or one of Plaintiff's clients, or may elect to continue in cooperative interdisciplinary operation of an authorized SLTLAW/SLTBE Project℠ mini-franchise at the Project House.

(13)    The Plaintiff transitions from the Project House currently in operation as an authorized SLTLAW/SLTBE Project℠ mini-franchise to launch another Project House. The Plaintiff replicates this process throughout each submarket within the United States, México and other foreign countries.

418.    The SLTLAW/SLTBE Project℠ Basic American Business Law Lecture Series™ consists of 8 comparative learning components:

(1)    Comparisons in the United States and México Constitutions I & II

(2)    Comparisons in Judicial Systems Acts, Codes and Procedures I & II

(3)     Comparisons in Antitrust Laws

(4)     Comparisons in Contract Law I & II

(5)     Comparisons in Professional Responsibility

(6)     Comparisons in Corporate Formation Law

(7)     Comparisons in Intellectual Property Protections I & II

(8)     Comparisons in Real Estate Transaction Procedures and Finance I & II

419.   The SLTLAW/SLTBE Project℠ Public, Political and Legal Oratory Competition Series™ consists of 5 international socially conscious defensive parts:

(1)     In Defense of Foreign National Independent Professional Immigrant Export Service Traders and Contractors.

(2)     In Defense of Foreign National Independent Professional Immigrant Residential and Commercial Tenants and Real Estate Property Owners.

(3)     In Defense of Foreign National Independent Professional Immigrant Tax Payers.

(4)     In Defense of Foreign National Independent Professional Immigrant Temporary and Permanent Resident Applicants.

(5)     In Defense of Foreign National Independent Professional Immigrant Investors.

420.   The SLTLAW/SLTBE Project℠ Interim Academic Interdisciplinary Research Mentor Exchange Series™ is designed to collaborate with ~~top tier~~ international universities, their advanced level researchers, alumnus, consortia, partners and

stakeholders to facilitate the cooperative development of graduate research candidates into future interdisciplinary research innovators targeted to:

(1)    Lead the research infrastructure to facilitate the high quality growth of new and existing legal, economic and tourism development research and policy analysis.

(2)    Attract alumni and philanthropic trusts, foundations, international grants and other important donors capable of major gifting and fundraising.

(3)    Support the continued international growth of indigenous cultures.

(4)    Create an Interdisciplinary Center for Legal, Economic & Tourism Development Research and Policy Analysis in conjunction with collaborative business academic programming and project modeling.

421.    The SLTLAW/SLTBE Project℠ Technical English for Professionals and Language Testing Performance Enhancement Series™, consists of 4 requisite parts:

(1)    Touch Typing in English I & II Series™

(2)    The Basic Technical English Vocabulary I & II Series™

(3)    The Basic Technical English Conversation I & II Series™

(4)    The International English Conversation Club Series™

422.    The SLTLAW/SLTBE Project℠ is designed to celebrate and promote the inherent influence and governing role of the law in interdisciplinary careers; and is simultaneously devised to promote economic growth, enhance English language testing performance, stimulate higher education re-entry, engage female leadership, develop university alumnus relations, invigorate international academic exchange and to spread tourism culture, fostered with a view to increase the efficiency of the university academic

institutional system's relevance to the global labor and entrepreneurial franchise markets, as holistically aimed to improve international societal relations.

### THE PROJECT CAR

423.   On April 18, 2011, the Administración General de Aduanas at the Nuevo Laredo border issued Plaintiff's Permiso de Importación Temporal de Vehiculos No. TUPA472039003 (México Permit), authorizing dual use of Plaintiffs' Metallic Green 2002 Volkswagen Passat, Vehicle Identification No. WVWPD63B72P238215 ("the Project Car") for personal and business professional activities within the territory of México.

424.   The Aduana representative advised Plaintiff that no other names shall appear on the México Permit, other than the names of the Plaintiffs, Sylvia Lynne Thomas and The Law Office of Sylvia L. Thomas, LLC, as they appear on the original Arizona Certificate of Title.

425.   Pursuant to the terms of the México Permit, Plaintiff's authorized used of the Project Car within the territory of México was subject to the following restrictions:

     a.     Withdrawal from México within the time allotted.

     b.     No overstay beyond expiration of permit, visa or resident status.

     c.     No family use unaccompanied by Plaintiff(s).

     d.     No sell within Mexican territory.

     e.     No direct use for profit (e.g. Taxi or Uber).

     f.     No illegal use.

     g.     No unauthorized party use.

426.   During Plaintiff's travel from Nuevo Laredo to Puebla, Puebla, México, the Project Car's oil pan was severely cracked. On around April 21, 2011, Plaintiff paid about $200 USD to Armenta Automotriz for the repair and return of the Project Car. After having held the Project Car for more than 13 days, rather than replace the cracked oil pan, Armenta Automotriz merely welded the crack.[111]

427.   Plaintiff experienced long-term maintenance issues that required multiple repairs and replacements of the Project Car's oil pan.

428.   On around July 26, 2013, Automotriz Bonn Dorada requested to view the Project Car's original Certificate of Title and México Permit in order to obtain its VIN for a future maintenance service appointment. A Volkswagen service manager additionally took an unauthorized photo of the Project Car's 2005 resale sticker, which listed the factory equipped features and other loaded amenities.[112]

429.   Two days later, two men, alleging to work for a Joint United States/México Interstate Vehicle Theft Task Force, accosted Plaintiff in the parking lot of the Wal-Mart Colonia San Manuel, alleged that the Project Car was reported stolen by the owner and demanded that Plaintiff surrender the Project Car. Plaintiff refused.

430.   After Plaintiff demonstrated her joint ownership of the Project Car with SLTLAW, the men allegedly reported Plaintiff's possession of the Project Car's original Arizona

---

[111] Accordingly, Plaintiff sent a Litigation Preservation Notice to Armenta Automotriz.
[112] Accordingly, Plaintiff sent a Litigation Preservation Notice to Automotriz Bonn Dorada.

Certificate of Title and México Permit to the alleged Joint Task Force, and apologized to Plaintiff for the inconvenience and alleged confusion.

431.  On May 16, 2014, outside the law office of Attorney José Salvador Benítez Nájera, Plaintiff was detained by the Puebla Transit Police, who alleged that the Plaintiff was driving the Project Car in violation of an ordinance that prohibited tinted windows. The Police advised Plaintiff that she was required to follow them to a nearby lot where Plaintiff was to surrender the Project Car and where it would allegedly remain until the Plaintiff payed a fine and replaced the windows or otherwise removed the tint. Plaintiff refused.

432.  After Plaintiff demonstrated that at the time of purchase, the Project Car was equipped with tinted windows, the Police apologized to Plaintiff for the alleged confusion, yet, absent legal weight, insisted that Plaintiff immediately replace the windows or otherwise remove the tint.

433.  Between early July 2013 and August 14, 2015, Plaintiff was routinely detained by the Puebla state, municipal, transit and the México federal police. During the majority of the stops, the police alleged that the Project Car was not authorized for use within the México territory, the license plates were not valid in México, or that the area where Plaintiff was driving was temporarily designated a check point for stolen cars. After Plaintiff demonstrated authorization by the Aduana of the Project Car's use within the México territory was automatically extended pursuant to Plaintiff's current immigration document, the police routinely apologized for the inconvenience.[113]

---

[113] Accordingly, Plaintiff sent a Litigation Preservation Notice to the Policia Estatal Preventiva Puebla, Secretaria de Seguridad Publica, Secretaria de Seguridad Publica y

434.   On November 8, 2013, outside of the Multicopias Imprenta in Colonia El Carmen, the police removed the Project Car's license plates and alleged that the Project Car, and about five other vehicles, partially parked on the rounded curb extension along Avenida 17 Oriente between Calle 2 Sur and Calle 4 Sur, was illegally parked. Plaintiff:

      a.   Demonstrated to the police how the rounded curb along Avenida 17 Oriente appeared to indicate that this type of parking was allowed.

      b.   Explained to the police the fact that there were no "no parking" signs along Avenida 17 Oriente where the rounded curb extends.

      c.   Called the police's attention to all the illegally double-parked cars blocking the flow of traffic along Calle 2 Sur.

435.   The police requested to see the Plaintiff's driver license, the Project Car's México permit and Plaintiff's immigration document(s) evidencing extension of the Project Car's authorized use in México.

436.   After Plaintiff demonstrated the same, the police requested Plaintiff's explanation of her activities in Puebla. Plaintiff explained that she was in the area conducting business with Multicopias Imprenta on behalf of her client, the IBERO. The police questioned if Plaintiff was a Professor at the IBERO. Plaintiff showed the police her independent worker permit and replied,

> No, I am an authorized independent professional business immigrant under contracts with the IBERO to edit an Article

---

Transito Municipal, Consejo Estatal de Seguridad Publico, Secretaria de Turismo del Estado de Pubela and/or La Policia Estatal Turistica

and to manage its upcoming Conference to be held in the IBERO's IDIT Lobby beginning November 28, 2013.

437.   The police returned Plaintiff's documents, restored the Project Car's license plates and cautioned Plaintiff that parking, even partially, on the sidewalk is never allowed. The police finally advised Plaintiff that in the future she should either legally park the Project Car along Calle 2 Sur or pay to park in one of the public garages in the area.

438.   After Plaintiff's July 14, 2015 receipt of respective professional licensure of her United States degrees as a México Doctorate of Law, Master of Business Administration and Bachelor of Communication, Plaintiff traveled on business between México and Phoenix, Arizona beginning August 15, 2015.

439.   On around August 29, 2015, the Defendants seized the Plaintiffs' personal and business property, including the Project Car, from the Project House and in doing so, the Defendants acted intentionally, and the seizure was unreasonable.

**THE PROJECT HOUSE
LEASE AGREEMENT**

440.   In around early May 2011, Plaintiff viewed a rental property owned by Ms. María Elba de Soledad Benítez Nájera ("Ms. Benitez") located at Cerrada Cadillac No. 20, Interior 4-3 Colonia Lomas de San Alfonso, Puebla, Puebla, México 72575 (the "Project House").

441.   Plaintiff informed Ms. Benítez of the one-year visa restriction that required Plaintiff to promote her future México interdisciplinary NAFTA International Business Business Professional activities involving the SLTLAW/SLBE Project without earning a México income. Plaintiff explained to Ms. Benítez that her rental payments during the

first year rental term will derive from Plaintiff's income as a self-employed Arizona licensed attorney and business consultant, which required Plaintiffs' frequent travel between the United States and México.

442.   Plaintiff informed Ms. Benítez that over the first year rental term, Plaintiff would pursue revalidation of her foreign professional studies, in order to obtain the certification from the SEP required for the SEGOB-INM to issue Plaintiff an independent worker permit under professional immigrant permanent resident status that would allow Plaintiff to receive her professional licenses to implement the SLTLAW/SLTBE Project℠ in México and additionally earn a México income. Plaintiff explained to Ms. Benítez that all subsequent rental payments will derive from Plaintiff's México income.

443.   Plaintiff also explained to Ms. Benítez that she would not be able to obtain a México cosigner (i.e., Víctor Tomás Oropeza Díaz) as Ms. Benítez previously required and was contemplated under the proposed rental agreement.

444.   Ms. Benítez authorized Plaintiff's use of the Project House for the dual residential and business purposes of the SLTLAW/SLTBE Project℠. Using a large "X", Plaintiff and Ms. Benítez crossed out the cosigner provisions and cosigner signature block within the rental agreement then initialed next to each "X" to indicate their agreement to delete the same. In lieu of a cosigner, Ms. Benítez agreed to hold onto the original State of Arizona Certificate of Title No. 15750770 and México Permit No. TUPA472039003 for the "Project Car", which Ms. Benítez agreed to return to Plaintiffs at the end of the first year rental term. The rental agreement also provided that Plaintiff was responsible to make bi-

monthly water consumption payments direct to the SOAPAP, which Ms. Benítez advised was $460 MXN (approx. $46 USD).

445.   Effective May 18, 2011, in Puebla, Puebla, México, Plaintiff and Ms. Benítez entered into the written agreement (prepared in Spanish by Ms. Benítez's attorney) for Plaintiff's rental of the Project House, in consideration of Plaintiff's monthly payment of $8,000 MXN (approx. $800 USD). Plaintiff agreed to update Ms. Benítez on her progress towards receiving the necessary permits and licenses required for Plaintiff to earn a México income.

446.   On May 18, 2011, Plaintiff was unaware that the SOAPAP water delivery system to the underground tank was constricted, so water access to the Project House was limited to what was in the underground tank that day. Plaintiff was also unaware that Ms. Benítez owed an outstanding nonperforming debt to the SOAPAP for bimonthly fixed rate water service over a prior 2-year period.

447.   Between May 26, 2011 and June 28, 2011, Plaintiff traveled to the United States on business. On around July 31, 2011, Plaintiff informed Ms. Benítez that she received no SOAPAP invoices at the Project House.

448.   On around August 5, 2011, Plaintiff informed Ms. Benítez of her discovery that the SOAPAP water delivery system was constricted and Plaintiff's access to water at the Project House had been limited to what was in the tank on May 18, 2011. Eventually, Ms. Benítez repaired the restriction.

449.   Plaintiff traveled to the United States on business between (a) August 25, 2011 and October 2, 2011; (b) November 25, 2011 and January 14, 2012, and (c) March 10, 2012 and April 14, 2012.

450.   On around April 18, 2012, Plaintiff informed Ms. Benítez that the SEGOB-INM renewed Plaintiff's professional business investor visa for an additional year, however, again without authorization to earn a México income. Plaintiff also explained that because she had not received the technical opinions from the BUAP, nor the foreign study revalidations from the SEP, Plaintiff was ineligible for a SEGOB-INM change of status to permanent resident professional immigrant authorized to receive a México income.

451.   On around May 25, 2012, Plaintiff informed Ms. Benítez that she received the BUAP's technical opinion of equivalency concerning her MBA studies and registered the Project House to appear on the BUAP Student Program & Accommodation Support's list of available housing, where Plaintiff specified that two furnished rooms with private baths were available for rent by female *international* exchange students.

452.   Between June 8, 2012 and June 29, 2012, Plaintiff traveled to the United States on business.

453.   On around July 2, 2012, Ms. Benítez renewed Plaintiff's rental agreement, effective May 18, 2012, at a reduced monthly rental rate of $7,000 MXN (approx. $700) and returned to Plaintiffs the Project Car's original State of Arizona Certificate of Title No. 15750770 and México Permit No. TUPA472039003.

454.    Under the renewed rental agreement, Ms. Benítez authorized the Plaintiff to sublet and utilize the Project House for the dual residential and business purposes of the SLTLAW/SLTBE Project℠. Ms. Benítez neither required the Plaintiff to have a cosigner nor to provide collateral.

455.    On around July 2, 2012, Plaintiff informed Ms. Benítez that she received no SOAPAP invoices at the Project House. Plaintiff and Ms. Benítez also reviewed how Plaintiff's plans to sublet to female international exchange students could lead to the SLTLAW/SLTBE Project℠ future management of Ms. Benitez's residential and commercial properties.

456.    Between July 7, 2012 and July 15, 2012, Plaintiff traveled to the United States on business. On around July 23, 2012, Plaintiff informed Ms. Benítez that she received the technical opinion of equivalency concerning her Juris Doctor studies from the ICJ.

457.    On around August 9, 2012, Plaintiff informed Ms. Benítez that she received one national exchange student rental applicant contact allegedly derived from the BUAP's student housing list. During the fall 2012, Plaintiff sublet one room to a BUAP female national exchange student.

458.    On October 16, 2012, Plaintiff informed Ms. Benítez that shortly after the BUAP issued technical opinions of equivalency concerning her BA-BIS studies, she received the Federal SEP's certification of her United States studies as equivalent to a Doctor of Law, Master of Business Administration and Bachelor of Communication offered at México universities.

459.   On around November 9, 2012, Plaintiff informed Ms. Benítez that because the SEGOB-INM declared that on November 6, 2012, it was under no obligation to inform applicants of the impending November 8, 2012 changes in the law, Plaintiff's November 9, 2012 application(s) for change of status to permanent resident professional immigrant with authorization to receive a México income was void, and consequently Plaintiff had to continue operating under the professional business investor visa that did not authorize Plaintiff to earn a México income.

460.   On around November 12, 2012, Plaintiff informed Ms. Benítez that Plaintiff received an RFC from the SAT, which categorized the SLTLAW/SLTBE Project℠ as an "individual person [Plaintiff] with business professional activities", and authorized Plaintiff to begin implementing the SLTLAW/SLTBE Project℠ economic trade activities in México under the classification of "other professional, scientific and technical services provided by the private sector".

461.   On around November 15, 2012, Plaintiff informed Ms. Benítez that she delivered a gratuitous English presentation during a conference at the IBERO titled, Elecciones de los Estados Unidos, 2do. Mandato de Barack Obama y Migración.

462.   On around December 8, 2012, Plaintiff advised Ms. Benítez that she received a SOAPAP invoice at the Project House, which alleged that Ms. Benítez owes an outstanding fixed-rate balance.

463.   As of January 19, 2013, the SOAPAP Legal, Collections and Recovery Management Departments respectively advised Ms. Benítez that the December 8, 2012

invoice and all other invoices the SOAPAP issued and addressed in Ms. Benítez's name to the Project House were Ms. Benítez's responsibility in relation to an outstanding nonperforming debt for the 2-year period prior to May 18, 2011.

464.   On around January 20, 2013, Ms. Benítez involved her "old family friend", Attorney Jesús Venegas in the SOAPAP matter. Over an eight-month period, Plaintiff informed Ms. Benítez how Attorney Venegas harassed Plaintiff, requested late meetings, accused Plaintiff of manipulating the water consumption readings, and used the stereotypical slur "excrement" to describe Plaintiff after she refused to pay Ms. Benitez's outstanding nonperforming debt(s) to the SOAPAP.

465.   Plaintiff informed Ms. Benítez that between January 2013 and June 2014, Plaintiff received no rental applicant contacts derivative of the BUAP's student housing list. Plaintiff also informed Ms. Benítez that according to the BUAP Student Program & Accommodation support staff, C. Wendy Elizabeth Corte González, contact information for the Project House remained on the list, but there was insufficient counter space to accommodate Plaintiff's flyers advertising the available rooms for rent by *international* exchange students at the Project House.

466.   On around February 6, 2013, Plaintiff informed Ms. Benítez that she received a CURP from the SEGOB-INM.

467.   On February 20, 2013, per advice of the SOAPAP legal representatives, Ms. Benítez had a meter installed at the Project House in order to calculate Plaintiff's water consumption liability from May 18, 2011 based on a 3-month average from the installation date.

468.   Between April 14, 2013 and May 10, 2013, Plaintiff traveled to the United States on business. On around May 18, 2013, Plaintiff informed Ms. Benítez that she received her temporary resident and independent worker permits, which authorized Plaintiff to receive a México income. Ms. Benítez again renewed Plaintiff's rental agreement at the $7,000 MXN monthly rate, with authorization to sublet and utilize the Project House for the dual residential and business purposes of the SLTLAW/SLTBE Project℠. Again, Ms. Benítez neither required the Plaintiff to have a cosigner nor to provide collateral.

469.   On around July 8, 2013, Plaintiff informed Ms. Benítez that she recruited Araceli Rojas Juárez to begin training at the Project House as the first international academic housing manager adult re-entry candidate for the FireBaby Breads™ Mini-Franchise component of the SLTLAW/SLTBE Project℠.

470.   On around July 13, 2013, Plaintiff informed Ms. Benítez of her gratuitous participation in an interview at the IBERO on its Radio program, La Economía y tu Bolsillo hosted by the IBERO Social Sciences Department.

471.   As of July 18, 2013, Plaintiff was current on rent at the Project House, but still owed certain late fees.

472.   On August 14, 2013, Ms. Benítez agreed that Plaintiff owed no more than $2,610 MXN (approx. $261 USD) for water consumed during the period of May 18, 2011 through February 19, 2013. Ms. Benítez instructed Plaintiff to make the payment direct to the SOAPAP.

473.   On August 16, 2013, Plaintiff paid the $2,610 MXN direct to the SOAPAP. That same day, the SOAPAP Collections and Recovery Management Departments confirmed the fixed-rate invoice(s) billed to the Project House after May 18, 2011 represent an outstanding nonperforming debt owed by Ms. Benítez.

474.   After the Plaintiff informed Ms. Benítez that Plaintiff acquired her first university client and showed Ms. Benítez the two IBERO trade contracts, Ms. Benítez agreed to wait to be paid for the rent due on August 18, 2013 forward, commensurate with Plaintiff's receipt of the IBERO's full payment, which Plaintiff anticipated in December 2013.

475.   In around mid-October 2013, Ms. Benítez involved her brother, Attorney José Salvador Benítez Najera. After Attorney Benítez reviewed the IBERO Conference promotional materials, which included Plaintiff's ICES/SECI℠ fundraiser series business component and the DAAD ecological tourism academic seminar component, he recommended that Ms. Benítez honor her agreement with Plaintiff to wait to be paid for rent due August 18, 2013 forward, commensurate with Plaintiff's receipt of the IBERO's full payment. Ms. Benítez reaffirmed her agreement with Plaintiff. Attorney Benítez also agreed to assist Plaintiff by promoting the Conference to his attorney colleagues.

476.   After the IBERO breached trade contracts I and II and the clarifications modifying trade contract I, by among things, nonpayment for the Plaintiff's services and service products, the Plaintiff and Attorney Benítez participated in good faith settlement consultations. Meanwhile, the Plaintiff delivered a Foreign Investment guest lecture at the ICJ using her NAFTA professional immigration process (the measures of which do not

require the Plaintiff to speak Spanish) and the SLTLAW/SLTBE Project as a Foreign Investment Case Study.

477.   After the IBERO learned the Plaintiff's guest lecture involved the Plaintiff's NAFTA professional immigration, the IBERO distributed a distrust letter against the Plaintiff's services and service products within the niche market. After receipt of the IBERO distrust letter, Attorney Benítez denigrated the Plaintiff,

> My sister no longer believes the IBERO contracted your trade service. You are a woman…Your country… would keep you here to become and remain insolvent. You…still have not learned not to involve other attorneys in your client matters…you couldn't pay your bills in the United States…my sister rented to you because she believed you were employed as a…university professor.

478.   The Delegación Procuraduría Federal del Consumidor (PROFECO) de Puebla three-times served the Plaintiff and/or Víctor Tomás Oropeza Díaz with alleged judicial notices of eviction and attachments demonstrative of unconstitutionalities and procedural inefficiencies allegedly filed (by various México attorneys and/or Judges some deceased) with the Puebla Civil City Court, Puebla Civil District Court and Puebla Civil Capital Court supposedly located within the Honorable Tribunal Superior de Justicia del Estado de Puebla/Poder Judicial del Estado de Puebla/Ciudad Judicial de Puebla Siglo XXI ("Ciudad Judicial de Puebla").

479.   Ms. Benítez falsely alleged that Oropeza Díaz co-signed the May 2011 Project House rental agreement and that she never agreed to wait to be paid by Plaintiff commensurate with the IBERO's payment to Plaintiff.

480.   The Juzgado Quinto Especializado en Materia Civil de la Ciudad de Puebla ("the Civil City Court") Judicial Secretary, Alfredo Louvier Hernández falsely alleged the Plaintiff falsified Oropeza Díaz's signature on the May 2011 Project House rental agreement.

481.   Ms. Benítez unlawfully evicted Plaintiff from the Project House and removed the Plaintiff's personal and business property, including the Project Car, which Ms. Benítez alleges is located somewhere near San Pablo Apetatitlán, Tlaxcala, México.

## THE DAAD GRANT AND ITS
## SUPPLEMENTAL INSTRUCTIONS GUIDE

482.   On May 7, 2013, the IBERO was a member institution of the Association of Jesuits Colleges and Universities (AJCU) and Dr. Reyes was still a full-time, salaried, tenured Professor and Coordinator of the IBERO Social Science Department's Economics and Finance Undergraduate Degree Program.

483.   As an IBERO Coordinator, Dr. Reyes' functions included academic professor, published author, public speaker, researcher, radio program host, and organizer of diverse academic events and projects. On behalf of the IBERO's business economic activities and its AJCU membership directives, Dr. Reyes also applied for event and project grant funding, delegated tasks, outsourced subcontract assignments and registered for payment subcontract editorial, publication, event and project management services in conjunction with the logistical assistance of the IBERO University Community.[114]

---

[114]Accordingly, Plaintiff sent a Litigation Preservation Notice to the AJCU.

155

484.   Dr. Reyes earned an advanced English studies Cambridge University Certification and reports a 98 percent English comprehension and fluency.

485.   On June 18, 2013, Dr. Reyes confirmed Acceptance of the DAAD's approved funding of a May 7, 2013 Grant Application (for Dr. Reyes as the DAAD-alumni applicant and responsible contact person) to organize a Sustainable Development Alternatives Seminar at the IBERO as the logistical Host facility.

486.   The Grant Application and its Acceptance were written in English. According to the Application, no foreign speaker was planned to be invited and the DAAD Grant reimbursable funding was conditioned upon:

a.   Financing expenses in connection with a sustainable development alternatives seminar under the tourism subject area.

b.   Financing projects, objectives and expenses acknowledged in relation to the Application.

c.   Use of earmarked funds economically, sparingly and as a whole or in part for the intended purpose.

487.   The Application also provided that if anyone of the conditions is not met, the DAAD is entitled to withdraw its funding.

488.   On around October 2, 2013, the IBERO received supplemental guidance from the DAAD instructing that its reimbursement financing is based on the number of participants set forth in the May 7, 2013 Grant application (the "DAAD Guide"). The DAAD Guide, written in Spanish, also conditioned that if DAAD-Alumni speakers make up less than 51% of seminar participants, the DAAD:

(1)     Would not fund expenses to accommodate a foreign speaker.

(2)     Would not reimburse the total expenses approved under the Grant Application.

(3)     May altogether withdraw its Grant funding.

489.   The DAAD Guide also recommended that the seminar organizers charge a registration fee to cover additional cost expenditures including cancellations.

### DEFENDANT IBERO'S PRE-TRADE CONTRACT CONTACTS WITH PLAINTIFF

490.   Around October 2012, Plaintiff met Dr. Gerardo Reyes Guzmán ("Dr. Reyes"), Coordinator of the IBERO Social Science Department's Economics and Finance Undergraduate Degree Program. Dr. Reyes reviewed Plaintiff's correspondence to the SEGOB-INM and enclosures in application for change of status from non-immigrant to professional immigrant.

491.   Plaintiff informed Dr. Reyes of her strategic interdisciplinary continuing education fund development programming, and the importance of her autonomy in México to the funding objectives of the SLTLAW/SLTBE Project, which preclude Plaintiff from working as an employee in México.

492.   Dr. Reyes also reviewed Plaintiff's application to the SAT for federal registry of taxpayers and directed Plaintiff to the SAT Recta Cholula location. Finally, Dr. Reyes reviewed Plaintiff's application to the SEP for registration of professional degrees and advised of his experience with the SEP revalidation process concerning his doctor and master studies abroad.

493.   Plaintiff explained to Dr. Reyes her plan to obtain an independent professional permit that would authorize Plaintiff to conduct interdisciplinary business law, franchise, fund development and academic activities between the United States and México and receive a dual income. Dr. Reyes opined to Plaintiff, "Other Americans will likely follow suit."

494.   On November 15, 2012, Plaintiff delivered an English presentation during a conference at the IBERO titled, <u>Elecciones de los Estados Unidos, 2do. Mandato de Barack Obama y Migración</u>. Plaintiff's presentation was gratuitous.

495.   On around November 18, 2012,

(1)     Arizona Attorney Padilla questioned Plaintiff, "You do know that Barack Obama cannot run for a third term? I know, because it says so in the United States Constitution."

(2)     Dr. Reyes shared with Plaintiff that in his prior experiences managing events and projects, he repeatedly dealt with people trying to cheat him and/or take over his work. Dr. Reyes further explained that in dealing with such situations, "I just let them do it, because in the end, the work gets completed, so everything works out okay and I still end up looking good."

496.   On around March 26, 2013, Dr. Reyes emailed correspondence recommending Plaintiff's trade services to his IBERO law and international relations colleagues.

497.   On April 3, 2013, Dr. Reyes reviewed Plaintiff's independent professional permit that authorized Plaintiff to conduct professional independent economic trade activities and receive an income in México, effective January 3, 2013. Plaintiff reiterated to Dr. Reyes

the importance of her autonomy in México to the funding objectives of the SLTLAW/SLTBE Project, which precluded her from working as a México employee.

498.   Plaintiff also shared with Dr. Reyes the requirement to obtain a México permanent resident permit, in order to achieve her aspiration to be the first African-American, single, female, United States national with dual residency, and dual licensed NAFTA authorized economic trade operations as an independent interdisciplinary business law attorney among other capacities between the United States, México and other foreign countries.

499.   That afternoon, Plaintiff's billfold was stolen from her purse at the Mi Viejo Café Plaza Cristal. Plaintiff telephonically reported the theft to Wells Fargo Bank, cancelled her bank cards and added the Wells Fargo identity theft protection to her account services. Plaintiff informed Dr. Reyes of the theft, and her intent to report the same to the appropriate Arizona and federal authorities during her next planned business trip to the United States. Dr. Reyes commented, "It's impressive to see that under the circumstances you continue to work."

500.   The Plaintiff reported and/or investigated the left, in person at the:

(1)    Arizona Department of Motor Vehicles, South Mountain office in Phoenix, where Plaintiff was issued a new driver license.

(2)    Federal Trade Commission, via the Social Security Administration's Phoenix office, where Plaintiff's social security card was re-issued.

(3)    Wells Fargo South Mountain branch in Phoenix, where Plaintiff opened new bank accounts and received new debit cards.

(4)    Phoenix Police Department South Mountain Precinct.

(5)    Procuraduría General de Justicia del Estado de Puebla Agencia del Ministerio Público Sur ("Puebla General Prosecutor").[115]

(6)    Bodega Aurrera Wal-Mart.

(7)    OXXO Corporate Office.

<u>The DSFCU, SBA and Wal-Mart México Evidence Destruction Satirical Parody</u>

501.    During the Plaintiff's 2010-2014 representation in the <u>Johnson, et al.</u> matter, Defendants circumvented sanctions post-admission that pertinent evidence was automatically untimely destroyed, notwithstanding their receipt of Johnson's initial demand advising that litigation was impending.

502.    Likewise, on February 28, 2017, the Arizona Supreme Court and SBA created an interim suspension window allowing for the Defendants' destruction of evidence held in relation to the Plaintiff's Litigation Preservation Notices.

503.    Similarly, around April 9, 2013, the Plaintiff attempted to view video surveillance at the Bodega Aurrera (Wal-Mart) and OXXO Corporate Office where the thieves attempted to make purchases using the Plaintiff's debit card(s). After a telephone call from Investigator Leo Canales, the Plaintiff was informed that the surveillance video had a 3-day lifecycle, and thus was automatically destroyed not later than April 8, 2013.[116]

---

[115] Accordingly, Plaintiff sent a Litigation Preservation Notice to Mi Viejo Café, Sergio Manuel Osuna Osuna, Procuraduría General de Justicia del Estado de Puebla Agencia del Ministerio Público Sur, Sindicatura Municipal H. Ayuntamiento de Puebla and/or Juzgado Calificador Delegacion Sur.
[116] Accordingly, Plaintiff sent a Litigation Preservation Notice to Leo Canales.

504.    On around May 27, 2013, Dr. Reyes arranged introductions for Plaintiff to present her trade services to his IBERO law and international relations colleagues, in addition to certain publishing contacts.

505.    Beginning June 6, 2013, Plaintiff met and corresponded with Dr. José Luis García Aguilar, Coordinator of the IBERO Social Science Department's Undergraduate Degree in International Relations.

506.    On June 17, 2013, Dr. García received email copies of Plaintiff's:

(1)    United States JD, MBA and BA-BIS degrees along with the SEP's respective certifications of equivalency to a México Doctor of Law, Master of Business Administration and Bachelor of Communication.

(2)    Arizona Corporation Commission "Good Standing Status" and State of Arizona Tradename Certification for SLTLAW and SLTBE.

(3)    2013 Arizona State Bar Membership Card.

(4)    Certifications to practice law in the Arizona Supreme Court, United States Federal District Court for the District of Arizona and the United States Ninth Circuit Federal Court of Appeals.

507.    On June 20, 2013, Dr. García received an email copy of Plaintiff's Curriculum Vitae.

508.    On July 13, 2013, Plaintiff participated in an interview on the IBERO Radio program, *La Economía y tu Bolsillo* hosted by the IBERO Social Sciences Department. The interview took place at the IBERO and Plaintiff's participation was gratuitous.

509.    Effective July 22, 2013 Defendant IBERO and Plaintiff entered into trade contract I for Plaintiff's publication management trade services and products. On August 2, 2013, the Board of Governors' CLE Task Force was charged to present a proposal to the SBA Board for the pre-certification of CLE. Effective August 5, 2013, Defendant IBERO and Plaintiff entered into trade contract II for Plaintiff's publication events management trade services and products.

**THE TRADE CONTRACTS**

Trade Contract I

510.    Effective July 22, 2013, in Puebla, Puebla, México, the IBERO entered into and executed a trade Contract ("Contract I") with Plaintiffs, for Plaintiff to provide targeted-publication editorial management services to the IBERO in relation to an English Article that it sought to have published in one of Defendant HORIZON USA's electronic journals.

511.    Plaintiff drafted (in English) Contract I, which Plaintiff reviewed line-by-line with Dr. Reyes and edited accordingly. Plaintiff again reviewed line-by-line with Dr. Reyes the final version of Contract I.

512.    Contract I states that the IBERO's payment of its proposed editorial flat fee in lieu of Plaintiff's consultation fee and hourly rate was conditioned upon the IBERO's payment of the editorial flat fee, and if HORIZON USA published the Article, inclusion of Plaintiffs' editorial credit within all publications of the Article, plus a publication bonus equal to the greater of 20% of all sales commissions/bonuses/royalties or not less than about $1,000 USD.

513.    Contract I was initialed and signed by Dr. Reyes in his capacity as Coordinator of the IBERO Social Science Department's Economic and Finance Undergraduate Degree Program.

514.    Contract I includes a choice of law clause memorializing the IBERO's agreement that the state law of Arizona governs the contractual terms.

515.    On July 12, 2013, the IBERO emailed the draft Article to Plaintiff.

516.    On August 19, 2013, Plaintiff emailed the edited version of the Article titled, <u>2002-2011 Mexican Trade Balance: Side Effects of the Nominal Exchange Rate Volatility</u> (the "edited Article") to the IBERO.

517.    Around October 15, 2013, by Comunidad Universitaria Golfo Centro, A.C. Check No. 011387, the IBERO paid Plaintiff the trade Contract I initial fee.

518.    On October 27, 2013, Plaintiff discovered that:

(1)    On September 11, 2013, the Article Plaintiff edited met the accepted international academic standards of blind peer review and was accepted for oral presentation during the Red Internacional de Investigadores en Ciencias de la Gestión (REINICIG) Third International Conference on Management Science.

(2)    On September 11, 2013, HORIZON USA accepted the Article Plaintiff edited for publication under manuscript number 11807059.

(3)    On September 11, 2013, the Article Plaintiff edited was submitted for appearance in the REINICIG referred ISSN-numbered publications.

(4)     On October 17, 2013, Dr. Reyes delivered an oral presentation of the Article Plaintiff edited during the REINICIG Third International Conference.

(5)     Each registered attendee of the REINICIG Conference paid up to $3,500 MXN or $350 USD.[117]

519.   On around October 30, 2013, the IBERO electronically submitted, to HORIZON USA for publication, its final manuscript of the Article Plaintiff edited with Plaintiff's editorial credit, upon information and belief, within the Acknowledgements or distinguished within the Author Details.

520.   On November 1, 2013, the Article Plaintiff edited was published in HORIZON USA's internationally peer-reviewed electronic journal, Advances in Economics and Business, without Plaintiffs' editorial credit. The IBERO blamed HORIZON USA editor, Daniel Anderson for the published Article's exclusion of Plaintiff's editorial credit.[118]

521.   The IBERO withheld payment of the trade Contract I publication bonus to Plaintiff.

522.   The IBERO breached trade Contract I by anticompetitive conduct as alleged in this Complaint.

523.   Because the IBERO did not comply with the Contract I conditions, as of December 31, 2013 its outstanding trade Contract I debt to Plaintiff for breach of contract was about $7,713 USD plus interest.[119]

---

[117] Accordingly, Plaintiff sent a Litigation Preservation Letter to REINICIG and FCA-UASLP.
[118] Accordingly, Plaintiff sent a Litigation Preservation Notice to HORIZON.
[119] Accordingly, Plaintiff sent a Litigation Preservation Notice to the IBERO.

524.   Plaintiffs' are entitled to recover actual, tortious and punitive damages, and attorneys' fees and costs.

Defendant IBERO's Ratifying Acts of Trade Contract I

525.   On August 27, 2013, the IBERO Social Science Administrative Manager, Ana María Corro Stefanoni emailed to Dr. Reyes, the payer information to register Plaintiff as a payee and to register Plaintiff's targeted-publication editorial management services for payment in accordance with trade Contract I. Corro also provided Dr. Reyes with the trade Contract I initial fee payment calculation for Plaintiff to include in her invoice. Dr. Reyes forwarded the email to Plaintiff.

526.   On August 28, 2013, in request for payment of the trade Contract I initial fee, Plaintiff submitted Invoice No. A0001 to the IBERO in accordance with the calculation and payer information Corro provided.

527.   On October 15, 2013, the IBERO remitted payment of the trade Contract I initial fee to Plaintiff in the form of Check No. 0113870.

528.   On around October 30, 2013, the IBERO submitted to HORIZON USA for publication its final manuscript of the edited Article with Plaintiff's editorial credit, upon information and belief, within the Acknowledgements or distinguished within the Author Details.

Trade Contract II

529.   Effective August 5, 2013, in Puebla, Puebla, México, the IBERO entered into and executed a second trade Contract ("Contract II") with Plaintiffs, for Plaintiff to provide

event management services to the IBERO as the Host of the DAAD Ecological Tourism Seminar/Conference.

530.   Plaintiff drafted (in English) Contract II, which Plaintiff reviewed line-by-line with Dr. Reyes and edited accordingly. Plaintiff again reviewed line-by-line with Dr. Reyes the final version of Contract II.

531.   Contract II states that the IBERO's payment of its proposed administrative flat rate, in lieu of Plaintiff's consultation fee and hourly rate was conditioned upon the IBERO's payment of the administrative flat fee, marks-ups, commissions and expenditures reimbursement, as well as its agreement to collaborate in Plaintiffs' ICES/SECI℠, International Fundraiser Series business component of the DAAD Ecological Tourism Academic Seminar (collectively, "the Conference") and the IBERO's agreement to Plaintiff's distribution of the ICES/SECI℠ registration profits as follows:

(1)   Payment of a designated percentage off the top to benefit México University undergraduate alumni and engage female leadership via Plaintiffs' degree scholarship and paid practical training internship programming.

(2)   Payment of one-half the remaining to Plaintiffs for event management services on behalf of the SLTLAW/SLTBE Project℠.

(3)   Payment of the remaining one-half to the IBERO in support of its Social Science Economics and Finance Undergraduate Degree programming.

532.   In appreciation of its one-half share, the IBERO agreed to fund a supplement to the advertising budget proportioned under the DAAD Grant and to guarantee payment of

Plaintiff's marks-ups, commissions, expenditures reimbursement and dessert products should either not qualify as a Grant allocation.

533.   Contract II was initialed and signed by Dr. Reyes in his capacity as Coordinator of the IBERO Social Science Department's Economic and Finance Undergraduate Degree Program.

534.   Contract II includes a choice of law clause memorializing the IBERO's agreement that the state law of Arizona governs the contractual terms.

535.   By November 25, 2013, Plaintiff discovered, in significant part, from Dr. Reyes that the IBERO deliberately provided Plaintiff with excerpts of Professor Martinez's doctoral thesis for use in preparing the DAAD Seminar speaker invitations, and that because Plaintiff refused to collude in the IBERO's facilitation of the DAAD Seminar as the alleged FOMIX International Seminar coordinator in conjunction with Defendants SECTUR, CONACYT and nonparty ACACCI-COMPITE (OMC/UNCTAD)[120]:

(1)     Defendants IBERO and HORIZON USA excluded Plaintiff's editorial credit from the trade Contract I published Article Plaintiff edited and the IBERO withheld payment of Plaintiff's trade Contract I publication bonus.

(2)     Defendants IBERO, HORIZON, SECTUR, the BUAP and the ICJ sabotaged the SLTLAW/SLTBE Project℠ ICES/SECI℠ fundraiser.

(3)     The IBERO refused to process payment of Plaintiff's trade Contract II provisional invoices for administrative fees and reimbursements, and instead authorized

---

[120] Accordingly, Plaintiff sent a Litigation Preservation Notice to the IBERO, SECTUR, SER, FOMIX-CONACYT and/or REINIECYT.

Dr. Reyes to advance certain trade Contract II administrative fee and/or reimbursement payments to Plaintiff in cash totaling about $1,010 USD.

(4)    The IBERO relieved Dr. Reyes of his position as Coordinator of the Economics and Finance Undergraduate Degree Program and required Dr. Reyes to personally secure the trade Contract II contractor payment guarantee.

(5)    The IBERO threatened Dr. Reyes' employment and pension if Plaintiff succeeded in selling any registrations for the SLTLAW/SLTBE Project℠ ICES/SECI℠ and if he did not obtain a Contract II modification that would release the IBERO from liability for breach of contract.

536.   On December 2, 2013, the IBERO authorized Dr. Reyes to advance certain trade Contract II reimbursement payments to Plaintiff in the amount of about $99 USD.

537.   The IBERO breached trade Contract II by anticompetitive conduct as alleged in the Complaint.

538.   Because the IBERO did not comply with the Contract II conditions, as of December 31, 2013 its outstanding trade Contract II debt to Plaintiff for breach of contract was about $74,712 USD plus interest.

539.   Plaintiffs' are entitled to recover actual, tortious and punitive damages, and attorneys' fees and costs.

Defendant IBERO's Ratifying Acts of Trade Contract II

540.   On August 21, 2013, the IBERO Social Sciences Department appointed a logistical liaison to assist with administrative tasks between Plaintiff and the IBERO University Community.

541.   On August 26, 2013:

(1)   The IBERO Institutional Communication Office authorized Plaintiff's use of the IBERO 30th Anniversary logo.

(2)   The IBERO design manager Arturo Cielo Rodriguez agreed to provide general communication, advertising and promotion logistical assistance, and to edit, constructively critique and approve all Conference promotional materials to be designed by the SLTLAW/SLTBE Project℠ scholarship interns.

542.   On August 28, 2013:

(1)   The IBERO Helpdesk and Internet Technology Departments reformatted the Conference speaker expenditure reimbursement form prepared by Plaintiff (absent practical input of SLTLAW/SLTBE scholarship interns), into a fillable PDF electronic format.

(2)   The IBERO Institutional Communication Office authorized Plaintiff's use of its recommended vendor list for contract print services.

543.   On September 2, 2013, the IBERO Information and Communication Technology Department issued Plaintiff a Temporary Parking Permit.

544.   On September 3, 2013, in compliance with Plaintiff's analysis of the DAAD grant application (absent practical input of SLTLAW/SLTBE scholarship interns), the IBERO Social Sciences Department acknowledged its inability to extend DAAD-Alumni membership privileges to accommodate the alleged FOMIX Project's foreign speaker.

545.   On September 6, 2013, the IBERO Social Sciences Department:

(1)      Affirmed Plaintiff's management of the Conference as agreed under the terms of trade Contract II.

(2)      Ordered removal of Plaintiff's name as Coordinator of the alleged FOMIX Project from the meeting agendas and all other related correspondence of Defendants CONACYT-FOMIX and SECTUR Centro de Convenciones and non-party ACACCI-COMPITE (OMC/UNCTAD).

(3)      Affirmed that the alleged FOMIX Project is not the DAAD Seminar component of the Conference and that Plaintiff is not to facilitate the Conference's DAAD Seminar component as the FOMIX Project.

546.   On September 13, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amount of about $197 USD.

547.   On September 30, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amount of about $224 USD.

548.   On October 6, 2013, in compliance with Plaintiff's analysis of the DAAD grant application and supplemental instructions (absent practical input of SLTLAW/SLTBE scholarship interns), the IBERO Social Sciences Department limited the alleged FOMIX Project presentations to a total of 4 speakers.

549.   On October 16, 2013, the Directors of the IBERO Departments of Social Science, Business, Art Design & Architecture and Humanities:

(1)    Approved the IBERO's participation in the SLTLAW/SLTBE Project℠ Intern Scholarship component.

(2)    Approved their undergraduate degree program coordinators to recommend alumnus candidates and to participate on Plaintiffs' interview committee.

(3)    Agreed to authorize Plaintiff's use of the IBERO university logo.

550.    On October 19, 2013, in compliance with Plaintiff's analysis of the DAAD grant application and supplemental instructions (absent practical input of SLTLAW/SLTBE scholarship interns), the IBERO Social Sciences Department proportioned the DAAD-Alumni and alleged FOMIX Project speakers to accommodate a daily respective 51/50 percent presentation ratio throughout the Conference's 2-day program schedule.

551.    October 27, 2013, the Institutional Communication Office authorized Plaintiff's use of the IBERO university logo.

552.    On October 29, 2013, the IBERO University Broadcasting Office scheduled weekly live Radio Interviews with the Conference speakers based on the scripts prepared by Plaintiff (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns).

553.    On November 5, 2013, the IBERO Design Manager approved the Conference program, flyers, posters and promotional materials prepared by Plaintiff (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns).

554.    On November 7, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amount of about $165 USD.

555.   On November 11, 2013, in accordance with the list and schematic drawing prepared by Plaintiff, (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns), the IBERO Maintenance and Internal Services Department authorized display of the Conference signage and facilitated the equipment order, as well as the IDIT Lobby layout and design coordination.

556.   On November 13, 2013, the IBERO Continuing Education Department accredited the SLTLAW/SLTBE Project℠ ICES/SECI℠ fundraiser in accordance with the BUAP's accreditation.

557.   On November 19, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amount of about $16 USD.

558.   On November 22, 2013, the IBERO Social Sciences Department funded a $10,000 MXN advertising budget supplement to the DAAD Grant.

559.   On November 23, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amounts of about $296 USD and $13 USD, respectively.

560.   On November 25, 2013:

(1)   The IBERO Press Release and Public Relations Manager approved the Conference Press Releases written by Plaintiff (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns).

(2)    The IBERO University Broadcasting Office produced the Conference Radio Spots written by Plaintiff (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns).

561.   On December 2, 2013, the IBERO authorized Dr. Reyes to advance trade Contract II administrative fees and/or reimbursements to Plaintiff in the amount of $99 USD.

562.   Between December 28, 2013 and January 16, 2014, the IBERO's Continuing Education Director Vera signed Plaintiff's ICES/SECI℠ Fundraiser attendance and accreditation certificate(s) for the one paid registrant attendee of the Conference.

The Payment Guarantee

563.   Effective August 5, 2013, pursuant to trade Contract II, the IBERO authorized issuance of a Contractor Payment Guarantee secured by the DAAD Reimbursable Grant. The payment guarantee was executed by Dr. Reyes in his capacity as an IBERO Coordinator.

564.   The Payment guarantee provided that all vendors and contractors would invoice the DAAD or the IBERO (as indicated) for payment via deposit in their bank account not later than January 13, 2014.

565.   Equally, on behalf of the SLTLAW/SLTBE Project℠ trade names FireBaby Breads™ and Creative Strategist™, the payment for Plaintiffs' dessert products, mark-ups, commissions and expenses reimbursement would be deposited into Plaintiff's bank account, not later than January 13, 2014.

The Modified Payment Guarantee

566.   On October 27, 2013,

(1)     Dr. Reyes informed Plaintiff that he resigned from his position as Coordinator of the IBERO Social Sciences Department Economics and Finance Undergraduate Degree Program and began working in the capacity of Academic Professor.

(2)     Dr. Reyes explained to Plaintiff that in this new capacity his functions were limited to course lecturer, researcher, author and public speaker, and that he was no longer authorized to enter into contractual agreements on behalf of the IBERO.

567.   The November 5, 2013 Joint Accreditation Application was completed by the Plaintiff, (absent practical input of SLTLAW/SLTBE Project℠ scholarship interns) and approved by the IBERO, BUAP and ICJ.

568.   On November 8, 2013, after the Project Car's license plates were removed and restored by the police outside of Multicopia Imprenta, the IBERO issued email correspondence to its recommended vendors denying authenticity of the contractor payment guarantee.

569.   On November 11, 2013, the IBERO required Dr. Reyes to make all advance deposit payments requested by its recommended vendors and other contractors using his personal financing options.

570.   The IBERO further required that its logo be removed from the contractor payment guarantee in order to clarify that such guarantee is not secured by the IBERO, but rather is secured by the DAAD Grant and secondarily secured by Dr. Reyes.

571.   After Plaintiff reminded the IBERO of its Contract II obligations to cooperate, as well as to supplement the DAAD advertising budget allocation, Dr. Reyes cautioned Plaintiff, "To the IBERO, the SLTLAW/SLTBE Project℠ is a representation of you pointing your 'Uncle Sam' finger at México and questioning, 'what are YOU doing to help YOUR people?"

572.   Dr. Reyes also expressed to Plaintiff that he had been harassed by certain IBERO coworkers in the past over his decision to marry his then six-year estranged wife, a German national. Plaintiff recommended that Dr. Reyes consider other employment options where his academic expertise would be more productively focused.

573.   On November 12, 2013, the IBERO authorized issuance of a Modified Contractor Payment Guarantee effective August 5, 2013. That same day, Dr. Reyes (in his capacity as DAAD-Alumni) executed the modified contractor payment guarantee, effective August 5, 2013, as secured by the DAAD Reimbursable Grant and secondarily secured by Dr. Reyes.

574.   The modified payment guarantee provided that that all vendors and contractors would invoice the DAAD for payment via deposit into their respective bank accounts not later than December 13, 2013. The Payment Guarantee further provided that if the DAAD does not make the deposit on or before December 13, 2013, Dr. Reyes will authorize personal credit card payment to the vendor or contractor.

575.   Dr. Reyes authorized that in such event, payment to the vendor or contractor would be made via his personal American Express Card ending ****6007 or MasterCard ending ****8972.

576.   Equally, on behalf of the SLTLAW/SLTBE Project℠ trade names FireBaby Breads™ and Creative Strategist™, if the DAAD's payment for Plaintiffs' dessert products, mark-ups, commissions and expense reimbursement is not deposited into Plaintiff's bank account by December 13, 2013, Dr. Reyes would make credit card payment to Plaintiff.

577.   The modified payment guarantee is unenforceable by duress, undue influence and retaliation.

The Conditioned Clarifications Modifying Trade Contract II

578.   On November 21, 2013, Dr. Reyes informed Plaintiff that IBERO threatened to terminate his employment and reduce his pension, if any ICES/SECI℠ registrations were sold and if he did not obtain a modification to trade Contract II that would release the IBERO from liability for breach of contract. According to Dr. Reyes, "My IBERO family sabotaged the SLTLAW/SLTBE Project℠ seminar registration fundraiser because they did not want you to earn an income."

579.   Dr. Reyes also informed Plaintiff's Project workers that out of fear for his job and pension, he allowed his IBERO family to sabotage the SLTLAW/SLTBE Project℠ registration fundraiser.

580.   Dr. Reyes explained that in consideration of Plaintiff's agreement to modify Contract II, the IBERO would cover Plaintiff's full payment for contractual interference and confirm its anticipated date of payment to Plaintiff with her México landlord, Ms. Benítez, as well as with Plaintiff's family investors in the United States. Dr. Reyes

explained to Plaintiff's Project workers that Plaintiff's agreement to modify Contract II would allow Plaintiff to satisfy her obligations to pay for their services.

581.   Plaintiff proposed that conditioned on the IBERO's full payment for contractual interference and the payment date confirmations, Plaintiff would modify Contract II by incorporation of the following clarifications, which are commensurate with the DAAD grant application and supplemental instruction guide:

(1)   The Seminar/Conference dates are November 28-29, 2013.

(2)   Dr. Reyes as the DAAD-Alumni Applicant and Responsible Contact Person is Plaintiff's client.[121]

(3)   The IBERO is the Seminar Host.

582.   The   conditioned   Contract   II   modification   would   also   clarify   that   the SLTLAW/SLTBE Project℠ ICES/SECI℠ fundraiser targets all México universities and professional chapters of attorneys, engineers, architects, accountants and notaries.

583.   Plaintiff explained to Dr. Reyes that the terms of the original Contract II will still apply, so while the conditioned clarifications are designed to relieve the IBERO of breach of contract, at minimum, as a nonparty Host, the IBERO would remain liable for:

(1)    Interference   with   Plaintiff's   contractual,   business   expectancy   and prospective economic advantage ("contractual interference").

(2)   Tortious and punitive damages.

---

[121] Accordingly, Plaintiff sent a Litigation Preservation Notice to the DAAD.

(3)    All of Plaintiff's México investments and related expenditures since February 2011.

584.   On November 29, 2013, Plaintiff explained to Dr. Reyes that the IBERO Continuing Education Director, Alexis Antonio Vera Sánchez:

(1)    Confirmed that payment of a registration fee to attend the ICES/SECI℠, which, in part, benefits IBERO undergraduate alumnus, is commensurate with other IBERO business academic collaborations the IBERO routinely approves.

(2)    Agreed that Plaintiff and Dr. Reyes should consult with the IBERO legal representative.

585.   Dr. Reyes informed Plaintiff that the IBERO legal representative told him that he was never authorized to contract for Plaintiff's services. Plaintiff explained that under Arizona law, the IBERO's ratifying acts prove that Dr. Reyes was authorized. Dr. Reyes expressed fear of further retaliation from the IBERO. Taking into account the IBERO's mandate that Dr. Reyes personally secure the modified contractor payment guarantee, together with the IBERO having relieved Dr. Reyes from his capacity as an IBERO Coordinator, Plaintiff agreed to attend a consultation with Dr. Reyes and the IBERO legal representative (after the Conference) in order to discuss Plaintiff's proposed clarifications to modify trade Contract II conditioned upon the IBERO's full payment to Plaintiff for contractual interference and its payment date confirmations to Plaintiff's landlord and family.

586.   Dr. Reyes refused to meet with Plaintiff and the IBERO legal representative and expressed concern to Plaintiff, "The IBERO does not understand that you are not

involved." Dr. Reyes further insisted, "I am not allowed to explain to you what is going on."

587.    Plaintiff strongly encouraged Dr. Reyes to consider applying for employment with the UDLAP where his academic expertise and Spanish/German/English language fluency could be more productively focused.

588.    Dr. Reyes explained that he did not want to leave the IBERO's employment because he believed that the IBERO could withhold his pension over some preoccupation with Professor Martínez's alleged expenditure of FOMIX Project funds, and that because of an employment document he signed, the IBERO would somehow hold him liable for personal financial benefits he derived from use of the IBERO's property.

589.    On the morning of December 2, 2013,

(1)    Plaintiff reviewed line-by-line with Dr. Reyes the conditioned clarifications modifying trade Contract II.

(2)    Dr. Reyes advised that he had no changes.

(3)    Plaintiff reiterated advice of her intent to consult with the IBERO legal representative.

(4)    Plaintiff and Dr. Reyes executed the conditioned clarifications modifying trade Contract II effective August 5, 2013, which were initialed and signed by Dr. Reyes in his capacity as DAAD-Alumni.

590.    During the December 2, 2013 review and execution of the conditioned clarifications modifying trade Contract II, Dr. Reyes, played a recorded self-recitation of Dr. Martin Luther King, Jr.'s speech, "I Had a Dream".

591.    After the IBERO received the December 4, 2013 email correspondence from the DAAD denying payment of Plaintiff's expenditure reimbursement application, the IBERO:

(1)     Refused Plaintiff's requests for legal consultation and denied provision of its attorney's contact information.

(2)     Denied liability for Plaintiff's trade services and alleged the involvement and fault of other parties.

(3)     Refused to confirm its anticipated date of payment to Plaintiff with Plaintiff's landlord and family investors.

(4)     Informed Plaintiff of its plan to facilitate Plaintiff's Project as its own.

(5)     Offered Plaintiff employment conditioned upon Plaintiff's agreement to release the IBERO from all liability under trade Contracts I and II, the Contractor Payment Guarantee, the Modified Contractor Payment Guarantee, and the conditioned clarifications modifying trade Contract II.

(6)     Additionally conditioned its employment offer upon Plaintiff's agreement to extend a reference on behalf of Professor Martínez.

(7)     Demanded Plaintiff's bank account number so it could deposit a payment amount that it believed to be fair.

592.    After Plaintiff declined, Dr. Reyes commented, "Guess you will have to go and find something else you love doing. Keep working. Whatever you do, don't stop working."

593.   The conditioned clarifications modifying trade Contract II do not constitute a novation, and may be unenforceable by duress, undue influence, retaliation and/or fraudulent misrepresentation.

594.   Because the IBERO did not comply with the conditioned clarifications modifying trade Contract II, pursuant to Contract II, the IBERO remains liable to Plaintiff for breach of contract damages, in addition to payment of interest, tortious and punitive damages.

595.   IBERO breached the conditioned clarifications modifying trade Contract II and likewise breached trade Contract II by anticompetitive conduct as alleged in this Complaint.

596.   Because the IBERO did not comply with the trade Contract II conditions, as of December 31, 2013 its outstanding trade Contract II debt to Plaintiff for breach of contract was about 74,712 USD plus interest.

597.   Plaintiffs' are entitled to recover actual, tortious and punitive damages, and attorneys' fees and costs.

**COUNT ONE**
Violations of §§ 1 - 2 of the SHERMAN ANTITRUST ACT
26 Stat. 209, codified at 15 U.S.C. §§ 1–7
**15 U.S.C. §§ 1 and 2**
(All Defendants)

598.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

599.   The Defendants' conduct constitutes a contract, combination or conspiracy in unreasonable restraint of trade or commerce in attempt to monopolize, or combine, or

conspire with another person or persons, to monopolize the interdisciplinary niche market or commerce.

600.   The Defendants entered into anti-competitive agreements in restraint of trade in violation of the Sherman Act section 1.

601.   The Defendants' conspiracy conduct violates the Sherman Act sections 1 and 2.

602.   The Defendants' employment of identity politics violates the Sherman Act sections 1 and 2.

603.   The Defendants' application of *Logotherapy* violates the Sherman Act sections 1 and 2.

604.   The Defendants' conduct constitutes naked horizontal agreements among competitors to control or otherwise unconscionably affix a low price to the Plaintiff's trade services and service products, or to control and otherwise restrict the Plaintiffs' output.

605.   The Defendants' conduct constitutes naked a horizontal agreements among competitors to control or otherwise unconscionably affix a low price to the Plaintiff's trade services and service products, or to control and otherwise restrict the Plaintiff's output, allocate customers, divide territories or markets and facilitate Defendants' exercise of market power.

606.   The Defendants' conduct constitutes horizontal group boycott agreements among competitors not to deal with the Plaintiff in order to exclude or otherwise disadvantage the Plaintiff as a niche market competitor, force the Plaintiff into an employment contract, divide territories or markets and facilitate Defendants' exercise of market power.

607.   The Defendants' conduct constitutes vertical group boycott agreements among competitors not to deal with the Plaintiff in order to exclude or otherwise disadvantage the Plaintiff as a niche market competitor, force the Plaintiff into an employment contract, divide territories or markets and facilitate Defendants' exercise of market power.

608.   The Defendants' publication and enforcement of language within the SBA's Communications Access to Members Policy in order to exclude member access to the Plaintiff's ICES/SECI℠ violates the Sherman Act sections 1 and 2.

609.   The Defendants' attempted implementation of an SBA precertification process requirement for the Plaintiff to offer ICES/SECI℠ violates the Sherman Act sections 1 and 2.

610.   The Defendants' attempted creation of an SBA centralized system for the delivery of all CLE programs violates the Sherman Act sections 1 and 2.

611.   The Defendants' conduct constitutes illegal agreements between two or more persons to restrain trade or exclusively deal with one another.

612.   The Defendants' horizontal agreements and arrangements lead to price fixing, limited or otherwise restricted competition and decreased output and are per se illegal and prosecutable by the United States government as a felony.

613.   The Defendants' horizontal agreements and arrangements lead to boycotting, limited or otherwise restricted competition and decreased output and are per se illegal and prosecutable by the United States government as a felony.

614.   The Defendants' vertical agreements and arrangements lead to boycotting, limited or otherwise restricted competition and decreased output and are per se illegal and prosecutable by the United States government as a felony.

615.   The Defendants' vertical and horizontal agreements and arrangements lead to monopolization, and are per se illegal and prosecutable by the United States government as a felony.

616.   The Defendants' conduct was irrational and unlawful.

617.   The Defendants' continued to meet to fine-tune their arrangements and agreements.

618.   The Defendants' conduct within the United States, México and other foreign countries produced anticompetitive effects within the United States that have reprehensible consequences within the state of Arizona and this District.

619.   The Defendants SBA, SECTUR, BUAP and ASU have monopoly power, and each made a decision to change the niche market, motivated by a desire to restrict niche market competition, and the decision has the effect of limiting or altogether eliminating the niche market competition.

620.   The conduct of Defendants SBA, Arizona Supreme Court, SECTUR, BUAP and ASU constitutes monopolization and attempted monopolization of the niche market in violation of Sherman Act section 2.

621.   The Defendants' conduct violates parallel state laws.

622.   There is no appropriate or legitimate business justification for the Defendants' conduct.

623.   The Defendants' conduct constitutes a continuing violation of the antitrust laws.

624.   The Defendants' conduct resulted in antitrust injurious effects to the Plaintiffs, their property and business.

625.   The Plaintiffs' claim is timely filed within the established limits of 15 U.S.C. § 15b. However, where necessary and/or appropriate, an exception to the statute of limitations exists.

626.   The acts and omissions taken by the Defendants to obstruct or otherwise control enforcement of the Plaintiff's trade contracts I and II were overt acts that restarted the statute of limitations.  Those acts caused independent harm and accumulating injury.

627.   Each Defendant completed a new independent overt act during the limitations period.

628.   Each Defendant's overt act was not merely a reaffirmation of a previous act.

629.   Each Defendant's overt act inflicted new and accumulating injury on the Plaintiff.

630.   Plaintiffs are entitled to treble damages in an amount to be proven at trial.

**COUNT TWO**
Violations of §§ 3, 4, 7, 14 and 16 of the CLAYTON ANTITRUST ACT
38 Stat. 70, *codified* at 15 U.S.C. §§ 12–27 *et seq.*
**15 U.S.C. §§ 14-15, 18, 24 and 26**
(All Defendants)

631.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

632.   The Plaintiffs are competitor participants in the niche market restrained by the Defendants.

633.   Defendant Antonio J. Dominguez's association with the Forakis Law Firm and the association of Christine Cracchiolo aka Christine Goodson Forakis with Defendant Nexo Legal is an understanding, contract, combination or conspiracy in unreasonable restraint of trade or commerce in attempt to monopolize, or combine, or conspire with another person or persons, to monopolize the interdisciplinary niche market or commerce.

634.   Defendants Antonio J. Dominguez and Nexo Legal's association(s) the Arizona Supreme Court, State Bar of Arizona, Arizona State University and/or Attorney Ronald Logan is an understanding, contract, combination or conspiracy in unreasonable restraint of trade or commerce in attempt to monopolize, or combine, or conspire with another person or persons, to monopolize the interdisciplinary niche market or commerce.

635.   The Defendants' used and are using the SBA lawyer regulation process to institute a baseless lawsuit against the Plaintiff in order to conceal their attempt to directly interfere with the Plaintiff's business relationships within the interdisciplinary niche market.

636.   The Arizona Supreme Court's enforcement in affirmance of the Defendants' abuse of the SBA lawyer regulation process constitutes a conspiracy to monopolize the interdisciplinary niche market by putting the Plaintiff out of business, weakening the Plaintiff, and thus destroying, eliminating and weakening existing and potential competition.

637.   The Defendants combined to harass and deter the Plaintiff from having free and unlimited access to agencies and the courts, and to defeat that right by massive, concerted, and purposeful group activities.

638.   The Defendants' conduct resulted in antitrust injurious effects to the Plaintiffs, their property and business.

639.   The antitrust injuries to the Plaintiff, the niche market, competition, consumers, end-users and commerce are of the type the antitrust laws were intended to prevent and that flows from that which makes the acts of the Defendants unlawful.

640.   The Defendants' conduct constitutes monopolization of the niche market in violation of Clayton Act section 7.

641.   Plaintiffs are entitled to preliminary and permanent injunctive relief preventing the Defendants from initiating further disciplinary proceedings against the Plaintiff and otherwise acts and omissions in pursuit of the contract, conspiracy or combination.

642.   Plaintiffs are entitled to preliminary and permanent injunctive relief preventing the consummation of the proposed Dominguez and Forakis Law Firm and/or Nexo Legal and Christine Cracchiolo aka Christine Goodson Forakis contract, conspiracy or combination.

643.   Plaintiffs are entitled to treble damages in an amount to be proven at trial.

**COUNT THREE**
Violations of § 6a of the FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT
98 Stat. 1246, *codified* at 15 U.S.C. §§ 1 *et seq.*
**15 U.S.C § 6a**
(All Defendants)

644.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

645.   By entering into the agreements with their competitors and continuing to enforce the restrictions imposed in those agreements and by other predatory and exclusionary

conduct described herein, the Defendants willfully acquired, and willfully maintained, a monopoly in the interdisciplinary niche market for the NAFTA authorized professional business investor trade operations in violation of Section 2 of the Sherman Act, with adverse effects that satisfy the requirements of Section 6a of the FTAIC. This violation is likely to continue unless the relief sought is granted.

646.   The Defendants' conduct targets the United States commerce.

647.   The Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on United States commerce as follows:

(1)   Restraint and reduction of competition in the United States' export business for NAFTA authorized professional business investor services.

(2)   Restraint and reduction of competition in the United States' export business for related general services and products, as well as, after sales services.

(3)   Restraint and reduction of NAFTA authorized professional business investor services within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries).

(4)   Depriving the United States' businesses and consumers for the benefits of free and open competition.

648.   The Defendants' conduct proximately caused the Plaintiffs' to suffer damages in the United States and Plaintiffs' injuries were an immediate consequence of such conduct.

649.   Plaintiffs are entitled to treble damages in an amount to be proven at trial.

650.    Pursuant to 18 U.S.C. 3571, the conduct of each Defendant is subject to a fine of $250,000 per individual, $500,000 per organization or alternatively twice the gross gains derived by each defendant, conspirator and co-conspirator.

**COUNT FOUR**
Violations of §§ 73 and 74 of the WILSON TARIFF ACT
98 Stat. 1246, *codified* at 15 U.S.C. §§ 8-9 *et seq.*
**15 U.S.C §§ 8-9**
(All Defendants)

651.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

652.    The fundamental object of the Defendants was control of the Plaintiff's NAFTA authorized trade services and service products within the interdisciplinary niche market and monopolize trade and commerce therein.

653.    The Defendants were aided by discriminating legislation, but by their own deliberate acts and omission, both in the United States, México and elsewhere, they brought about injurious antitrust effects within the United States.

654.    The Defendants' conduct constitutes a continuing violation of the antitrust laws.

655.    The Plaintiffs' are entitled to recover treble damages in an amount to proven at trial.

**COUNT FIVE**
Violations of § 43(a) of the LANHAM ACT
60 Stat. 441, *codified* at 15 U. S. C. §1125(a), *et seq.*
**15 U. S. C. § 1125(a)(1)(A) and § 1125(a)(1)(B)**
(All Defendants)

656.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

657.   The Plaintiff is a NAFTA professional business investor immigrant conducting authorized economic trade activities between the United States, México and other foreign countries.

658.   The Plaintiffs are engaged in commerce within the control of Congress.

659.   The Defendants' distrust propaganda contained false and misleading information and misrepresentations that deceived consumers and end-users in the niche market.

660.   As a result of the distrust propaganda consumers and end-user in the niche market withheld and continue to withhold trade from the Plaintiff that resulted in lost sales and reputations damages

661.   The Defendants' conduct constitutes unfair competition by false advertising.

662.   The Defendants misrepresented the Plaintiff as their employee.

663.   Defendants misrepresented the Plaintiff's trade contract I and II services to facilitate a competing program and project.

664.   Defendants misrepresented the Plaintiff as coordinator of a competing program and project.

665.   The Defendants' conduct constitutes unfair competition by false association.

666.   Plaintiffs fall within the zone of interest protected by the statute.

667.   Plaintiffs suffered and continue to suffer commercial injuries to business reputation and present and future trade contract sales proximately caused by Defendants' violations of the statute.

668.   Plaintiff is entitled to recover corrective advertising, injunctive relief and damages in an amount to be proven at trial.

**COUNT SIX**
Violations of the RACKETEER INFLUENCED AND
CORRUPT ORGANIZATION (RICO) ACT
102 Stat. 4398, *codified* at 18 U.S.C. § 1961, et seq.
**18 U.S.C. § 1961(1)(B) and 1962(b)**
(All Defendants)

669.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

670.   The Defendants through a widespread criminal enterprise engaged in a pattern of racketeering activity across State lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the past ten (10) calendar years.

671.   The Defendants' predicate acts cluster around peonage and slavery, involuntary servitude and forced labor.

672.   The Defendants engaged in racketeering activity related to peonage, slavery, involuntary servitude and forced labor for the purpose of financial gain, which is indictable under 18 U.S.C. §§ 1581, 1583-1584, 1589-1590, 1593-1595.

673.   Other RICO predicate acts, although appearing to be isolated events, were actually part of the overall conspiracy and pattern of racketeering activity alleged herein, e.g. Obstruction of Justice, Interference with Commerce by Threats, Fraud and False Statements, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, Fraud in Foreign Labor Contracting.  *See*, 18 U.S.C. §§ 1503, 1951-1952, 1351, respectively.

674.   The primary objective of the racketeering enterprise has been to inflict severe and sustained economic hardship upon the Plaintiff, with the intent of impairing, obstructing, preventing and discouraging Plaintiff from successful international operation of the SLTLAW/SLTBE Project in the capacity of the first African-American, single, female, United States national with dual residency, and dual licensed NAFTA authorized economic trade operations as an independent interdisciplinary business law attorney between the United States, México and other foreign countries. But rather through the unlawful employment of identities politics and further *Logotherapy* theories, attempted to place the Plaintiff under a circumstance of peonage, where the Plaintiff would be forced to marry, and like a debt slave work as an employee or continue to work independently, but under a forced supervised partnership arrangement.

675.   On February 28, 2017, upon information and belief, the Defendants impersonated a State Supreme Court Presiding Disciplinary Judge in violation of A.R.S. §13-2006(A)(3) (a felony), with the intent to induce the Plaintiff to provide or allow access to property, and wherein the Plaintiff was unlawfully suspended from the practice of law, and threatened with further sanction.

676.   State and federal officers and employees are among the probable causes that threaten further continuation of the severe economic hardship and other wrongs described herein.

677.   At various times and places, partially enumerated in Plaintiff's documentary material, the Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise of persons who were associated in fact and who did engage

in, and whose activities did affect, interstate and foreign commerce, all in violation of 18

U.S.C. § 1962(b).

678.   At various times and places, partially enumerated in Plaintiff's documentary

material, the Defendants did conspire to acquire and maintain an interest in a RICO

enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§

1962(b) and (d).

679.   During the ten (10) calendar years preceding February 28, 2017, the Defendants

did cooperate jointly and severally in the commission of two (2) or more of the RICO

predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and

did so in violation of the RICO law at 18 U.S.C § 1962(b) prohibited activities.

680.   The Defendants did commit two (2) or more of the offenses itemized above in a

manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a

continuing threat of their respective racketeering activities, also in violation of the RICO

law at 18 U.S.C § 1962(b).

681.   At various times and places, partially enumerated in Plaintiff's documentary

material, the Defendants did associate with a RICO enterprise of persons who were

associated in fact and who engaged in, and whose activities did affect, interstate and

foreign commerce, in violation of 18 U.S.C. §§ 1962(c) and (d), consistent with § 1961(4),

(5) and (9).

682.   At various times and places, partially enumerated in Plaintiff's documentary

material, the Defendants did conspire to associate with a RICO enterprise of persons who

were associated in fact and who engaged in, and whose activities did affect, interstate and

foreign commerce, all in violation of 18 U.S.C. §§ 1962(c) and (d), consistent with § 1961(4), (5) and (9).

683.   The Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c) and (d), consistent with § 1961(4), (5) and (9).

684.   At various times and places, partially enumerated in Plaintiff's documentary material, the Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d), consistent with § 1961(4), (5) and (9).

685.   During the ten (10) calendar years preceding February 28, 2017, the Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of 18 U.S.C. § 1962(b), (c) and (d) prohibited activities.

686.   The Defendants committed two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. § 1962(b), (c) and (d).

687.   Although the liberal construction rule was never codified in Title 18 of the United States Code, pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, RICO laws are to be liberally construed, and are consistent with the *respondeat superior* principal (of liability for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

688.    Civil RICO statutes are supplemented by the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights and by virtue of the Supremacy Clause of the United States Constitution, any conflicts with State laws and State constitutional provisions are resolved in favor of the RICO statutes.

689.    Plaintiffs are entitled to recover treble damages in an amount to be proven at trial.

**COUNT SEVEN**
Violations of the rights secured by the Civil Rights Act of 1871 and 1964,
**42 U.S.C. § 2000d**
(Defendants PHEAA, Navient and Suntrust Bank)

690.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

691.    The names and contact information for the Plaintiff's family member and non-family member references are on the Plaintiff's student loan consolidation applications.

692.    On April 1, 2009, the sum of the Plaintiff's monthly consolidated government loan payment and consolidated private loan payment exceeded $1,100. Effective January 23, 2009, Defendant PHEAA/AES granted the Plaintiff a one-year economic hardship deferment under the William D Ford Federal Direct Loan (Direct Loan) Program, the Federal Perkins Loan Program, or the Federal Family Education Loan Program.

693.    On May 6, 2009, the Plaintiff's consolidated government loan was in economic hardship deferment status, her consolidated private loan payment of $864 exceeded 20% of the co-borrower's monthly income and Defendant Navient (formerly SallieMae) confirmed that the Plaintiff and co-borrower met the pre-approval qualifications for economic hardship forbearance.

694.   That same day, Defendant Navient delayed approval, while its agents made calls to the Plaintiff and/or co-borrower alleging:

(1)   The Plaintiff and co-borrower were confusing the consolidated private loan with the Plaintiff's government loan.

(2)   The Plaintiff and co-borrower joint income was the qualification indicator.

(3)   The consolidated private loan monthly payment was recently reduced and no longer exceeds the co-borrower's gross monthly income.

(4)   Economic hardship forbearance is only available for "single loan" borrowers and the Plaintiff's consolidated private loan is not a "single loan".

(5)   Navient does not offer economic hardship forbearance for private loans.

695.   The Plaintiff's private consolidation loan application includes the date of birth and driver license number of the Plaintiff and the co-borrower.

696.   On May 8, 2009, Navient denied the Plaintiff and co-borrower request for economic hardship forbearance, which the Plaintiff and co-borrower disputed. Navient accelerated the Plaintiff's consolidated private loan, sent it out for third-party collection and began negative consumer reporting of the disputed debt against the Plaintiff and co-borrower.

697.   The Plaintiff and co-borrower disputed Navient's denial and the loan's alleged acceleration, delinquency, default, balance, interest, as well as other related charges including collection fees.

698.   Between May 8, 2009 and August 5, 2009, Navient and/or its agents made subsequent calls to the Plaintiff and/or co-borrower requesting 3 advanced payments of

$350 for an alleged limited time temporary forbearance opportunity under a 30-year amortized lending program. The Plaintiff and co-borrower declined and again disputed Navient's May 8, 2009 denial.

699.   Since May 8, 2009, Navient and its agents continue in attempt to collect and to make unlawful consumer reports on the disputed debt against the Plaintiff and co-borrower.

700.   Respectively on September 22, 2016 and October 18, 2016, Navient agents, AlliedInterstate and Asset Recovery, attempted to collect on the disputed debt from the Plaintiff and co-borrower.

701.   After Defendant IBERO breached the terms of trade contracts I and II, the Plaintiff's government loans were placed into default status and the Plaintiff began a loan rehabilitation program with Defendant PHEAA that PHEAA advised the completion of would renew the Plaintiff's economic hardship deferment eligibility for an additional 3-year term.

702.   On around August 26, 2015, the Plaintiff completed the PHEAA government loan rehabilitation program and subsequently applied for PHEAA/AES economic hardship deferment.

703.   Since August 28, 2015, PHEAA/AES repeatedly confirmed the Plaintiff's eligibility and pre-approval for economic hardship deferment one day, then the following day PHEAA/AES denied approval alleging, (a) inability to determine whether the Plaintiff works full-time or part-time, or (b) the Plaintiff had used the maximum time allotted.

704.   Since August 28, 2015, PHEAA/AES continues to provide the Plaintiff with conflicting reports of eligibility and ineligibility, and accordingly confirmed pre-approval, then subsequently denied the Plaintiff's application(s) for economic hardship deferment.

705.   On October 14, 2016, PHEAA/AES alleged that the Plaintiff's new lender, Defendant SunTrust Bank, prohibited renewal of the Plaintiff's economic hardship deferment eligibility for the additional 3-year term.

706.   On October 21, 2016, SunTrust granted the Plaintiff a 1-year temporary hardship forbearance.

707.   The conduct of Defendants PHEAA/AES, Navient and Suntrust Bank excluded the Plaintiff from participation in a federally assisted program.

708.   The conduct of Defendants PHEAA/AES, Navient and Suntrust Bank constitute a denial of the Plaintiff's benefits of a federally assisted program.

709.   The conduct of Defendants PHEAA/AES, Navient and Suntrust Bank constitute discrimination under a federally assisted program on the ground of race, sex, color or national origin, disability, religion, age, sexual orientation or status as a parent.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**COUNT EIGHT**
Violations of the rights secured by the Civil Rights Act
42 U.S.C. **§** 1983 the rights secured by the
First, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, Thirteenth and Fourteen
Amendments to the United States Constitution, and the rights defined and
secured by their analogues established and defined in the
Constitution of the State of Arizona, United States Agreements, Investor-Protection
Treaties, Acts and International Human Rights Treaties and Conventions
**42 U.S.C. § 1983**
(All Defendants)

710.   The United States is a party to the North American Free Trade Agreement (NAFTA) and the Plaintiff is a member of the class the NAFTA is designed to protect. Defendants' conduct constitutes violations of the NAFTA, 107 Stat 2060-2224, *codified at* 19 U.S.C. §§ 3301, 3311, *et. seq.* Articles 904(3)-(4), 1202-1205, 1210, 1501-1502 and 1601-1602.

711.   The United States is a party to the Convention Concerning the Abolition of Forced Labor (CCAFL) and the Plaintiff is a member of the class the CCAFL is designed to protect. The Defendants' conduct constitutes violations of Article 1 of the CCAFL.

712.   The United States is a party to the Convention to Suppress the Slave Trade and Slavery (CSSTS) and Plaintiff is a member of the class the CSSTS is designed to protect. The Defendants' conduct constitutes violations of Articles 2(b) and 5 of the CSSTS, Section I, Article I of the CSSTS Supplement.

713.   The United States is a party to the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment (CAT) and Plaintiff is a member of the class the CAT is designed to protect. The Defendants' conduct constitutes violations of 2, 4-5, 13-14 and 16 of the CAT.

714.   The United States is a party to the Convention for the Elimination of All Forms of Discrimination Against Women (CEDAW) and Plaintiff is a member of the class the CEDAW is designed to protect. The Defendants' conduct constitutes violations of Articles 2, 3, 5, 8, 11(c) and 16 of the CEDAW.

715.   The United States is a party to Convention to Eliminate Racial Discrimination (CERD) Plaintiff is a member of the class the CERD is designed to protect. The Defendants' conduct constitutes violations of Articles 1-5, 8, 10-11, 14 and 16 of the CERD.

716.   The United States is a party to Convention on Civil and Political Rights (CCPR) and the Plaintiff is a member of the class the CCPR is designed to protect. The Defendants' conduct constitutes violations of Articles 1-3, 7-8, 17-20, 23 and 26 of the CCPR.

717.   The United States is a party to the Convention on Economic, Social and Cultural Rights (CESCR) and the Plaintiff is a member of the class the CESCR is designed to protect. The Defendants' conduct constitutes violations of Articles 1-3, 6, 10 and 15 of the CESCR.

718.   The United States is a party to United States-México Income Tax Convention (USMITC) and the Plaintiff is a member of the class the USMITC is designed to protect. The Defendants' conduct constitutes violations of Articles 25 and 26 of the USMITC and its Protocols.

719.   The United States is a party to the Convention on Consent to Marriage (CCM) and the Plaintiff is a member of the class the CCM is designed to protect. The Defendants'

conduct constitutes violations of Article 1 of the CCM, and Principle 1 of the Recommendation on CCM.

720.   The Defendants' conduct constitutes violations of the Plaintiff's First Amendment rights to conscious and free exercise of religious practices, freedom of speech and expression from government interference, rights to petition the government for redress of grievances, and international human rights First Amendment analogues defined and secured under the Article Two, Section Six of the Arizona Constitution, RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

721.   The Defendants' conduct constitutes violations the Plaintiff's Fourth Amendment right to security and of person, home, papers and effects, privacy of home life, unreasonable searches and seizures, and international human rights Fourth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

722.   The Defendants' conduct constitutes violations the Plaintiff's Fifth Amendment rights against compulsion to be a criminal witness against herself, deprivation of life, liberty and property without due process of law, deprivation of private property for public use (without just compensation) and rights implicit guarantee to equal protection (non-discrimination) of laws, as well as the international human rights Fifth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

723.   The Defendants' conduct constitutes violations of the Plaintiff's Sixth Amendment right under the confrontation clause to be informed of the nature and cause of a criminal

accusation, to be confronted with the witnesses against her, to have compulsory process of obtaining witnesses in her favor, and to have Assistance of Counsel for her defense, and international human rights Sixth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

724. The Defendants' conduct constitutes violations of the Plaintiff's Eighth Amendment rights against the federal government's imposition of excess fines or cruel and unusual punishment and international human rights Ninth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

725.  The Defendants' conduct constitutes violations of the Plaintiff's Ninth Amendment rights to make economic, political, social and cultural self-determinations and international human rights Ninth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

726.  The Defendants' conduct constitutes violations of the Plaintiff's Eleventh Amendment rights to petition the federal Courts for redress of grievances against officials who are acting as representatives of a state, and where the state's conduct is also unconstitutional and international human rights Eleventh Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

727.  The Defendants' conduct constitutes violations of the Plaintiff's Thirteenth Amendment rights prohibiting slavery and involuntary servitude within the United States or any place subject to their jurisdiction and international human rights Thirteenth Amendment analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

728.  The Defendants' conduct constitutes violations of the Plaintiff's Fourteenth Amendment rights to the unabridged privileges and immunities of United States citizenship (including against discrimination by the law and state government interference in First Amendment rights), rights against deprivation of life, liberty and property without due process of law and rights to equal protection of laws, as well as the international human rights Fourteenth Amendment analogues defined and secured under the RFRA, RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

729.  The Plaintiff is a member of the class the Religious Freedom Restoration Act (RFCA) is designed to protect. The Defendants' conduct constitutes violations of the RFCA 17 Stat 1488, *codified* at 42 U.S. Code § 2000bb–1, *et seq.* as well as its international human rights analogues defined and secured under the RICO, NAFTA, CCAFL, CSSTS, CAT, CEDAW, CERD, CCPR, CESCR, USMITC and CCM.

730.  The RFRA requires accommodation of the Plaintiff's religious practices so that the evidentiary support for her pre-litigation investigation factual findings and strategies are not subject to inopportune mandatory disclosure in advance of the discovery and disclosure phase set forth in the procedural rules, that Plaintiff is not subject to tariff or

nontariff barriers, sanctions or adverse inferences, and the Plaintiff's license to practice law is not subject to interim or other form suspension under the pretext of state government lawyer regulation.

731.   The RFRA and the First Amendment Free Exercise and Freedom of Expression Clause mandates a finding that the Plaintiff's protected rights to free speech, expression and religious practice constitute a "reasonable good faith basis" for her Rule 54(d)(2), Ariz.R.Sup.Ct failure to comply with the Subpoena for Written Response to the Screening Letter, which makes it against equity and good conscious and under the totality of the circumstances, a miscarriage of justice for the Presiding Disciplinary Judge of the Arizona Supreme Court to impose the sanction of interim suspension and subsequent admonishment of the Plaintiff.

732.   Mandatory membership in the SBA is neither uniform, with respect to religion, gender, race, marital status, social status, socio-economic status and/or political affiliation, nor a compelling governmental interest.

733.   The Defendants' substantial burden on the Plaintiff's exercise of free speech, expression and religious practice to obtain copies of litigation preservation notices lawfully disseminated to anticipated party defendants and nonparty witnesses and custodians of record legally obliged to preserve relevant evidence, under the pretext of facilitating the practice of lawyer regulation, neither constitutes furtherance of a compelling government interest nor is the least restrictive means of furthering an alleged compelling government interest.

**COUNT NINE**
Violations of the FAIR CREDIT REPORTING ACT (FCRA)
84 Stat. 1128, *codified* at 15 USC § 1681 *et seq.*
**15 U.S.C. §§ 1681 b(f), 1681w and 16 C.F.R. § 682.3**
(All Defendants)

734.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

735.   The Plaintiff reasonably interpreted Q&B's acts or omissions as indicating Attorney Booker had apparent authority. Attorney Booker employment specifically empowered him to obtain the Plaintiff's consumer report and Attorney Booker was aided in the procurement of the Plaintiff's consumer report by designated Q&B departments and staff.

736.   Eligibility for pro bono legal representation is not a permissible purpose under §1681b(c)(1).

737.   Pro bono legal representation neither constitutes a § 1681a(l) business need for a consumer report nor a benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status.

738.   Q&B did not extend the Plaintiff a firm offer of credit, and the FCRA § 1681b(c)(1) would not permit Q&B to receive the Plaintiff's credit report for an albeit permissible but unstated purpose.

739.   Q&B obtained the Plaintiff's authorization under false pretenses and mislead the reporting agency to believe Q&B satisfied the intent requirements pursuant to §1681(a)(3).

740.   Q&B's conduct constitutes a calculated attempt to mislead another in order to obtain information.

741.   Q&B is vicariously liable for the violations of Attorney Booker and its designated departments and staff.

742.   Upon information and belief, in around August 2010, Attorney Antonio Dominguez and the Dominguez Law Firm, PC acquired the Plaintiff's consumer report, gave a copy and/or provided information therefrom to his client Martha Serrano cautioning, "See for yourself -- your sister's bankrupt attorney is taking advantage her by charging your sister high attorneys' fees so she can pay her bills."[122]

743.   Q&B willfully or negligently procured the Plaintiff's consumer report without a permissible use and, upon information and belief failed to dispose of or safeguard the information in the Plaintiff's consumer report in violation of §§1681b(f) and 1681w and 16 C.F.R. § 682.3. Q&B improperly used the Plaintiff's consumer report.

744.   Dominguez PC willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

745.   Nexo Legal willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

---

[122] Accordingly, Plaintiff sent Dominguez a Litigation Preservation Notice.

746.   Elaina West willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

747.   Leo Canales willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

748.   Dr. Osadolor willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

749.   The IBERO willfully or negligently procured the Plaintiff's consumer report without a permissible use in violation of §1681b(f), improperly used, and upon information and belief, distributed it within the interdisciplinary niche market.

750.   On January 22, 2016, the Plaintiff discovered that beginning 2005 her mandatory character and fitness disclosures were unlawfully distributed within the interdisciplinary niche market.

751.   The existence of the harm to the Plaintiffs as a result of the Defendants' negligent and/or willful acts and omissions was determinable.

752.   The specific dollar amount of that harm to the Plaintiffs in this action that was speculative at the time of the initial wrong, crystallized in upon the Plaintiff's 2010 discovery of Defendants' unlawful dissemination of the consumer report within the interdisciplinary niche market, and the Defendants' unlawful acquisition and unlawful

exploitation of the Plaintiff's bankruptcy judgment identified on consumer report against the Plaintiff within the interdisciplinary niche market constitutes overt acts in continued violation of state and federal antitrust laws.

753.   The Defendants' conduct alleged herein depicts a sense of personal ill will toward the Plaintiff that activated their undertaking of the acts and omissions resulting in the Plaintiff's harm. Q&B participated in or condoned Attorney Booker's conduct constituting the aggravating factor.

754.   As a result of the Defendants' conduct, the Plaintiff suffered antitrust injuries not limited to economic damages, reputation impairment, humiliation and emotional distress anxiety, hesitance, reclusiveness, stress, nervousness, depression and sleeplessness.

755.   Pursuant to §§ 1681n and/or 1681o, the Plaintiff is entitled to actual or statutory damages and such amount of punitive damages as the court may allow.

### COUNT TEN
### BREACH OF FIDUCIARY DUTY
(Arizona Supreme Court Character and Fitness Committee
– Polsinelli, PC – State Bar of Arizona)

756.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

757.   The Arizona Supreme Court Character and Fitness Committee is not a disciplinary authority.

758.   Plaintiff entrusted the mandatory confidential disclosure of her financial, consumer report, business involvement, bankruptcy, address, civil litigation and employment histories, to Arizona Supreme Court Committee on Character and Fitness ("Committee").

208

759.   Edward F. Novak an Attorney with Defendant Polsinelli currently serves as Chair of the Committee.

760.   During Arizona Superior Court Judge Howard Sukenic's service on the 2005 Committee he requested the Plaintiff's attendance of a panel hearing after expressing the Committee's concerns for assurance that the Plaintiff would not be a "credit abuse backslider and bankruptcy recidivist".

761.   At the outset of the July 6, 2055 panel hearing, attorneys Timothy R. Hyland and David F. Gaona explained to the Plaintiff, "I do not know why you are here Ms. Thomas." Hyland and Gaona then directed the Plaintiff to Attorney Sukenic insisting, "Go ahead, Howard, you requested this hearing."

762.   After receipt of the Plaintiffs' June 6, 2016 litigation preservation notice, via telephonic conference with the Plaintiff, Judge Sukenic asserted, "I was not the only 2005 committee member."

763.   The Committee, pursuant to Ariz.Sup.Ct., Rule 37(c) committed that the Plaintiff's records of applications for admission to the practice of law and the Character and Fitness Committee proceedings and procedures concerning the Plaintiff's applications for admission shall remain confidential within the meaning of the Rule.

764.   A fiduciary relationship and duty existed.

765.   In furtherance of the conspiracy, the Arizona Supreme Court Committee on Character and Fitness breached that fiduciary duty by dissemination of the Plaintiff's confidential mandatory disclosures within the interdisciplinary niche market.

766.   In 2006, Polsinelli referenced an ambiguous nondisclosure in relation to the Plaintiff and later characterized the Plaintiff as unable to, "Identify credit worthy clients."

767.   In 2015, the Ciudad Judicial de Puebla wrongfully accused the Plaintiff of falsifying a co-signer signature on the Project House Lease Agreement.

768.   The Defendants conduct was outrageous, or taken in reckless indifference to the the Plaintiff's rights, reputation and stake in the trade.

769.   The Plaintiff has suffered and continues to suffer damages, including antitrust injuries directly caused by the Arizona Supreme Court Committee on Character and Fitness' breach of fiduciary duty.

770.   The existence of the harm to the Plaintiffs as a result of the Defendants' dissemination of the Plaintiff's mandatory character and fitness disclosures beginning 2005 was determinable. The specific dollar amount of that harm to the Plaintiffs in this action that was speculative at the time of the initial wrong, crystallized in 2016 upon the Plaintiff's discovery of the breach.

771.   Plaintiff is entitled to recover compensatory damages and punitive damages in an amount to be proven at trial.

**COUNT ELEVEN**
**VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT**
Ariz.Rev.Stat. §§ 44-1402, 44-1403 and 44-1408(B)
(All Defendants)

772.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

773.   The Defendants' conduct as alleged herein violated the Arizona Uniform State Antitrust Act § 44-1401, et seq.

774.   The Plaintiffs bring this action pursuant to §§ 44-1408(B) and 44-1415, and seek relief, including but not limited to injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees, and treble damages for Defendants' flagrant violation.

**COUNT TWELVE**
RESPONDEAT SUPERIOR
(All Defendant Entities)

775.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

776.   The Plaintiff reasonably interpreted Polsinelli's acts or omissions as indicating Attorneys Berke, Stevens, Goodwin and Harper had apparent authority. Polsinelli's employment of Berke, Stevens, Goodwin and Harper specifically empowered them to obtain the Plaintiff's confidential mandatory character and fitness disclosures, disseminate and use information from them to discriminate against the Plaintiff within the interdisciplinary niche market. Berke, Stevens, Goodwin and Harper were aided in the dissemination and discrimination by designated Polsinelli departments, offices and staff.

777.   The Plaintiff reasonably interpreted Doyle PC's acts or omissions as indicating Attorneys Doyle, Berman and Whales had apparent authority. Doyle PC's employment of Doyle, Berman and Whales specifically empowered them to obtain the Plaintiff's confidential mandatory character and fitness disclosures, disseminate and use information

from them to discriminate against the Plaintiff within the interdisciplinary niche market. Doyle, Berman and Whales were aided in the dissemination and discrimination by designated Doyle, PC departments, offices and staff.

778.   The Plaintiff reasonably interpreted the acts or omissions of the Maricopa County Justice Court and Maricopa County Board of Supervisor as indicating Presiding Judge Ore and Chief Clerk Perkins had apparent authority. The employment of Ore and Perkins specifically empowered them to obtain the Plaintiff's confidential mandatory character and fitness disclosures, disseminate and use information from them to discriminate against the Plaintiff within the interdisciplinary niche market. Ore and Perkins were aided in the dissemination and discrimination by designated Maricopa County Justice Court and Maricopa County Board of Supervisor departments, offices and staff.

779.   The Plaintiff reasonably interpreted the acts or omissions of the Maricopa County Superior Court as indicating that its Judges and Commissioners presiding over cases for which the Plaintiff was attorney of record had apparent authority. The Maricopa County Superior Court's employment of said Judges and Commissioners specifically empowered them to obtain the Plaintiff's confidential mandatory character and fitness disclosures, disseminate and use information from them to discriminate against the Plaintiff within the interdisciplinary niche market and those Judges and Commissioners were aided in the dissemination and discrimination by Maricopa County Superior Court departments, offices and staff.

780.   The Plaintiff reasonably interpreted Bowman & Brooke's acts or omissions as indicating Attorney Booker had apparent authority. Bowman & Brooke's employment of

Attorney Booker specifically empowered him to relocate and disseminate his Quarles & Brady files, knowledge of and experience with the Plaintiff's consumer report with him to Gordon Rees. Attorney Booker was aided in the relocation and dissemination of the Plaintiff's consumer report by designated Quarles & Brady and Bowman & Brooke departments and staff.

781.   The Plaintiff reasonably interpreted Gordon & Rees' acts or omissions as indicating Attorney Booker had apparent authority. Gordon & Rees' employment of Attorney Booker specifically empowered him to relocate his files, knowledge of and experience with the Plaintiff's consumer report with him to Gordon & Rees. Attorney Booker was aided in the relocation and dissemination by designated Quarles & Brady and Gordon & Rees departments, offices and staff.

782.   The Plaintiff reasonably interpreted Quarles & Brady's acts or omissions as indicating Attorney Evans had apparent authority. Quarles & Brady's employment of Attorney Evans specifically empowered him to acquire the Plaintiff's consumer report. Attorney Evans was aided in the acquisition by designated Quarles & Brady's departments, offices and staff.

783.   The Plaintiff reasonably interpreted Greenberg Traurig's acts or omissions as indicating Attorney Evans had apparent authority. Greenberg Traurig's employment of Attorney Evans specifically empowered him to relocate his files, knowledge of and experience with the Plaintiff's consumer report with him to Greenberg Traurig. Attorney Evans was aided in the relocation by designated Quarles & Brady and Greenberg Traurig departments, offices and staff.

784.   The Plaintiff reasonably interpreted Gallagher & Kennedy's acts or omissions as indicating Attorney Evans and Ross had apparent authority. Gallagher & Kennedy's employment of Evans specifically empowered him to relocate his files, knowledge of and experience with the Plaintiff's consumer report with him to Gallagher & Kennedy. Evans' employment with Gallagher & Kennedy empowered him with access to Ross' files, knowledge and experience with the Plaintiff's client file. Gallagher & Kennedy's employment of Ross specifically empowered him with access to Evans' files, knowledge and experience with the Plaintiff's consumer report. Evans was aided in the relocation by designated Greenberg Traurig and Gallagher & Kennedy departments, offices and staff.

785.   The Plaintiff reasonably interpreted the SBA's acts or omissions as indicating its officers, board, section and committee members who make trade recommendations within the interdisciplinary niche market, as well as its intake and staff attorneys and counsel who manage(d) bar charges by and against the Plaintiff within the interdisciplinary niche trade market had apparent authority. The SBA's employment of, delegation to and/or appointment of such officers, board, section and committee members, intake and staff attorneys, and counsel specifically empowered them to make trade recommendations and initiate investigations against the Plaintiff within the interdisciplinary niche market. The SBA officers, board, section and committee members, intake and staff attorneys, and counsel were aided in the facilitation of such recommendations and investigations by designated SBA departments, offices and staff.

786.   The Plaintiff reasonably interpreted the Arizona Supreme Court's acts or omissions as indicating the Committee on Character and Fitness, SBA, Attorney Discipline Probable

Cause Committee and the Presiding Disciplinary Judge had apparent authority. The Arizona Supreme Court's employment of delegation to and/or appointment of the Committee on Character and Fitness, SBA, Attorney Discipline Probable Cause Committee and the Presiding Disciplinary Judge specifically empowered them to distribution the Plaintiff's confidential mandatory disclosures and use them to instigate a disciplinary proceeding against the Plaintiff within the interdisciplinary niche market. The Committee on Character and Fitness, SBA, Attorney Discipline Probable Cause Committee and the Presiding Disciplinary Judge were aided in the dissemination and instigation by designated Arizona Supreme Court departments, offices and staff.

787.   The Plaintiff reasonably interpreted ASU and the Arizona Board of Regents' acts or omissions as indicating that Douglas J. Sylvester had apparent authority. ASU and the Arizona Board of Regents' employment of Douglas J. Sylvester specifically empowered him to claim innovation for the ASU Global Launch, Alumni Law Group and CLE Funded Scholarships programming, and upon information and belief impersonate the Arizona Supreme Court Presiding Disciplinary Judge. Douglas J. Sylvester was aided in such acts by designated Arizona Supreme Court, SBA, ASU and the Arizona Board of Regents' departments, offices and staff.

788.   The Plaintiff reasonably interpreted the IBERO's acts or omissions as indicating its Economic and Finance and International Relations Coordinators and Social Sciences, Continuing Education and Institutional Communication Directors had apparent authority. The IBERO's employment of its Coordinators and Directors specifically empowered them to enter into trade contracts I and II and approve joint accreditation and promotion of the

Plaintiff's ICES/SECI℠ International Fundraiser Series and approve the IBERO's participation in the Plaintiff's degree and licensing scholarship practical training internship within the interdisciplinary niche market.

789.   The Plaintiff reasonably interpreted the BUAP's acts or omissions as indicating its Institutional Communication and Continuing Education Directors had apparent authority. The BUAP's employment of such Directors specifically empowered them to approve joint accreditation and promotion of the Plaintiff's ICES/SECI℠ International Fundraiser Series and the ICJ's participation in the Plaintiff's degree and licensing scholarship practical training internship within the interdisciplinary niche market. The Institutional Communication and Continuing Education Directors were aided in such conduct by designated BUAP faulty, departments, offices and staff.

790.   The Plaintiff reasonably interpreted the ICJ's acts or omissions as indicating its Institutional Communication, Academic Quality and Continuing Education Directors had apparent authority. The ICJ's employment of such Directors specifically empowered them to approve Joint Accreditation and Promotion of the Plaintiff's ICES/SECI℠ International Fundraiser Series and the ICJ's participation in the Plaintiff's degree and licensing scholarship practical training internship within the interdisciplinary niche market. The Institutional Communication, Academic Quality and Continuing Education Directors were aided in such conduct by designated ICJ faulty, departments, offices and staff.

791.   The Defendants are responsible for the actions of their employees who were acting within the scope of their employment and authority.

792.   The Defendants' conduct occurred substantially within the authorized time and space limit of their employment and authority while engaged in their general duties.

793.   The words, comments, remarks, conduct and/or threats about, towards and/or against the Plaintiff made by act or omission of the Defendants occurred substantially within the authorized time and space limit of their employment and authority while engaged in their general duties.

794.   The Defendants' words, comments, remarks, conduct, threats, circumstantial ratifications by act or omission concerning the Plaintiff were motivated at least in part by a purpose to serve their trade activities.

795.   The Defendants' acts and omissions concerning the Plaintiff were an impulse or emotion which naturally grew out of or was incident to Defendants' directive to protect its stake in the trade, and to preserve their respective employment, career, partnership track investment and/or pension.

**COUNT THIRTEEN**
AGENCY
(All Defendant Entities)

796.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

797.   The employees and member(s) were the Defendants' expressed or implied actual agents.

798.   The employee(s) and member volunteer(s) had the actual authority of the Defendant(s) to commit the alleged conduct in conjunction with the assistance of the Defendant(s).

799.   The employee(s) and member volunteer(s) were acting under the control of the Defendant(s).

800.   The totality of the circumstances surrounding the conduct of the employee(s) and member volunteer(s) together with the words and conduct of the Defendant(s), demonstrate that the Defendant(s) impliedly authorized the conduct of the employee(s) and member volunteer(s).

801.   The facts and circumstances of this case demonstrate an understanding (by the Plaintiff, Defendant(s), employee(s) and member volunteer(s)) of the respective Defendant's authorized agency, and that there was at least an implied intention to create the authority of the respective employee and member volunteer as an agent of the Defendant.

802.   The employee and member volunteer is the respective Defendant's apparent agent(s).

803.   The apparent agency did not arise from the conduct of the employee alone. Whether intentionally or unintentionally, each Defendants caused the Plaintiff to believe the employee and member volunteer was the Defendant's authorized agent. As a result of each Defendant's words and conduct, the Plaintiff's reliance, though detrimental was reasonably justified.

804.   The employee and member volunteer are the respective Defendant's agent(s) by estoppel.

805.   Based on conduct alleged herein, the Plaintiff reasonably believed that the employee and member volunteer was the respective Defendants' authorized agent.

806.   The Defendants intentionally or carelessly caused such belief and were aware that the Plaintiff's believed the respective employee and volunteer member was the Defendant's authorized agent.

807.   The Plaintiff relied on this belief by performance or otherwise acts and omissions alleged herein and was injured thereby.

808.   The respective employees and member volunteers intended to act on behalf the Defendants.

809.   The employees intended to act on behalf Defendants IBERO, BUAP and ICJ by respective July 12, 2013, August 5, 2013 entry into trade Contracts I and II and September 24, 2013 approval of the ancillary Joint Accreditation and Promotion Agreement, as well as initial performances in accordance.

810.   The Defendants learned of the actions of their respective employee(s) or member volunteer(s) after they occurred and each Defendant exercised their choice and consent to ratify those employee actions and are therefore liable for those actions.

811.   The acts alleged herein constitute affirmance of Defendants IBERO, BUAP and ICJ by exercise of respective consent to entry into trade Contracts I and II and/or the

ancillary Joint Accreditation and Promotion agreement by their employed authorized agent(s).

812.   The Defendants IBERO, BUAP and ICJ exercised their choice and consent to be bound to trade Contracts I and II and/or the ancillary Joint Accreditation and Promotion agreement and accepted the benefits thereof including.

**COUNT FOURTEEN**
THIRD-PARTY BENEFICIARY
(Defendant IBERO)

813.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

814.   The Plaintiff and Defendants IBERO, BUAP and ICJ intended that the Plaintiff directly benefit from the Plaintiff's SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series registration fee commission set forth in trade Contract II and the ancillary Joint Accreditation and Promotion Agreement.

815.   The Plaintiff, and Defendants IBERO, BUAP and ICJ intended to recognize the Plaintiff's SLTLAW/SLTBE Project℠ Interdisciplinary Degree Licensing Scholarship and Practical Training Internship as the primary party in interest in relation to the ICES/SECI℠ International Fundraiser Series registration fee commission set forth in trade Contract II and the ancillary Joint Accreditation and Promotion Agreement.

816.   Trade Contract II, the August 22, 2013/October 4-21, 2013 email correspondence (attaching copies of the Intern Scholarship Announcement, Application and Contract) and the ancillary Joint Accreditation and Promotion Agreement collectively express the

mutual intent of the Plaintiff and the Defendants IBERO, BUAP and ICJ to benefit the Plaintiffs on behalf of the SLTLAW/SLTBE Project.

## COUNT FIFTEEN
BREACH OF CONTRACT
(IBERO, BUAP, ICJ)

817.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

818.   Trade Contract I is an express written, executed and validly enforceable agreement between the Plaintiff and the IBERO.

819.   Trade Contract II is an express written, executed and validly enforceable agreement between the Plaintiff and the IBERO.

820.   IBERO breached trade Contracts I and II.

821.   The Joint Accreditation and Promotion document is an express written, executed and validly enforceable ancillary agreement to trade Contract II between the Plaintiff and Defendants IBERO, BUAP and ICJ.

822.   Defendants breached the Joint Accreditation and Promotion Agreement.

823.   The Payment Guarantee is an express written, executed and validly enforceable ancillary agreement to trade Contract II between the Plaintiff and Defendant IBERO.

824.   IBERO breached the Payment Guarantee.

825.   The Modified Payment Guarantee is an express written, executed, invalid and unenforceable ancillary agreement to trade Contract II between the Plaintiff and Dr. Reyes.

826.   IBERO interfered with the Modified Payment Guarantee and caused its breach.

827.   The Conditioned Clarifications Modifying Trade Contract II is an express written, executed, invalid agreement between Plaintiff and Dr. Reyes, which was rendered unenforceable by fraud and duress suffered upon Dr. Reyes by the IBERO.

828.   The IBERO breach and interfered with the Conditioned Clarification Modifying Trade Contract II.

829.   It was foreseeable to Defendant IBERO when it entered into trade Contracts I and II, the trade Contract II ancillary Payment Guarantee and the trade Contract II ancillary Joint Accreditation and Promotion Agreement that the Plaintiff's damages caused by its breaches would probably result if the Contracts were breached.

830.   It was foreseeable to Defendant IBERO when it coerced Dr. Reyes to negotiate and enter into the Conditioned Clarifications Modifying trade Contract II that the Plaintiff's intentional inference and expectancy damages would probably result if the conditions were breached.

831.   It was foreseeable to Defendant BUAP when it entered into the trade Contract II ancillary Joint Accreditation and Promotion Agreement that the Plaintiff's damages caused by its breaches would probably result if the ancillary agreement was breached.

832.   It was foreseeable to Defendant ICJ when it entered into the trade Contract II ancillary Joint Accreditation and Promotion Agreement that the Plaintiff's damages caused by its breaches would probably result if the ancillary agreement was breached.

833.   As a result of the Defendants' breaches, the Plaintiff suffered antitrust injuries and is entitled to recover direct, consequential and treble damages in an amount to be proven at trial.

**COUNT SIXTEEN**
BREACH OF THE COVENANT OF GOOD
FAITH AND FAIR DEALING
(IBERO, BUAP, ICJ)

834.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

835.   The law implies special duties of care and protection upon Defendants IBERO, BUAP and ICJ created by the terms of trade Contract II identifying IBERO as the innkeeper/host of the guest Conference and the Plaintiff's premiere NAFTA authorized SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series benefitting the Project's Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship.

836.   Defendants IBERO, BUAP and ICJ assumed responsibility for logistical assistance for the event and fiduciary responsibility for the approved donation of a designated percental of the registration fees for scholarship funding.

837.   Defendants IBERO, BUAP and ICJ breached the duty of good faith and fair dealing.

838.   The public interest in Defendant IBERO upholding the duty of good faith and fair dealing implied in trade Contracts I and II, the trade Contract II ancillary Payment

Guarantee and Joint Accreditation and Promotion Agreement far outweighs any alleged spirit of free competition.

839.   The public interest in Defendants BUAP and ICJ upholding the duty of good faith and fair dealing implied in the trade Contract II ancillary Joint Accreditation and Promotion Agreement far outweighs any alleged spirit of free competition.

840.   Plaintiffs are entitled to recover treble antitrust consequential damages that resulted naturally and directly from the breach and punitive damages.

**COUNT SEVENTEEN**
FRAUDULENT MISREPRESENTATION
OR CONCEALMENT
(IBERO)

841.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

842.   The IBERO had a legal obligation to promptly, fully and accurately disclose to the Plaintiff all information and documents that may be relevant or otherwise requested the Plaintiff.

843.   The IBERO represented to Plaintiff that:

(1)   The trade Contract I research Article the Plaintiff was contracted to edit was solely for the valued purpose of securing U.S. publication.

(2)   The trade Contract II academic component of the Event that the Plaintiff was contracted to co-organize, plan and manage was a DAAD Alumni Sustainable Development Alternatives Conference with an *ecological theme* originated and organized by Dr. Reyes; and to be hosted and logistically coordinated by the IBERO.

(3)      The trade Contract II business component of the Event, the Plaintiff was permitted to organize, plan and manage on behalf of her SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series from which designated percentages of the registration fees benefit the Plaintiff, the SLTLAW/SLTBE Project Degree Licensing and Practical Training Internship, and the IBERO Undergraduate Degree in Economics and Finance.

844.   The trade Contract I representation(s) made Defendant IBERO were false.

845.   The trade Contract II representation(s) made by Defendant IBERO were false.

846.   Each representation pursuant to the Clarifying Conditions Modifying Trade Contract II was false.

847.   Each representation was material and sufficiently important to influence the actions of reasonable persons in the position of the Plaintiff.

848.   The IBERO knew that the trade Contract I representations were false.

849.   The IBERO knew that the trade Contract II representations were false.

850.   The IBERO intended the Plaintiff would act upon the representations in the manner reasonably contemplated by the IBERO.

851.   The Plaintiff did not know that the representations were false.

852.   The Plaintiff relied on the truth of the representations.

853.   The Plaintiff's reliance was reasonable and justified under the circumstances.

854.   As a result, the Plaintiff suffered antitrust injuries and is entitled to recover treble actual and consequential damages.

855.   The Plaintiff is entitled to a punitive damages award.

## COUNT EIGHTEEN
NEGLIGENT MISREPRESENTATION
(IBERO)

856.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

857.   Alternatively, the IBERO is liable to the Plaintiff for negligent misrepresentation.

858.   The IBERO either provided the Plaintiff with false or incorrect information that:

(1)   The trade Contract I research Article that the Plaintiff was contracted to edit was solely for the valued purpose of securing U.S. publication, or

(2)   Omitted or failed to disclose entry of the edited Article for presentation during the October 16, 2013 REINICIG Third International Conference on Management Sciences Entrepreneurship, Innovation and Organizational Learning: Facing the Upcoming Challenges as material information.

859.   The IBERO either provided the Plaintiff with false or incorrect information that:

(1)   The trade Contract II academic component of the Event that the Plaintiff were contracted to co-organize, plan and manage was a DAAD Alumni Sustainable Development Alternatives Conference with an *ecological theme* originated and organized by Dr. Reyes; and to be hosted and logistically coordinated by IBERO, **or**

(2)   Omitted or failed to disclose the IBERO's commitment that Plaintiff would manage the FOMIX International Seminar Project with a rural tourism theme on behalf of an undisclosed Enabling Capabilities program as material information.

(3)     The trade Contract II business component the Plaintiff was permitted to organize, plan and manage, on behalf of her SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraising Series, and from which a designated percentage of the registration fees would mutually benefit the Plaintiff, the SLTLAW/SLTBE Project℠ Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship, and the IBERO Undergraduate Degree in Economics and Finance, or

(4)     Omitted or failed to disclose the FOMIX/SECTUR International Seminar and FOMIX-CONACYT Enabling Capabilities Project grant and IBERO/ACACCI-COMPITE (OMC/UNCTAD)/FOMIX-CONACYT Contractual obligations as competing concerns and material information.

860.   The IBERO intended that the Plaintiff rely on the information provided and the IBERO provided it for that purpose.

861.   The IBERO failed to exercise reasonable care in obtaining or communicating the information.

862.   As a result, the Plaintiff suffered antitrust injuries and is entitled to recover treble actual and consequential damages.

863.   The Plaintiff is entitled to a punitive damages award.

**COUNT NINETEEN**
INTENTIONAL INTERFERENCE WITH A CONTRACT
(All Defendants)

864.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

865.   Defendants interfered with and caused the IBERO to beach trade Contracts I and II.

866.   Defendants interfered with and caused the IBERO, BUAP and ICJ to breach the trade Contract II ancillary Payment Guarantee.

867.   Defendants interfered with and caused the IBERO to breach the trade Contract II ancillary Payment Guarantee and Joint Accreditation and Promotion Agreement.

868.   Defendants interfered with and caused Dr. Reyes to breach the trade contract II ancillary Modified Payment Guarantee.

869.   Defendants interfered with and caused Dr. Reyes to breach the Conditioned Clarifications Modifying trade Contract II.

870.   Prior to entering into trade Contracts I and II, the IBERO was in possession of the Plaintiff's lucrative status temporary resident permit and commensurate independent professional immigrant work permit, in addition to the Plaintiff's minimum education and alternative credentials as a NAFTA Appendix 1603.D.1 authorized independent professional interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor.

871.   Prior to entering into the trade Contracts II ancillary Payment Guarantee, the IBERO was in possession of the Plaintiff's lucrative status temporary resident permit and commensurate independent professional immigrant work permit, in addition to the Plaintiff's minimum education and alternative credentials as a NAFTA Appendix

1603.D.1 authorized independent professional interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor.

872.   Prior to entering into the trade Contracts II ancillary Joint Accreditation and Promotion Agreement, the IBERO, BUAP and ICJ were in possession of the Plaintiff's lucrative status temporary resident permit and commensurate independent professional immigrant work permit, in addition to the Plaintiff's minimum education and alternative credentials as a NAFTA Appendix 1603.D.1 authorized independent professional interdisciplinary business law attorney, communication design strategist and entrepreneurial franchisor.

873.   The Defendants were aware of the existence of trade Contracts I and II.

874.    The Defendants were aware of the existence of the trade Contract II ancillary Payment Guarantee, Modified Payment Guarantee and Joint Accreditation and Promotion Agreement.

875.   The Defendants were aware of the existence of the Conditioned Clarifications Modifying trade Contract II.

876.   Defendants were aware of the mutual financial benefits to the Plaintiff, the SLTLAW/SLTBE Project and the IBERO Economics and Finance Undergraduate Degree Program,

877.   Defendants were aware of the trade Contract I future business expectancy from the ability to market the Plaintiff's editorial credit in the published Article.

878.   Defendants were aware of the trade Contract II future business expectancy from the ability to market the success of the Plaintiff's premier SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraising Series benefitting the Project's Interdisciplinary Degree and Licensing Scholarship and Practical Training Internship.

879.   Any alleged motives of the Defendants to advance, by wrongful means, any alleged opposing interests of the Enabling Capabilities Program and FOMIX International Seminar Project do not arise to a legitimate competitive reason to avoid liability.

880.   As a result of the Defendants' interference and resultant breaches by the IBERO, BUAP and ICJ, the Plaintiff suffered antitrust injuries and is entitled to recover tort and treble damages.

881.   It is reasonably probable the Plaintiff' profits would have been earned except for the breach.

882.   The loss of profits is the direct and natural consequence of the breach.

883.   The Plaintiff's lost profits can be shown with reasonable certainty.

884.   The Plaintiff is entitled to recover damages to reputation by loss of service and service product opportunities within the interdisciplinary niche market operating as an business law attorney, creative strategist and entrepreneurial franchisor on behalf of the SLTLAW/SLTBE Project.

885.   The Plaintiff is entitled to recover emotional suffering damages sustained.

886.   The Plaintiff is entitled to a punitive damage award.

/ / /

**COUNT TWENTY**

INTENTIONAL INTERFERENCE WITH BUSINESS EXPECTANCY
AND/OR PROSPECTIVE ECONOMIC ADVANTAGE
(All Defendants)

887.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

888.   The Plaintiff, on behalf of the SLTLAW/SLTBE Project, would have gained a net benefit had trade Contracts I and II and the trade Contract II ancillary Payment Guarantee and Joint Accreditation Agreement been performed and the Contract II entrepreneurial business expectancy been realized.

889.   It is reasonably probable that the Plaintiff would have earned a profit if the breach and interference had not occurred.

890.   The Plaintiff's loss of profits is the direct and natural consequence of the breach.

891.   The amount of the Plaintiff's lost profits can be shown with reasonable certainty.

892.   The Plaintiff can reasonably calculate the minimum profits she would have gained had the entrepreneur business expectancy of trade Contracts I and II and the trade Contract II ancillary agreements been realized.

893.   As an AJCU member, the IBERO's breach of trade Contracts I and II and the trade Contract II ancillary agreements more probably influenced consumers and end-user within the interdisciplinary niche market not to conduct business with the Plaintiff on behalf of the SLTLAW/SLTBE Project.

894.   As a result of the Defendants' conspiracy conduct, the Plaintiff suffers continuing antitrust injuries evidenced by:

(1)     August 3, 2009 lease purchase option offer of $850,000 from the Project House prototype Landlord, Tom Carmody.

(2)     Mid-August 2009 advice from Mark West, "You need to find a man, before it's too late. The best candidate is someone from Arizona because they will have less exposure to the options available in other places."

(3)     Early-September 2009 comment from HNBA Board Member Alex Navidad, "You're the type of woman not willing give up power. But just as I sometimes put my paralegals and assistants in check by telling them things that they do not want to hear or accept, you too need to recognize 'this is a man's world'."

(4)     Late-April 2010 question from Mark West, "Can you claim pro bono credit for all of the unrewarded hours you have worked?"

(5)     July 19, 2010 comment from Amen Iseghohi, "I can tell by the way Mark smiles and laughs around you that he respects your opinion. It is a sad shame that in order to get to Mark West, I have to through someone like you."

(6)     Around August 13, 2010 assertion by Attorney Dominguez of Dominguez, PC, "See for yourself -- your sister's bankrupt attorney is taking advantage her by charging your sister high attorneys' fees so she can pay her bills."

(7)     Mid-November 2010 caution from Mark West, "The community is looking for you to promote the appointment of qualified African-Americans to fill the vacant committee positions."

(8)     Mid-November 2010 suggestion from Mark West, "The circumstances of your present relationship could be motivation for you to consider building an immigration law practice."

(9)     February 24, 2011 commentary among Attorney Evans, ABBA President Richard and Judge Patterson (Retired), in anticipation of the Plaintiff being "extraordinarily challenged with navigating distinctions" between the constitutions, laws, judicial systems, and languages of the United States and United Mexican States.

(10)    March 2011 comment from Attorney Banks in acceptance of co-manage legal writing and research assignments, "At least you pay me."

(11)    Around June 2011 comment from Attorney LaShawn Jenkins, "You keep making the same mistake."

(12)    August, 2011 question from Wilford Rhine, "Do you only date Mexican men now?"

(13)    July 30, 2012 comment from potential the SLTLAW/SLTBE Project real estate transaction and boating sales practical training associate provider, René Contreras, "The United States Bankruptcy laws allow Americans to escape their financial obligations. I hear that you are intimately familiar with such bankruptcy process."

(14)    October 10, 2012 comment from the BUAP Faculty of Law and Social Sciences, "The BUAP does not give technical opinions supporting revalidation of Gringo law courses".

(15)    Mid-November 2012 suggestion from Dr. Reyes on how to deal with people who try to take over your work, "I just let them do it, because in the end, the work gets completed, so everything works out okay and I still end up looking good."

(16)    November 18, 2012 comment from Attorney Padilla, "The President can only serve two terms, I know this because it's in the Constitution."

(17)    Ongoing joke of Attorney Padilla, "You need to find an old rich man and marry him just before he dies."

(18)    September 11, 2013 comment from Sales Roa Jr., "My father taught me everything I know about our business. Your target market is distinct from the Cine&Mas target market, because we prefer to work with clients who actually have money and can afford to pay for our advertising."

(19)    May 11, 2013 comment from Leo Canales, "Yeah, heard you are looking for a man to take care of you. But first, we must surgically fix you so I can have a mixed-blood biological child."

(20)    Around August 9, 2013 respective comments from Adrian Reyes and Dr. Reyes. "There must be a man living here in the Project House with you!" and "If you have a problem with my son's conduct, you should appropriately address it to me instead of others."

(21)    Attorney Jesús Venegas' mid-August 2013 use of the stereotypical racial slur, "excrement" to describe the Plaintiff after she refused to be extorted into paying the Project House Landlord's pre-May 18, 2011 outstanding water consumption debt to the SOAPAP.

(22)    Around October 27, 2013 question from Dr. Reyes, "Do you want to be with a Black man?"

(23)    November 5, 2013 comment from BUAP Continuing Education Director Contreras comparing the Plaintiff's SLTLAW/SLTBE Project to *Mona Lisa Smile*, "Like Julia Roberts you will train young women to be good wives."

(24)    November 7, 2013 comment from Dr. Reyes, "I borrowed money from my brother to invest in my purchase of apartments that I now rent to students. I plan to pay him back one day. You too should invest your money wisely so you can repay your debts."

(25)    November 8, 2013 IBERO mandate that Dr. Reyes, "Authorize all IBERO recommended vendors and other third-party contractors to prepare all invoices in the name of Sylvia Lynne Thomas and personally guarantee payment."

(26)    November 8, 2013 comment from Dr. Reyes, "I can cover the prepayment deposits because I have my own money and established credit to do so."

(27)    November 11, 2013 comment from Dr. Reyes, "To the IBERO, the SLTLAW/SLTBE Project is a representation of you pointing your 'Uncle Sam' finger at México and questioning, 'what are YOU doing to help YOUR people?'"

(28)    October 16, 2013 comment from Dr. Reyes, "So, the great and powerful BUAP did not recommend any candidates for your intern scholarship program?"

(29)    December 2, 2013 comment from Dr. Reyes, "That's right, pay your vendors first. Yes, always pay your debts first."

(30)    December 4, 2013 comment from Dr. Reyes, "Oh well, guess you'll have to go find and invest in something else you love. But, keep working. Whatever you do, don't stop working."

(31)    Around December 4, 2013 comment from Dr. Reyes, "The IBERO will never recommend your trade services to any academic institutions or to my colleagues, so that you can cheat and overcharge them like you have done the IBERO."

(32)    Around December 4, 2013 comment from Dr. Reyes, "I prefer to work with the Enabling Capabilities FOMIX Project Coordinator, Cristina Pastrana López anyway, she has her own money, her own place, a big car, she enjoys spending time with me and my son, she is loyal, and she listens and learns."

(33)    Non-follow through of January 23, 2013 commitment from Maria Luisa Victoria García Rosas, Coordinadora de Incubadora de Negocios Dirección Rectoría UVM to schedule meeting with the Plaintiff and the UVM Rector.

(34)    January 27, 2014 comment and advice from Coordinadora García Rosas, "Everyone believes that you are angry. Your SLTLAW/SLTBE Project service offerings are duplicative of UVM University Network services."

(35)    March 5, 2014 distribution of distrust propaganda by IBERO legal representative Jesus Bernardo Rosas Pozos.

(36)    Spring 2013 comment from DGRIIA BUAP Student Program & Accommodation Coordinator Wendy Corte González, "the Project House contact information is on the list, but there is no counter space to accommodate your promotional flyer".

(37)   The Plaintiff did not acquire BUAP international academic exchange students to sublet Project House rooms during the Fall 2013 and Spring 2014 semesters.

(38)   Spring 2014 commentary from the Colegio de Ingenieros Civiles del Estado de Puebla, A.C. (CICEPAC), Colegio de Arquitectos de Puebla, AC (CAPAC), Ilustre Colegio de Abogados del Estado de Puebla, A.C. and Colegio de Notorias del Estado de Puebla in favor of their member participation in future SLTLAW/SLTBE Project ICES/SECI℠ International Fundraisers Series, "Only if there is an opportunity for everyone to make money."

(39)   Spring 2014 expectation from ICJ students that in exchange for their positive survey ratings, the Plaintiff would give good grades and overlook their overt plagiarism in lieu of master's level group stimulated critical thinking, illuminated ideas, strengthened points of view and shaped opinions in relation to the Foreign Investment Case Study of the SLTLAW/SLTBE Project.

(40)   April 22, 2014 to present non-response from the UDLAP Jefe del Departamento de la Licenciatura en Derecho, Dr. Carlos Julian y Nacer and Jefe del Departamento de Relaciones Internacionales y Ciencias Políticas, Embajador Eminente Raphael Stregner Cataño in relation to Dr. Leandro Rodriguez Medina's recommendation of the Plaintiff's proposed SLTLAW/SLTBE Project service offering emphasizing "…her willingness to undertake joint projects."

(41)   On around April 30, 2014 and late-October 2014 comments from Arizona Attorney Joe Padilla challenging the Plaintiff's knowledge of the peso-to-dollar exchange rate and ability to accurately calculate a peso-to-dollar exchange transaction.

(42)   May 9, 2014 comment from Attorney Benítez, "The problem is that you have not had much experience with upstanding men."

(43)   May 16, 2014 comment from Attorney Benítez, "If you had a husband, you would be obligated to keep your promises to him."

(44)   May 16, 2014 comment from Attorney Benítez. "You couldn't pay your bills in the United States and you still can't pay them in México, where the costs are much lower."

(45)   May 16, 2014 question from Attorney Benítez's assistant Alicia, "Did Attorney Benítez recommend you remove all references to your provision of services to the IBERO from your CV and the SLTLAW/SLTBE Project promotional materials?"

(46)   May 16, 2014 urging from Attorney Benítez, "You must help build my immigration practice."

(47)   May 16, 2014 command from Puebla Transit Police, outside of Attorney Benítez's office, "You must surrender the Project Car because the dark tinted windows are unlawful."

(48)   May 16, 2014 insistence from a strange man at the Project House door demanding, "Let me in! I made a payment and scheduled this appointment through Attorney Benítez, who gave me this remote control to the front gate!"

(49)   May 17, 2014, comment from ICJ student and Universidad Autónoma de Tlaxcala professor, "You can provide legal representation in Bankruptcy, you know, like what you did in the United States."

(50)   May 19, 2014 comment from ICJ Academic Secretary, Dr. Alexis Juárez Cao Romero, "We intend to invite the IBERO to participate in your SLTLAW/SLTBE Project services contracted by the ICJ."

(51)   May 21, 2014 comment from the *ICJ Quality Assurance Coordinator*, Mtro. Ernesto Galindo Báez, "Your opinion of men must change."

(52)   June 2014 advice from Attorney Benítez, "The IBERO Rector gave me this March 5, 2014 letter denying receipt of and benefit from your services. He said Dr. Thomas must first file her Complaint. Then and only then will our legal representative entertain discussing an out-of-court resolution."

(53)   June 2014 threat from Attorney Benítez, "If you don't pay the past due rent or move out of the house, I will report you to the SEGOB-INM as a pernicious person!"

(54)   June 10, 2014 SAT Notice of Sanctions alleging failure to comply with April 15, 2014 noticed fiscal year 2013 taxpayer obligation.

(55)   Around June 16, 2014 comment from Attorney Padilla, "You know who should be paid $50 per hour? The cashiers at McDonald's who take orders in English and repeat them in Spanish to the cooks. They should be paid $50 per hour!"

(56)   Non-follow through from ICJ Director, Dr. Julián Germán Molina Carrillo on June 16, 2014 commitment to confirm Board of Director's approval of the SLTLAW/SLTBE Project℠ Basic American Business Law Lecture Series.

(57)   June 17, 2014 advice from ICJ Postgraduate Academic Secretary, Mtra. Alejandra García Téllez, "Director Molina's preliminary approval of the SLTLAW/SLTBE Project Basic American Law Lecture Series was based on a mistaken

belief that Project's Lecture Series and ICES/SECI℠ International Fundraiser Series were one and the same."

(58)    Non-follow through from BUAP Continuing Education Department on June 24, 2014 commitment to schedule joint BUAP and ICJ faculty and departmental meetings in support of the Plaintiff's June 24, 2014 SLTLAW/SLTBE Project proposal.

(59)    Late June 2014 allegation by Attorney Benitez, "Your country doesn't care about you and would rather keep you here to become and remain insolvent."

(60)    July 11, 2014 comment from Lic. Gabriel Muñoz Cortés, Jefe Departamento Representación Legal Procuraduría de la Defensa de Contribuyente, "You are the problem…'I need to elaborate.'"

(61)    July 19, 2014 recommendation by Cine&Mas General Director Sales Roa, Jr. of three female instructors from the Centro de Idiomas Volks Wagen with whom the Plaintiff can, "Make friends and trade recipes or something."

(62)    August 18, 2014, comment from DGRIIA BUAP Coordinador el Área de Proyectos Especiales y Alianzas Estrategícas, Lic. Álvaro Figueroa González, "It is not necessary for BUAP to terminate the employment of Coordinadora de Hospedaje y Programa Wendy Corte González, when she could easily be transferred to work in another area."

(63)    August 27, 2014 comment from CineyMas Director General, Humberto Sales Roa, Jr, "I want assurance that our statement in support of the SLTLAW/SLTBE Project℠ service offerings cannot be mistaken for our agreement to provide you with economic support."

(64)   August 31, 2014 explanation from Pedro Juan Maravillas Sánchez, el Chef Ejecutivo del Grupo Estancia, "Because Lic. Gabino Gordillo, el Capitán del La Estancia Argentina Restaurante never informed me of the March 24-26, 2014 meetings, I did not attend." and subsequent question, "Does the Project's preference to female scholarship candidates mean that it does not benefit males?"

(65)   September 1, 2014 question from potential SLTLAW/SLTBE Project practical training associate provider, Fabián Gómez Hernández of Contra-Parte, "You know how to calculate the dollar to peso exchange rate? Come on, you know this, you can do it," and subsequent comment, "You cannot afford the rent on one of my condos. At least not right now."

(66)   September 4, 2014 mandate from SLTLAW/SLTBE Project practical training provider, Víctor Lobato Larios of Grupo Garay, "Right now, use your Project organizational chart to demonstrate how you, the Project and others will make money."

(67)   Non-follow through of CineyMas September 8, 2014 confirmation of its prior expressed interest in contracting Plaintiff to assist with its expansion into the U.S. market.

(68)   Non-response from the Plaintiff's Spring 2014 presentation of the SLTLAW/SLTBE Project℠ service offerings to over 40 collective universities, attorneys, law firms, professional associations, restaurants and businesses within the interdisciplinary niche market.

(69)    September 14, 2014 assertion from Dr. Osadolor, "You need to spend more time studying. Maybe someday you will be like Oprah Winfrey, but for now, you must start all over."

(70)    September 16, 2014 comment from Sales Roa, Jr., "Our support of your Project will be to provide practical training assignments, not finances. By the way, how do you like the payment arrangements for your rent?" The next day Sales Roa Jr., projected his comments to Plaintiff towards a silver-haired man (who drove a convertible sports car) sitting at the table below the television where Plaintiff regularly sits, "Sylvia, it's good to see that you are working. Now, all you have to do is lose the extra weight."

(71)    September 17, 2014 opinion of BUAP Continuing Education Director Contreras, "Insufficient advertising sabotaged the SLTLAW/SLTBE Project℠ November 28-29, 2013 premier ICES/SECI℠ International Fundraiser Series business component of the Conference Event at the IBERO."

(72)    September 24, 2014 characterization by the BUAP, ICJ, Dr. Osadolor, the SBA, ABBA and HNBA of the SLTLAW/SLTBE Project℠ ICES/SECI℠ International Fundraiser Series as a "Diplomádo Público" rather than a "Seminar" with a beneficiary scholarship and practical training internship component, as classified under the NAFTA Appendix 1603.D.1.

(73)    November 19, 2014 threat from Carmen Sales Roa to withdraw the Cine&Mas practical training support from the SLTLAW/SLTBE Project if the Plaintiff

did not agree to, "Hold the Yves Rocher Sales Event on Friday, November 28, 2014 and exclude certain Plaza Sole store owners from participation."

(74)    November 19, 2014 comment from Carmen Sales Roa, "You look very professional. Now, all you have to do is find a boyfriend."

(75)    November 21, 2014 comment from the BUAP Tamaulipas national academic exchange student Leslie Torres Soto, "If there was a man in the Project House all these challenges you are facing would lessen."

(76)    November 21, 2014 refusal of the BUAP, UDLAP and UPAEP international relations offices to collaborate in promoting a Yves Rocher SLTLAW/SLTBE Project practical training assignment to the Puebla international academic exchange student market on behalf of a Tamaulipas national academic exchange student.

(77)    November 21, 2014 insistence by Ms. Torres, "All income from the YR Event must be used to pay for student food and drinks during the Event," and request to "Arrive by bus and participate in the Yves Rocher Sales Event along with the other Mexican national university students, rather the facilitate as the practical training Event organizer."

(78)    November 24, 2014 allegation by Ms. Torres, "My contacts refused to collaborate in promoting my Yves Rocher practical training assignment to their international academic exchange student contacts."

(79)    November 24, 2014 discovery that Ms. Torres did not complete the advertising and marketing directives under the action checklist as committed to Yves Rocher within her Business Proposal.

(80)    December 22, 2014 comment from CineyMas Director Sales Roa, Sr., "You need to understand the concept of taking care of a man in exchange for him taking care of you. Now, repeat after me, 'Grandotes me pegan'," (translated big woman spank me).

(81)    January 8, 2015 SAT Notice of Extemporaneous Sanctions alleging failure to comply with July 21, 2014 noticed taxpayer obligation for nonpayment of fiscal year 2013 taxpayer obligation.

(82)    January 14, 2015 accusation from Judicial Secretary, Alfredo Louvier Hernández, "I mistakenly believed that the "X" striking through the co-signer signature block above your initials and those of Ms. Benítez on the Project House Rental Agreement represented Mr. Oropeza's signature as the co-signer."

(83)    January 16, 2015, refusal of Prodecon legal advisor Muñoz to petition the Federal Tax Court, under the pending appeal of the June 10, 2014 Sanction, for supplemental Addition of the January 8, 2015 Extemporaneous Sanction, alleged by the SAT to be a taxpayer obligation originated from the Plaintiff's alleged failure to comply with the Unique Accumulative Demand No. 401253EG000294; and in pursuit of a ruling that such Extemporaneous Sanction would logically cease to exist if the Court resolved the pending appeal in favor of the Plaintiff, or alternatively if the SAT granted the Plaintiff 100% percent Forgiveness of Taxpayer Sanction.

(84)    February 22-23, 2015 respective admission and evasion by Dr. Osadolor, "I had you investigated." and "I don't really know what you mean. I am upset with your statement. I do not think I would have time [to talk] anymore."

(85)    March 20-24, 2015, June 30, 2015, July 14, 2015 and November 4, 2015, Northstar Financial invitation to attend, "an exclusive educational financial planning luncheon event we are hosting for a small group of attorneys" and "a lunch discussion specifically addressing the financial concerns of attorneys" and "address the financial pitfalls many attorneys in your similar situation face".

(86)    April 10, 2015 refusal by the PRODECON Complaints and Claim Manager, Luis Carlos Ortega Martínez to petition for summary judgment or, alternatively, reference and attach evidence (of the SAT's fraudulent notice proving the Plaintiff did not evade service of process) within a pending pleading. Ortega commented, "The United States laws are not applicable in México so, this not an appropriate time to petition for summary judgment and not the appropriate pleading to assert such facts, make such arguments and attach such evidence. You are a taxpayer, not a client. The PRODECON will advise you of what pleadings to file, and when the appropriate time comes to present such arguments and evidence."

(87)    May 16, 2015 accusations from Attorney Benítez, "The Project House rental agreement was co-signed," and from Ms. Benítez, "I never agreed to wait to be paid by you after the IBERO's pays you."

(88)    July 1, 2015 unauthorized version of the Plaintiff's Allegations filed with the Federal Tax Court by PRODECON claims manager Ortega Martínez.

(89)    July 29, 2015 PRODECON representatives disregard for the Plaintiff's facts in preservation of mitigation, human rights, constitution, federal law and territoriality claims, while requesting the Plaintiff sign a version of the Forgiveness of Sanction Petition

address to SAT collection recovery and based on misguided legal analysis and convoluted, inaccurate facts regarding tax year eligibility and use of plural form sanctions; in addition to omission of pertinent exhibits and evidence,  accumulated demand recidivism refutation, accounts receivable financial incapacity refutation, nonpayment and boycott evidence, and trade contracts I and II performance terms.

(90)    August 27, 2015 comment from Clyde Granderson, "I can't believe that you let that man convince you to remove the University's name from your contract."

(91)    August 29, 2015 unlawful ouster of the Plaintiff from the Project House, removal of the Plaintiff's personal and business property and theft of the Project Car.

(92)    September 8, 2015 allegation and warning from Attorney Joe Padilla, "The problem before was you did not know how to make money. Now are you ready to return to Phoenix and be an attorney and only an attorney?"

(93)    Plaintiff's 2016 copyright infringement clients' recommendation that the Plaintiff use their proposed contingency fee sliding scale for, "All of your future litigation cases. So that your interest will be aligned."

(94)    Plaintiff's 2016 franchise agreement clients' challenge, "Are you going to run back to México with this money? At the current exchange rate, in México you'll be considered rich."

(95)    Attorney Antonio J. Dominguez's alleged June 6, 2016 assertion, "I do not know Attorney Sylvia L. Thomas. I do not understand why she emailed me a Litigation Preservation Notice," and subsequent alleged assertion, "Since my practice focuses on México, [I'm] not sure what [Respondent] is trying to accomplish with these emails. I'm

not sure why she is suing the Mexican University in A[rizona], I'm not sure if she is trying to prevent me to get potential client."

(96)    May 30, 2016 through June 30, 2016 calls to the Plaintiff's family members alleging their ownership of the property located at 531 E. Lynwood Street, Phoenix, Arizona.

(97)    October 5, 2016 to December 25, 2016 allegations that the Plaintiff contracted Tuberculosis and declined screening.

(98)    March 17, 2017 assertions allegedly from PDJ William J. O'Neil,

> Arguing the State Bar was conflicted the PDJ offered [the Plaintiff] opportunity to file the documents and response with Independent Bar Counsel or the Disciplinary Clerk not later than 4:00 p.m. [The Plaintiff] declined but swore under oath she would comply with the subpoena request not later than March 3, 2017.

> On March 14, 2017, [the Plaintiff] moved to "modify the imposed time limitations, vacate the effective date of the suspension and permanently stay all further [the] disciplinary proceedings; or alternatively immediately reinstate the respondent to the practice of law and permanently stay all further disciplinary proceedings." ("Motion").

> [The Plaintiff's] Motion is certified under Civil Rule 11. That rule requires that statements within a motion must be "formed after reasonable inquiry" and "well grounded in fact." The response of the State Bar with its attachments have again demonstrated the depth of [the Plaintiff's] disinclination to follow the Rules of the Supreme Court and any authority except her own.

> Law is a process of persuasion, and while oratory is a part of that process, justice is built upon objective adherence to rules, not false assertions designed to misdirect or fool the court rather than persuade it under the Rules. The facts are [The Plaintiff] knew as of receipt of the screening letter and that she

247

had an obligation to timely respond to it.  [The Plaintiff] has had since that date the ability to prepare that response from that time forward even under her arguments.  The self-declaration of the importance of a case [the Plaintiff] has yet to file is that her self-declaration supersedes the Rules and any contrary argument.  Instead of seeking relief from the clear directive established by the Supreme Court Rules, [the Plaintiff] also self-declared herself exempt and inaptly relied on her opinion that her self-declaration was unassailable.

No attorney has the authority to order the obligations imposed by the Supreme Court Rules as inapplicable.  No attorney has the authority to order a subpoena authorized by the Supreme Court under its rules inapplicable.  [The Plaintiff] went further.  When her motion was denied regarding that subpoena, she again presumptively self-declared her position as unassailable and intentionally refused to comply with the subpoena.

[The Plaintiff's] Motion repeatedly declares that which she knows is not true.  [The Plaintiff] emphasized in italics she had authority to state the State Bar was unopposed to her multiple stated positions.  At best she misunderstood the State Bar position. … [the Plaintiff's] Motion offers no good cause for the expansive relief she seeks and her conduct establishes a continuing troubling pattern; accordingly:

IT IS ORDERED admonishing Respondent, Sylvia Thomas.

(99)  March 18, 2017 post of interim suspension against the Plaintiff on the SBA website.

(100)  Non-response from Cruz Maria Diaz to the Plaintiff's April 6, 207 service offerings.

(101)  Non-response from Jodee Lynette to the Plaintiff's April 13, 2017 service offerings.

(102)  Non-response from Kara Peterson to the Plaintiff's April 15, 2017 service offerings.

895.   Such harm would not have occurred but for the breach and interference.

**COUNT TWENTY ONE**
DEFAMATION
(All Defendants)

896.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

897.   In furtherance of the anticompetitive conspiracy conduct, the Defendants made defamatory statement(s) that were false and calculated to, and do, expose the Plaintiff and the Plaintiff's trade services to disrepute, contempt and ridicule. The Defendants' defamatory statement(s) attacked the Plaintiff's integrity, virtue and reputation.

898.   The Defendants' made such false and defamatory statements about the Plaintiff, at the time knowing the statements were false and defamatory, in reckless disregard of the truth of the statements, or negligently failing to ascertain the truth of the matters stated.

899.   The Defendants published the statements to a third-party.

900.   The published statements, individually and collectively, referred to herein have caused, are causing, and will cause the Plaintiff to suffer injury to her professional standing, to her reputation and good name; and, they have held and will continue to hold the Plaintiff up to public scandal and ridicule.

901.   By such published statements, the Defendants did injure the Plaintiff's reputation within the interdisciplinary niche market (encompassing trade within and between the United States, México and other foreign countries), within her personal and professional circles, and in the community at large.

902.    The published statements have adversely impacted the Plaintiff's scholarly credibility, and opportunities for writing, editing, lecturing, public speaking, and book sales.

903.    The published statements have proximately caused the Plaintiff to suffer antitrust injuries not limited to reputation impairment, impairment of community standing or future standing, emotional distress, humiliation, inconvenience, anxiety and future anxiety and monetary loss, which are continuing.

904.    The Plaintiff is entitled to compensatory and actual damages.

905.    The Plaintiff is entitled to a punitive damage award.

**COUNT TWENTY TWO**
AIDING AND ABETTING
(All Defendants)

906.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if fully set forth herein.

907.    The Defendants engaged in the anticompetitive conspiracy conduct described herein.

908.    Each Defendant was aware that the other Defendants engaged in the conspiracy conduct.

909.    Each Defendant provided substantial assistance or encouragement to another Defendant with the intent of furthering and promoting the conspiracy conduct.

910.    The Defendants aided and abetted in the conspiracy conduct and are therefore liable for the consequences of such conspiracy conduct.

911.   The Plaintiffs suffered antitrust injuries and are entitled recover actual and consequential.

912.   The Plaintiff is entitled to a punitive damage award.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and for judgment against Defendants, and each of them jointly and/or severally as appropriate by law, as follows:

1.     Grant to the Plaintiff immediate preliminary and permanent injunctive relief against the Defendants, by Order:

a.     Prohibiting or otherwise perpetually staying all current and future disciplinary proceedings against the Plaintiff by the Defendants State Bar of Arizona and the Arizona Supreme Court.

b.     Prohibiting the Defendants from further distribution of the false and misleading information and otherwise defamatory statements.

c.     Directing Defendants to correct the antitrust injurious effects that their false and misleading information and otherwise defamatory statements created.

d.     Prohibiting the Defendants sale, trade, auction, exchange and otherwise disposal of Plaintiffs' 2002 Volkswagen Passat and other business and personal property unlawfully seized.

e.     Directing Defendants to return the Plaintiffs' 2002 Volkswagen Passat and other business and personal property unlawfully seized.

2.     Adjudge and decree that Defendants have monopolized the interstate trade and commerce within the interdisciplinary niche market for the provision of (business law and

communication design interdisciplinary continuing education) seminars, conferences, practical training functions and related services and products in violation Sections 2 of the Sherman Act;

3.      Adjudge and decree that Defendants have entered into unlawful contracts, combinations and conspiracies which unreasonably restrain the trade in interstate commerce within the interdisciplinary niche market for the provision of (business law and communication design interdisciplinary continuing education) seminars, conferences, practical training functions and related services and products in violation Section 1 of the Sherman Act;

4.      Adjudge and decree that the understanding, contract, combination and conspiracy between Antonio J. Dominguez and Forakis Law Firm and/or Nexo Legal and Christine Cracchiolo aka Christine Goodson Forakis to be unlawful and in violation of Section 7 of the Clayton Act.

5.      Adjudge and decree that the understanding, contract, combination and conspiracy between Antonio J. Dominguez, Nexo Legal and the Arizona Supreme Court, State Bar of Arizona, Arizona State University and/or Attorney Ronald Logan to be unlawful and in violation of Section 7 of the Clayton Act.

6.      The Defendants and all persons, firms and corporations acting on their behalf and under their direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out or renew, any understandings, contracts, agreements, practices or understandings in violation of the Sherman Act and/or the Clayton Act.

7.       Adjudge and decree that Defendants violated Sections 3, 4, 7, 14 and 16 of the Clayton Act;

8.       Adjudge and decree that Defendants violated Section 6a of the Foreign Trade Antitrust Improvements Act;

9.       Adjudge and decree that Defendants violated Sections 8 and 9 of the Wilson Tariff Act;

10.       Adjudge and decree that Defendants violated Section 43 of the Landham Act;

11.       Adjudge and decree that Defendants violated Sections 1581, 1584, 1589, 1590, 1592, 1593A, 1594, 1595, 1952, 1961(1)(B) and 1962(b) of the RICO Act;

12.       Adjudge and decree that Defendants violated 42 U.S.C. § 2000d of the Civil Rights Act;

13.       Adjudge and decree that Defendants' conduct constitutes 42 U.S.C. § 1983 Civil Rights Act violations of the First, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, Thirteenth and Fourteenth Amendments of the United States Constitution;

14.       Adjudge and decree that Defendants violated Articles 904(3)-(4), 1202-1205, 1210, 1501-1502 and 1601-1602 of the NAFTA;

15.       Adjudge and decree that Defendants violated Article 1 of the Convention Concerning the Abolition of Forced Labor;

16.       Adjudge and decree that Defendants violated Articles 2(b) and 5 of the Convention to Suppress the Slave Trade and Slavery and Section I, Article I of its Supplement;

17.     Adjudge and decree that Defendants violated Articles 2, 4-5, 13-14 and 16 of the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment;

18.     Adjudge and decree that Defendants violated Articles 2, 3, 5, 8, 11(c) and 16 of the Convention for the Elimination of All Forms of Discrimination Against Women;

19.     Adjudge and decree that Defendants violated Articles 1-5, 8, 10-11, 14 and 16 of the Convention for the Elimination of all Forms of Racial Discrimination;

20.     Adjudge and decree that Defendants violated Articles 1-3, 7-8, 17-20, 23 and 26 of the Convention on Civil and Political Rights;

21.     Adjudge and decree that Defendants violated Articles 1-3, 6, 10 and 15 of the Convention on Economic, Social and Cultural Rights;

22.     Adjudge and decree that Defendants violated Article 1 of the Convention on Consent to Marriage and Principle 1 of its Recommendation;

23.     Adjudge and decree that Defendants violated § 200bb-1(a) and (b) of the Religious Freedom Restoration Act;

24.     Adjudge and decree that Defendants' activities violated FCRA §§ 1681 b(f) and 1681w;

25.     Adjudge and decree that Defendants' activities violated Article 2, Section 6 of the Arizona Constitution;

26.     Adjudge and decree that Defendants' activities violated A.R.S. §§ 44-1402, 44-1403 and 44-1408(B);

27.     Adjudge and decree that Defendants' activities violated A.R.S. § 13-2006(A)(3);

28.     Enjoin and restrain, pursuant to federal and state law, the Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf of in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having similar purpose or effect to the anticompetitive conspiracy conduct set forth above;

29.     For an accounting of, and the imposition of a constructive trust with respect to all revenues received by each Defendant as a result of their violations.

30.     Award to the Plaintiff disgorgement of the Defendants' ill-gotten gains, unjust enrichment and any other equitable relief as the Court finds appropriate to redress the Defendants' violations of federal or state antitrust laws and to restore competition;

31.     Award to the Plaintiff damages to the extent sought pursuant to the applicable state laws as enumerated in Counts 10-22 of this Complaint;

32.     Award to the Plaintiff actual, consequential, compensatory and tortious damages suffered by Plaintiffs, in an amount to be proven at trial.

33.     Award to the Plaintiff treble damages pursuant to federal and state laws.

34.     Award to the Plaintiff attorneys' fees, costs and disbursements in this action (including for expert witnesses).

35.     Award to the Plaintiff prejudgment and post-judgment interest according to law.

36.     Award to the Plaintiff punitive damages in an amount to be determined at trial.

37.     That the Plaintiff have such other and further equitable relief as justice may warrant under the circumstances otherwise may be deemed just and proper by this Court to restore

competitive conditions within the interdisciplinary niche market affected by the

Defendants' unlawful conduct.

Dated: May 8, 2017                              Respectfully submitted,

                                               By:   /s/Sylva L. Thomas
                                               Sylvia L. Thomas (AZ Bar No. 023845)
                                               THE LAW OFFICE OF SYLVIA L.
                                               THOMAS, LLC
                                               P.O. Box 1584
                                               Tempe, Arizona 85280-1584
                                               Tel.: 480.273.9431
                                               Email: sylvia.thomas@sltlaw.net
                                               *Attorneys for Plaintiffs*